**Nos. 26-1231, 26-1232**

**In the United States Court of Appeals for the Ninth Circuit**

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

THE STATE OF OREGON, et al.,
*Defendants-Appellees,*

OUR OREGON, et al.,
*Defendants-Intervenors-Appellees.*

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

SHIRLEY WEBER, et al.,
*Defendants-Appellees,*

NAACP, et al.,
*Defendants-Intervenors-Appellees.*

**On Appeal from the United States District Courts
for the District of Oregon and the Central District of California**

**Brief *Amicus Curiae* of America's Future and
Citizens United in Support of Plaintiff-Appellant and Reversal**

MICHAEL BOOS
 Washington, DC  20003

PATRICK M. MCSWEENEY
 Powhatan, VA  23139

RICK BOYER
 Lynchburg, VA  24506

JEREMIAH L. MORGAN*
WILLIAM J. OLSON
  WILLIAM J. OLSON, P.C.
 370 Maple Avenue W., Suite 4
 Vienna, VA  22180-5615
  (703) 356-5070
*Counsel of Record
*Attorneys for Amici Curiae*
March 25, 2026

## DISCLOSURE STATEMENT

The *amici curiae* herein, America's Future and Citizens United, through their undersigned counsel, submit this Disclosure Statement pursuant to Federal Rules of Appellate Procedure 26.1, 29(c). These *amici curiae* are non-stock, nonprofit corporations, which have no parent company, and no person or entity owns them or any part of them.

The *amici curiae* are represented herein by Jeremiah L. Morgan, who is counsel of record, and William J. Olson, of William J. Olson, P.C., 370 Maple Avenue West, Suite 4, Vienna, Virginia 22180-5615. These *amici* are also represented herein by: Michael Boos of Citizens United, 1006 Pennsylvania Avenue, SE, Washington, DC 20003; Patrick M. McSweeney of 3358 John Tree Hill Road, Powhatan, VA 23139; and Rick Boyer of Integrity Law Firm, P.O. Box 10953, Lynchburg, VA 24506.

*s/Jeremiah L. Morgan*
Jeremiah L. Morgan

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    *U.S. v. Weber* — Central District of California. . . . . . . . . . . . . . . . . . . . . . .  1

    *U.S. v. Oregon* — District of Oregon . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

ARGUMENT

I. THE COURT BELOW DISREGARDED THE CLEAR MEANING OF THE CONTROLLING STATUTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    A. The District Court's Amalgamated Purpose Analysis . . . . . . . . . . . .  5

    B. Civil Rights Act of 1960 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

    C. National Voter Registration Act of 1993 . . . . . . . . . . . . . . . . . . . .  7

    D. The Protection of Congressional Authority Rationale . . . . . . . . . . . .  8

II. THE DISTRICT COURT INVERTED THE SUPREMACY CLAUSE TO SUBORDINATE FEDERAL LAW TO STATE LAW . . . . . . . . . . . . . . . . . . . . . . .  12

III. THE COURT BELOW HAD NO AUTHORITY TO REJECT THE GOVERNMENT'S "PURPOSE AND BASIS" FOR ITS INFORMATION REQUEST AS "PRETEXTUAL". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

IV. THE DECISIONS BELOW ARE PART OF A TROUBLING RECENT TREND TOWARD AN IMPERIAL JUDICIARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

V.      THE CHINESE GOVERNMENT MAY HAVE BEEN ALLOWED GREATER
        ACCESS TO VOTER ROLLS THAN THE FEDERAL GOVERNMENT . . . . . . . . . . 18

VI.     OREGON SHARES ITS VOTER LIST WITH OTHER STATES AND NON-
        GOVERNMENTAL ORGANIZATIONS, BUT REFUSES TO SHARE IT WITH
        THE FEDERAL GOVERNMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## TABLE OF AUTHORITIES

Constitution
Article I, Section 4, Clause 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Statutes
52 U.S.C. § 20507 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
52 U.S.C. § 20701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9
52 U.S.C. § 20703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 9, 17
Civil Rights Act of 1960 (52 U.S.C. §§ 20701-20706). . . . . . . . . . . . . 3, *passim*
National Voter Registration Act of 1993 (52 U.S.C. §§ 20501-20511) . . 3, *passim*
Help America Vote Act of 2002 (52 U.S.C. §§ 20901-21145) . . . . . . . . . . . 3,5,13

Cases
*Am. C.R. Union v. Philadelphia City Commissioners*,
     872 F.3d 175 (3d Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
*BedRoc Ltd., LLC v. United States*, 541 U.S. 176 (2004) . . . . . . . . . . . . . . 11, 12
*EPIC Systems Corp. v. Lewis*, 584 U.S. 497 (2018) . . . . . . . . . . . . . . . . . . . 17
*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . 18
*Gibbons v. Ogden*, 22 U.S. 1 (1824) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
*J.B. v. United States*, 916 F.3d 1161 (9th Cir. 2019). . . . . . . . . . . . . . . . . . 12, 17
*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). . . . . . . . . . . . . . . . . . . 15, 16
*Lamie v. United States Tr.*, 540 U.S. 526 (2004). . . . . . . . . . . . . . . . . . . . . 9, 10, 17
*League of Women Voters of the U.S. v. Harrington*,
     560 F. Supp. 3d 177 (D.D.C. 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
*Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025) . . . . . . . . . . . . . . . 18
*Nakano v. United States*, 742 F.3d 1208 (9th Cir. 2014). . . . . . . . . . . . . . . 12, 17
*Pacito v. Trump*, 2026 U.S. App. LEXIS 6586 (9th Cir. 2026) . . . . . . . . . . . 16, 17
*Pennington v. Coxe*, 6 U.S. 33 (1804) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11
*Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024). . . . . . . . . . 14
*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*United States v. California*, 921 F.3d 865 (9th Cir. 2019) . . . . . . . . . . . . . . . . . 14
*United States v. Fisher*, 6 U.S. 358 (1805) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6
*Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068 (10th Cir. 2025). . . . . . . 10
*Wheeler v. Smith*, 50 U.S. 55 (1850) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Miscellaneous

Antonin Scalia & Bryan Garner, Reading Law (2012) . . . . . . . . . . . . . . . . . . . . . . . 11

John Solomon & Jerry Dunleavy, "Britain had meltdown when China hacked voter files, but U.S. intel kept it secret in America," *Just The News* (Mar. 16, 2026). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Kristi Stahr & Michael Greibrok, "THE GREAT EXIT: Why States are Leaving Politically Driven ERIC and Why More States Should Follow," *Foundation for Government Accountability* (Dec. 13, 2023) . . . . . . . . . . . 20

Hans von Spakovsky & J. Adams, "Maintaining Accurate Voter Registration Rolls: The Need to Rehabilitate the ERIC Program or Form an Alternative," *The Heritage Foundation (*Apr. 19, 2023). . . . . . . . . . . . . . . 21

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* America's Future and Citizens United are nonstock, not-for-profit organizations, exempt from federal income taxation under sections 501(c)(3) and 501(c)(4) of the Internal Revenue Code, dedicated, *inter alia*, to the correct construction, interpretation, and application of law. *Amici* participate actively in the public policy process and have filed numerous *amicus curiae* briefs in federal and state courts.

## STATEMENT OF THE CASE

Before the court are district court decisions from California and Oregon involving the same issue — federal government access to state voter registration lists.

### *U.S. v. Weber* — Central District of California

On July 10, 2025, the Civil Rights Division of the U.S. Department of Justice ("DOJ") requested that the California Secretary of State provide an electronic copy of California's voter registration list, as well as various other

---

[1] Counsel for the parties have consented or not objected to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members or their counsel contributed money that was intended to fund preparing or submitting this brief.

1

information.  California refused, saying it would provide a redacted list for DOJ inspection at the Secretary of State's office, but certain information would be redacted.  After further correspondence between California and the DOJ, with California continuing to refuse to provide an unredacted copy of the voter registration list, the DOJ filed suit in the Central District of California on September 25, 2025, seeking court enforcement of its demand.

California filed a motion to dismiss on November 7, 2025, and the intervenor-defendants also filed motions to dismiss.  On January 15, 2026, the district court granted the motion to dismiss, finding that "the DOJ's proffered statement and purpose, as required under the statute, is both lacking in depth and is contrived."  *United States v. Weber*, 2026 U.S. Dist. LEXIS 8545, *23 (C.D. Cal. 2026) ("*Weber*").

The district court "grounded" its decision on a series of illegal motives that it imputed to the federal government.

> Now it seems the Executive Branch of the United States government **wants to abridge** the right of many Americans to cast their ballots. This is what this case is **grounded in** — the right to vote and the government's obligation to protect that right....  The DOJ's request for the sensitive information of Californians stands to have a chilling effect on American citizens like political minority groups and working-class immigrants who may consider not registering to vote or skip casting a ballot because they are worried about how their information will be used.  [*Id*. at *4, *8 (emphasis added).]

The district court held that the DOJ had not complied with the Civil Rights Act ("CRA"), which requires a written statement of the purpose and basis for the demand for the voter information. *Id*. at *24. Instead, the court imputed ulterior motives for the DOJ's request, hidden behind the DOJ's "pretextual, formalistic explanations." *Id*. at *29. The court believed that the real reason for the request was "comprehensive data collection" and immigration enforcement. *Id*. at *30-32. The court also held that the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA") do not require California to provide unreadacted voter registration information to the DOJ, and that federal privacy laws also prevent compliance with the DOJ's demand.

### *U.S. v. Oregon* — **District of Oregon**

Similar to the facts underlying the California litigation, on July 16, 2025, the DOJ requested Oregon's voter registration list from the Oregon Secretary of State. After Oregon's refusal, the DOJ filed suit in the District of Oregon on September 16, 2025. On February 5, 2026, the district court granted Oregon's motion to dismiss.

The court asserted that neither NVRA nor HAVA allowed the federal government access to unreadacted voter registration information. The court believed that the DOJ's demand letter did not provide a sufficient "basis and

3

purpose" for the demand as required by the CRA.  Accordingly, the court dismissed the complaint without leave to amend.  *See United States v. Oregon*, 2026 U.S. Dist. LEXIS 25259, \*39 (D. Ore. 2026).

The Oregon court relied on the *Weber* decision as having established "the true purpose of Plaintiff's voter data requests across the states."  *Id*. at \*32.  The court perceived DOJ's "ulterior motives," and stated, "[t]he presumption of regularity that has been previously extended to Plaintiff that it could be taken at its word ... no longer holds."  *Id*. at \*34.

<strong>ARGUMENT</strong>

This case involves appeals from Oregon and California district courts, but sections I-III of this *amicus* brief address only the California decision, and section VI addresses only the Oregon decision.  Nevertheless, these *amici* hope that this brief is helpful to the Court in resolving both appeals.

## I.     THE COURT BELOW DISREGARDED THE CLEAR MEANING OF THE CONTROLLING STATUTES.

This case could and should have been resolved by the district court simply turning to the text of the relevant statutes.  Instead, the district court chose to fashion a common legislative history for all three laws and use that imagined

4

history to override the text. Where the meaning of the language of a statute is plain, it is not just the citizens, but the courts too, are bound by its plain meaning.

## A.    The District Court's Amalgamated Purpose Analysis.

The district court opened its opinion not with any reference to the text of these statutes, but rather with four pages of paeans to "democracy," references to the evils of "Jim Crow" laws, and its imagined view that a single congressional intent undergirded the following three federal laws enacted over a 42-year period:

> (i) the Civil Rights Act of 1960;
> (ii) the National Voter Registration Act of 1993; and
> (iii) the Help America Vote Act of 2002.

Based on the one single purpose of these three laws, the court decided the case:

> In passing Title III of the Civil Rights Act ("Title III"), the NVRA, and HAVA, Congress' intent was clear — ensuring that **all Americans**, regardless of **race**, are **able to vote** without fear or distress. [*Weber* at *7.]

Concluding that "race" was the only concern of Congress, the district court did not even entertain the possibility that Congress wanted only "eligible" Americans to vote, asserting that "all" Americans should be able to vote. *Id*.

The district court ignored the wise counsel that judges should begin with text, not the legislative history. As Chief Justice Marshall asserted: "[w]here a law is plain and unambiguous, whether it be expressed in general or limited terms,

5

the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction." *United States v. Fisher*, 6 U.S. 358, 399 (1805).

### B. Civil Rights Act of 1960.

The text of Section 301 of the Civil Rights Act first requires the preservation of records with respect to federal elections:

> Every officer of election shall **retain and preserve**, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, **all records** and papers which come into his possession relating to any application, **registration**, payment of poll tax, or other act requisite to **voting** in such election.... [52 U.S.C. § 20701 (emphasis added).]

Then, another section of the CRA makes a clear grant of power to the Attorney General to require the release of any information related to voting, by the states to the federal government, upon demand. Section 303 states:

> **Any record** or paper required by section 20701 of this title to be retained and preserved shall, **upon demand in writing by the Attorney General** or his representative directed to the person having custody, possession, or control of such record or paper, be **made available** for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor. [52 U.S.C. § 20703 (emphasis added).]

6

The government summarized Section 303 as follows:

> Section 303[] authorizes the Attorney General or her representative to demand in writing that "the person having custody, possession, or control of such record[s] or paper[s]" make them "available for inspection, reproduction, and copying." 52 U.S.C. § 20703. [Brief of Appellant, *U.S. v. Weber*, at 3.]

## C.    National Voter Registration Act of 1993.

Supplementing the CRA requirement of disclosure to the Attorney General, the NVRA requires voter information to be available for inspection by the general public. When records are withheld, NVRA provides the general public with a private cause of action if voter records are denied, in the interest of helping ensure transparent and accurate voter records. NVRA Section 8(i) states:

> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, **all records** concerning the implementation of programs and activities conducted for the purpose of ensuring the **accuracy** and currency of official lists of **eligible voters**, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered. (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made. [52 U.S.C. § 20507(i) (emphasis added).]

The government summarized this section, as follows:

7

The plain text of Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…."  52 U.S.C. § 20507(i)(1).  **That includes the voter registration list**, which necessarily must be used to ensure the accuracy of the official list of eligible voters, and is some of the best evidence of a state's voter list maintenance efforts.  [*Weber*, Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Dkt. 63) at 22 (Nov. 18, 2025) (emphasis added).]

Even if state privacy statutes were interpreted to authorize redaction of certain information regarding Social Security or voter ID numbers before release to the public under the NVRA, it would present no bar to release to the federal government under the CRA, which deals with the broad investigative authority of the Attorney General.  In fact, such redactions would defeat the  purpose, as expressed in the CRA's text, that "all records and papers ... relating to ... voting" are within the Attorney General's power to compel.

### D.    The Protection of Congressional Authority Rationale.

The district court invoked a novel principle to reject the Attorney General's request, not claiming that it is protecting California under the doctrine of Federalism, but protecting Congress from the Executive Branch, upholding the Separation of Powers:

It is not for the Executive, or even this Court to authorize the use of civil rights legislation as a tool to forsake the privacy rights of

8

millions of Americans.  That power belongs solely to Congress. [*Weber* at \*5.]

The court's phrase "forsak[ing] the privacy rights of millions of Americans," is considerably over the top.  Nothing in the statutes suggests, as the court does, that state governments may know who their registered voters are, but the federal government may not.  Federal and State elections are held simultaneously, and it would appear that the federal government would have no less of an interest than a state in ensuring that the voter rolls include only eligible voters.  The very existence of Sections 301 and 303 stands against the district court's suggestion that Congress intended state voter records to be kept in hermetically sealed containers, open to state officials, but sealed against federal "prying eyes."  *Weber* at \*22.

As the Supreme Court has made clear, the district court's rejection of the text and reliance on its preferred reading of congressional "intent" does not protect, but actually undermines, congressional authority.  "If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent.  It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think ... is the preferred result." *Lamie v. United States Tr.*, 540 U.S. 526, 542 (2004) (internal quotation

9

omitted). "The starting point in discerning congressional intent is the existing statutory text.... It is well established that when the statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms." *Id.* at 534.

Further, in its reliance on "intent," the court ruled as if the intent of all three statutes involved only race. The court disregarded that, in NVRA, Congress set out several purposes:

> The NVRA has four enumerated purposes: (1) to establish procedures that will increase the number of **eligible** citizens who register to vote in elections for Federal office; (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of **eligible** citizens as voters in elections for Federal office; (3) to protect the **integrity** of the electoral process; and (4) to ensure that **accurate** and current voter registration rolls are maintained. [52 U.S.C.] § 20501(b). [*Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1079 (10th Cir. 2025) (emphasis added).].

The purpose of protecting the "integrity" of the electoral process by ensuring current and "accurate" voter rolls containing only "eligible" citizens is a congressional charge devoid of any racial component whatsoever.

The district court does not protect Congress by ignoring Chief Justice Marshall's instruction that "a law is the best expositor of itself." *Pennington v.*

10

*Coxe*, 6 U.S. 33, 52 (1804). "The sovereign will is made known to us by legislative enactment." *Wheeler v. Smith*, 50 U.S. 55, 78 (1850).

As Justice Scalia and Bryan Garner wrote, "Naturally, if one views the text as defining and therefore confining, there is hardly a better way to unshackle oneself than to minimize [the text] by calling it mere 'evidence'" of what the law actually is.[2] Of particular application here is Professor Laurence Tribe's humorous observation: "I never cease to be amazed by the arguments of judges ... who proceed as though legal texts were little more than interesting documentary evidence of what some lawmaker had in mind." *Id*. (quoting L. Tribe, "Comment").

Chief Justice Rehnquist wrote for the Court in 2004, "[t]he preeminent canon of statutory interpretation requires us to presume that [the] legislature says in a statute what it means and means in a statute what it says there. Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (internal quotation omitted). The Court continued, "our longstanding precedents

---

[2] Antonin Scalia & Bryan Garner, <u>Reading Law</u> at 398 (Thomson West 2012).

... permit resort to legislative history only when necessary to interpret ambiguous statutory text." *Id.* at 187 n.8.

Finally, it should be noted that these principles of interpretation have long been recognized in this Circuit. "The plain meaning of a statute is always controlling unless that meaning would lead to absurd results.... It is only when statutory terms are ambiguous, that is, open to more than one plausible interpretation ... that courts may look to legislative history." *Nakano v. United States*, 742 F.3d 1208, 1213-14 (9th Cir. 2014) (internal quotation omitted). "Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms.... Only if this approach leaves or reveals ambiguity may we turn to extrinsic evidence such as legislative history.... [O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *J.B. v. United States*, 916 F.3d 1161, 1167 (9th Cir. 2019) (internal quotations omitted).

## II. THE DISTRICT COURT INVERTED THE SUPREMACY CLAUSE TO SUBORDINATE FEDERAL LAW TO STATE LAW.

The district court stated that "HAVA contains no disclosure provision. 52 U.S.C. §§ 20901-21145. As such HAVA, cannot preempt California law and require California election officials to produce an unredacted voter list 'in disregard of the law of their state.'" *Weber* at *47 (quoting *Am. C.R. Union v.*

12

*Philadelphia City Commissioners*, 872 F.3d 175, 186 (3d Cir. 2017)). The court made no such statement about CRA or NVRA.

The court relied on a Third Circuit case also involving HAVA and NVRA which utterly fails to support an argument that the Supremacy Clause does not apply. Rather, the Third Circuit simply stated that these statutes' requirement that states disclose voting records, *e.g.*, felon status to the federal government, does not require states to remove felons from voting rolls if state laws permit felons to vote. The complete in-context quotation from the Third Circuit opinion is, "a requirement that information be shared does not impose a duty on election officials to subsequently act on that information by purging those individuals from the voter rolls in disregard of the law of their state." *Am. C.R. Union* at 186. The Third Circuit neither made nor attempted to make the claim the district court makes here, that a federal disclosure law cannot preempt state nondisclosure laws.

Returning for guidance to Chief Justice Marshall, it has been clear for two centuries that, "the framers of our constitution ... declar[ed] the supremacy not only of itself, but of the laws made in pursuance of it.... In every such case, the act of Congress ... is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it." *Gibbons v. Ogden*, 22 U.S. 1, 210-11 (1824). The district court's misreading of a single Third Circuit case only

13

underscores the thin ice on which the decision below rests. Again, this Court has long recognized the same:

> Under the doctrine of conflict preemption, "state laws are preempted when they conflict with federal law. This includes cases where 'compliance with both federal and state regulations is a physical impossibility,' and those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" [*United States v. California*, 921 F.3d 865, 878-79 (9th Cir. 2019) (*quoting Arizona v. United States*, 567 U.S. 387, 399 (2012)).]

The district court also relied on another irrelevant authority. In 2024, the First Circuit decided *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024), ruling that the NVRA preempted a contrary Maine law used to prohibit a public interest organization from obtaining voter lists. The First Circuit did permit redaction of some more sensitive personal information such as birthdates and Social Security numbers before turning the lists over to the organization. But the First Circuit neither ruled on nor considered any information demand from the Attorney General pursuant to the CRA, but only a request from the public interest organization. Indeed, the First Circuit recognized that in the case of a conflict between federal and state law, the federal law prevails. It simply ruled that redaction of items such as birthdates and social security numbers in a release to a private organization did not violate NVRA.

14

**III.    THE COURT BELOW HAD NO AUTHORITY TO REJECT THE GOVERNMENT'S "PURPOSE AND BASIS" FOR ITS INFORMATION REQUEST AS "PRETEXTUAL."**

The district court erred in rejecting the government's proffered "purpose and basis" based on a statement of a single "lawyer working in the DOJ's Voting Section tasked with obtaining states' voter rolls [who] was concerned that 'the data would be used not for purging voter rolls of people who aren't eligible to vote, but for broader immigration enforcement.'" *Weber* at *31. Starting with this flimsy basis, the district court determined that the "purpose and basis" which the government proffered for its request was an "obfuscation of its true motives," hidden "under the guise of a pretextual investigative purpose." *Id*. at *33.

But, as the Fifth Circuit long ago recognized, under the CRA's broad grant of investigative authority to the Attorney General, "[o]n the filing of this simple statement by the Attorney General, the Court is required to treat it as a summary proceeding....  [T]he factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand ... is not open to judicial review or ascertainment." *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962).

The Fifth Circuit correctly recognized the authority of Congress to delegate this "sweeping" investigative authority to the Attorney General and the courts'

15

consequent removal from the equation. "This is so because the papers and records subject to inspection and demand have been specifically identified by Congress. The Attorney General is entitled to have made available for his 'inspection, reproduction and copying' in the custodian's office 'any record or paper' which [the CRA section] requires 'to be retained and preserved.' The incorporated standard of [the CRA section] is sweeping." *Id.*

The statute tells the Attorney General what she must do to obtain the requested records. The Attorney General here has done so and is accordingly entitled to production by the state. The statute gave the district court no authority claimed here to presume that the stated "purpose and basis" is pretextual.

## IV.   THE DECISIONS BELOW ARE PART OF A TROUBLING RECENT TREND TOWARD AN IMPERIAL JUDICIARY.

In her opinion for the Court in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), Justice Barrett cautioned against federal judges "embracing an imperial judiciary." *Id*. at 858. The recent trend of federal judges deciding to restrain the Executive "just because they genuinely believe they are the last refuge against policies that they deem to be deeply unwise" are likely to erode the credibility of the judiciary. *Pacito v. Trump*, 2026 U.S. App. LEXIS 6586, at *90 (9th Cir. 2026) (Lee, J., dissenting in part).

The courts below declined to apply the plain and unambiguous language of 52 U.S.C § 20703 and, in so doing, "were seduced by the temptation of judicial resistance." *Pacito* at *90. Under the well-settled rule of statutory construction, courts are not permitted to consider legislative history where the language of the statute is unambiguous. *Lamie*, 540 U.S. at 534; *J.B.*, 916 F.3d at 1167; *Nakano*, 742 F.3d at 1213-14. Each of the district courts justified its disregard of the plain language of 52 U.S.C. § 20703 by pointing to what it contended were the effects of other statutory provisions, including provisions of state law. *Weber*, 2026 U.S. Dist. LEXIS 8545, at *38-39; *Oregon*, 2026 U.S. Dist. LEXIS 25259, at *35-37.

When confronted with arguably conflicting federal statutory provisions, courts are "not at liberty to pick and choose" among them and must "strive to give effect to both." *EPIC Systems Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (internal quotation omitted). A party contending that the arguably conflicting provisions cannot be harmonized "bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow." *Id.* (internal quotation omitted). Such intention has not been shown here.

The disregard of clearly established precedent to reach the policy result in both cases is an act of an "imperial judiciary." This overreach is of heightened concern because it reflects the pattern of bias in recent election law decisions.

Unlike the courts below that rejected federal preemption arguments and exacerbated the interests of states, other federal courts have rejected arguments raised by conservative states based on their role under the Elections Clause in administering election laws by relying on federal preemption and disregarding or minimizing the interests of the states. *See, e.g., Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025); *Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016); *League of Women Voters of the U.S. v. Harrington*, 560 F. Supp. 3d 177 (D.D.C. 2021). Although those cases involve different aspects of federal voter registration laws, the decisions demonstrate that activist judges choose their positions regarding the Elections Clause and federal preemption in order to reach their preferred policy outcomes, even though the positions are patently inconsistent.

## V.  THE CHINESE GOVERNMENT MAY HAVE BEEN ALLOWED GREATER ACCESS TO VOTER ROLLS THAN THE FEDERAL GOVERNMENT.

There is a degree of irony knowing that some states have handled their voter registration roles in such an irresponsible manner that foreign countries which are hostile to our nation have been allowed access. "U.S. intelligence [has known]

18

since 2020 that Beijing also gained access to American voter registration data, according to documents ... and interviews with officials with direct knowledge."[3]

> "[Redacted] Chinese intelligence officials analyzed multiple U.S. states' [Redacted] election voter registration data, [Redacted] to conduct public opinion analysis on the 2020 US general election," stated a once highly classified April 2020 National Intelligence Council memo entitled "Cyber Operations Enabling Expansive Authoritarianism." [*Id.*]

If true, states should be more concerned that voter registration lists have been exposed to a potentially hostile country, and less concerned that the federal government would be able to help ensure that those voter rolls are accurate.

## VI. OREGON SHARES ITS VOTER LIST WITH OTHER STATES AND NON-GOVERNMENTAL ORGANIZATIONS, BUT REFUSES TO SHARE IT WITH THE FEDERAL GOVERNMENT.

For some time, Oregon has been sharing its voter registration information with about half of the states who, like Oregon, are members of the Electronic Registration Information Center ("ERIC"), a non-governmental nonprofit entity.[4] Founded in 2012, ERIC currently has 25 member states and the District of Columbia. ERIC's website explains that member "states securely submit voter

---

[3] John Solomon & Jerry Dunleavy, "Britain had meltdown when China hacked voter files, but U.S. intel kept it secret in America," *Just The News* (Mar. 16, 2026).

[4] California does not participate in ERIC.

registration and motor vehicle department data to ERIC," supposedly to "help states improve the accuracy of ... voter rolls, increase access to voter registration for all eligible citizens, reduce election costs, and increase efficiencies in elections."[5]  However, the actual activities of ERIC appear shrouded in mystery. One report on ERIC asserts that ERIC's primary goal is increasing voter registration:

> While ERIC is supposed to help participating states maintain accurate voter rolls, the organization seems to be more interested in **increasing voter registration**....  ERIC [requires] member states to **send voter registration information to potentially eligible but unregistered individuals** at least 15 days before the state's registration deadline.[6]

Even more disturbingly, that report indicates that, once a state like Oregon provides voter registration to the non-governmental ERIC, ERIC provides that voter registration information to other private organizations for political purposes:

> ERIC's founder, David Becker ... is also the Executive Director and Founder of the Center for Election Innovation & Research (CEIR)....  **ERIC shares data collected by the states with third parties like CEIR for political purposes** ... Pennsylvania's secretary of state [in 2023] sent a letter to ERIC demanding that they stop sharing data with third parties for get-out-the-vote efforts.  [*Id*. (emphasis added).]

---

[5]  Electronic Registration Information Center website homepage.

[6]  Kristi Stahr & Michael Greibrok, "THE GREAT EXIT: Why States are Leaving Politically Driven ERIC and Why More States Should Follow," *Foundation for Government Accountability* (Dec. 13, 2023) (emphasis added).

Apparently several states have found these charges concerning ERIC to be credible. In 2022-23:

> [s]everal states [withdrew] from ERIC over credible claims of bias, lack of transparency, and **questions about data sharing and usage**, among other reasons.... Louisiana cited concerns about "questionable funding sources and that **possible partisan actors may have access to ERIC network data for political purposes**, potentially undermining voter confidence" in ERIC's operations....[7]

The Oregon Secretary of State's website states that it shares information with the non-governmental organization ERIC: "Oregon elections officials regularly communicate and share information among each other and **other local, state, and federal partners** to keep voter rolls clean.... This information sharing **includes ... ERIC....**"[8] This statement appears to be true as to ERIC and other states, but not the federal "partner."

## CONCLUSION

For the foregoing reasons, this Court should reverse the decisions of both district courts.

---

[7] Hans von Spakovsky & J. Adams, "Maintaining Accurate Voter Registration Rolls: The Need to Rehabilitate the ERIC Program or Form an Alternative," *The Heritage Foundation (*Apr. 19, 2023) (emphasis added).

[8] "Election Integrity," *Oregon Secretary of State* (accessed Mar. 18, 2026) (emphasis added).

21

Respectfully submitted,

MICHAEL BOOS
 CITIZENS UNITED
 1006 Pennsylvania Ave. SE
 Washington, DC  20003


PATRICK M. MCSWEENEY
 3358 John Tree Hill Road
 Powhatan, VA  23139


RICK BOYER
 INTEGRITY LAW FIRM
 P.O. Box 10953
 Lynchburg, VA  24506

  */s/ Jeremiah L. Morgan*
JEREMIAH L. MORGAN*
WILLIAM J. OLSON
 WILLIAM J. OLSON, P.C.
 370 Maple Avenue W., Suite 4
 Vienna, VA  22180-5615
 (703) 356-5070
*Counsel of Record

*Attorneys for Amici Curiae*
March 25, 2026

22

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-1231, 26-1232

I am the attorney or self-represented party.

**This brief contains** 4,777 **words, including** 0 **words** manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Jeremiah L. Morgan **Date** 3/25/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of America's Future and Citizens United in Support of Plaintiff-Appellant and Reversal was made, this 25th day of March 2026, by the Court's Appellate Case Management System upon the attorneys for the parties.

*/s/ Jeremiah L. Morgan*

_____

Jeremiah L. Morgan
Attorney for *Amici Curiae*