No. 26-1231

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

STATE OF OREGON; TOBIAS READ, in his official capacity as the Oregon
Secretary of State,

Defendants-Appellees,

OUR OREGON; DAN DIIULIO; EMMA CRADDOCK; STEPHEN GOMEZ,

Intervenor-Defendants – Appellees.

_____

APPELLEES' BRIEF

_____

Appeal from the United States District Court
for the District of Oregon

_____

DAN RAYFIELD  #064790
Attorney General
PAUL L. SMITH  #001870
Solicitor General
ROBERT A. KOCH  #072004
Attorney-in-Charge,
Civil & Administrative Appeals
JONA J. MAUKONEN  #043540
Assistant Attorney-in-Charge,
Civil & Administrative Appeals
1162 Court St. NE
Salem, Oregon 97301-4096
Telephone:  (503) 378-4402
robert.a.koch@doj.oregon.gov
Attorneys for Defendants - Appellees

_____

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION ......................................................... 3

STATEMENT OF THE ISSUES .............................................................. 3

STATEMENT OF THE CASE ................................................................. 4

    A.    Proceedings Below ........................................................... 4

        1.    The federal government demands a digital copy of Oregon's entire voter roll, unredacted to include sensitive personal data. ...................................... 4

        2.    The district court dismisses plaintiff's complaint for lack of congressional authorization to seek such sensitive personal data. ....................................... 6

        3.    Plaintiff sues states across the country seeking to amass digital copies of all states' unredacted voter rolls. ............... 8

    B.    Legal Overview .............................................................. 8

        1.    The Elections Clause and Oregon law ................................. 8

        2.    The National Voter Registration Act of 1993 (NVRA) ...... 10

        3.    The Help America Vote Act of 2002 (HAVA) .................. 11

        4.    Title III of the Civil Rights Act of 1960 (Title III) ............. 12

SUMMARY OF THE ARGUMENT ....................................................... 14

STANDARD OF REVIEW ..................................................................... 15

ARGUMENT ........................................................................................... 16

    A.    Plaintiff's invocation of Title III of the Civil Rights Act of 1960 fails. ...................................................................... 16

        1.    Principles of statutory construction constrain plaintiff's invocation of newfound authority under Title III. .............. 16

i

2.     Plaintiff's Article III demand letter failed to identify a lawful "basis and purpose" under 52 U.S.C. § 20703. ....... 19

3.     A state's voter roll is not a voter-registration "record" or "paper" that comes into a state's possession under 52 U.S.C. § 20701. ............................................................ 26

4.     A state's voter roll is not a voter-registration record "retained and preserved" under 52 U.S.C. § 20703. ........... 29

5.     Title III does not preempt state data privacy laws. ............. 30

B.    Plaintiff's request violates the Privacy Act and E-Government Act. .................................................................................... 32

1.     The Privacy Act prohibits plaintiff from collecting or maintaining records of an individual's First Amendment activity, like voting. ........................................................... 32

2.     The Privacy Act requires notice in the Federal Register before plaintiff can collect and maintain a sensitive database of millions. ........................................................... 36

3.     The E-Government Act requires a privacy impact assessment before plaintiff can start collecting a database of millions. ........................................................... 38

CONCLUSION ...................................................................................... 40

# TABLE OF AUTHORITIES

## Cases Cited

*Abramski v. United States*,
573 U.S. 169 (2014)...................................................................... 17, 20, 26

*Bassiouni v. FBI*,
436 F.3d 712 (7th Cir. 2006) ..................................................................... 34

*Biden v. Nebraska*,
600 U.S. 477 (2023)...................................................................................... 26

*Bost v. Ill. State Bd. of Elections*,
146 S. Ct. 513 (2026)................................................................................... 24

*Brannan v. United Student Aid Funds, Inc.*,
94 F.3d 1260 (9th Cir. 1996) ..................................................................... 31

*Buckley v. Am. Const. L. Found., Inc.*,
525 U.S. 182 (1999)...................................................................................... 34

*Corley v. United States*,
556 U.S. 303 (2009)................................................................................ 18, 22

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989)...................................................................................... 17

*Doe v. Kamehameha Schs./Bernice Pauahi Bishop Est.*,
470 F.3d 827 (9th Cir. 2006) ..................................................................... 17

*Foster v. Love*,
522 U.S. 67 (1997).......................................................................................... 9

*Garris v. FBI*,
937 F.3d 1284 (9th Cir. 2019) ...................................................... 33, 34, 36

*Hartmann v. Cal. Dep't of Corr. & Rehab.*,
707 F.3d 1114 (9th Cir. 2013) ................................................................... 32

*Hibbs v. Winn,*
542 U.S. 88 (2004)........................................................................................ 18

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996) ..................................................................... 15

*Learning Resources, Inc. v. Trump*,
146 S. Ct. 628 (2026)........................................................................ 18, 23, 25

iii

*MacPherson v. IRS*,
    803 F.2d 479 (9th Cir. 1986) ................................................... 34

*Maracich v. Spears*,
    570 U.S. 48 (2013).............................................. 17, 20, 26

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)............................................................. 31

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*,
    595 U.S. 109 (2022)............................................................. 18

*Niz-Chavez v. Garland*,
    593 U.S. 155 (2021)............................................................. 17

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006)................................................................. 24

*Rutan v. Republican Party of Ill.*,
    497 U.S. 62 (1990)............................................................... 34

*Smiley v. Holm*,
    285 U.S. 355 (1932)............................................................... 9

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966)..................................................... 13, 20, 27

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) .............................................. 15

*United States v. Benson*,
    No. 26-1225 (6th Cir.) ........................................................... 8

*United States v. Lynd*,
    301 F.2d 818 (5th Cir. 1962) ................................................ 21

*United States v. Morrison*,
    529 U.S. 598 (2000)............................................................. 31

*United States v. Weber*,
    No. 26-1232 (9th Cir.) ..................................................... 8, 17

*Utility Air Regulatory Group v. EPA*,
    573 U.S. 302 (2014)......................................................... 18, 25

*W. Virginia v. EPA*,
    597 U.S. 697 (2022)................................................. 17, 18, 19, 23

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)............................................................. 19

iv

*Wyeth v. Levine*,
    555 U.S. 555 (2009)............................................................... 31, 32

## Constitutional and Statutory Provisions

28 U.S.C. § 1291 ........................................................................... 3

28 U.S.C. § 1331 ........................................................................... 3

5 U.S.C. § 552a ................................................................... 2, 4, 32

5 U.S.C. § 552a(a)(3) .................................................................. 15

5 U.S.C. § 552a(a)(5) ............................................................. 15, 37

5 U.S.C. § 552a(e)(4) ....................................................... 15, 36, 37

5 U.S.C. § 552a(e)(7) ............................................................. 15, 33

5 U.S.C. § 552a(f) ...................................................................... 15

52 U.S.C. § 20501 ......................................................................... 3

52 U.S.C. § 20501(a) ................................................................... 10

52 U.S.C. § 20501(b) ................................................................... 10

52 U.S.C. § 20504 ....................................................................... 10

52 U.S.C. § 20507 ......................................................................... 3

52 U.S.C. § 20507(a) ..................................................................... 2

52 U.S.C. § 20507(a)(4)......................................................... 10, 35

52 U.S.C. § 20507(a)–(f) ............................................................. 10

52 U.S.C. § 20507(b)(1) .............................................................. 10

52 U.S.C. § 20507(b)–(d) ............................................................ 10

52 U.S.C. § 20507(i) ........................................................ 11, 21, 31

52 U.S.C. § 20507(i)(1) .................................................... 11, 28, 35

52 U.S.C. § 20507(i)(2) ............................................................... 11

52 U.S.C. § 20701......................................... 3, 13, 14, 26, 27, 28, 29

52 U.S.C. § 20703.................... 3, 4, 7, 13, 14, 19, 20, 22, 26, 27, 29

52 U.S.C. § 20901 ......................................................................... 3

52 U.S.C. § 21083........................................................................ 3, 28

52 U.S.C. § 21083(a) ............................................................... 4, 11

52 U.S.C. § 21083(a)(1)(A) ............................................... 14, 27, 30

52 U.S.C. § 21083(a)(2) ............................................................ 11, 35

52 U.S.C. § 21083(a)(2)(A) ..................................................... 14, 30

52 U.S.C. § 21083(a)(4) ............................................................ 11, 35

52 U.S.C. § 21085 ......................................................................... 2, 12

52 U.S.C. § 552a(5)(e) ..................................................................... 36

52 U.S.C. § 552a(a)(5) ..................................................................... 36

52 U.S.C. §§ 20901–21072 ............................................................. 11

52 U.S.C. §§ 21081–21085 ............................................................. 11

E-Government Act of 2002,
    Pub. L. No. 107-347, 116 Stat. 2899 ..................... 2, 4, 15, 32, 38, 39

O.R.S. § 192.826(3)(a) .................................................................... 10

O.R.S. § 247.945(1) ..................................................................... 9, 10

O.R.S. § 247.948 ........................................... 1, 14, 28, 31, 34, 37

O.R.S. § 247.948(1)(a) ....................................................................... 9

O.R.S. § 247.948(2) ........................................................................... 9

O.R.S. § 247.965(2) ......................................................................... 10

O.R.S. § 254.465 ............................................................................... 25

U.S. Const., Amend. I ............................................... 15, 24, 32, 34

U.S. Const., Art. I § 4, cl. 1 ....................................... 1, 6, 9, 24

## Other Authorities

86 Cong. Rec. H5208 (daily ed. Mar. 10, 1960) .................................. 14, 20, 27

*Basis*, Merriam-Webster.com Dictionary,
    https://www.merriam-webster.com/dictionary/basis .............................. 19

Exec. Office of the President, Office of Mgmt. & Budget,
    *M-03-22, OMB Guidance for Implementing the Privacy Provisions of
    the E-Government Act of 2002* (Sept. 26, 2003),
    https://www.justice.gov/opcl/page/file/1131721/dl ............................... 39

vi

Exec. Order No. 14,399,
91 Fed. Reg. 17,125 (Apr. 3, 2026) ........................................................ 25

Jude Joffe-Block,
*As DOJ prepares to share state voter data with DHS, a key privacy officer resigns*, NPR (Apr. 3, 2026), https://www.npr.org/2026/04/03/nx-s1-5768455/privacy-doj-dhs-voter-data ........................................... 25

*Preserve*, Merriam-Webster.com Dictionary,
https://www.merriam-webster.com/dictionary/preserve ......................... 29

Press Release,
*Justice Department Sues Idaho for Failure to Produce Voter Rolls* (Apr. 1, 2026),
https://www.justice.gov/opa/pr/justice-department-sues-idaho-failure-produce-voter-rolls ............................................................................... 8

*Purpose*, Merriam-Webster.com Dictionary,
https://www.merriam-webster.com/dictionary/purpose .......................... 19

*Retain*, Merriam-Webster.com Dictionary,
https://www.merriam-webster.com/dictionary/retain ............................. 29

S. Comm. on Gov't Operations & H.R. Comm. on Gov't. Operations,
94th Cong., *Legislative History of the Privacy Act of 1974 S. 3418 (Public Law 93-579): Source Book on Privacy*,
https://www.justice.gov/opcl/paoverview_sourcebook .......................... 33

System of Records Notice,
68 Fed. Reg. 47610 (Aug. 11, 2003) ................................................. 37, 38

System of Records Notice,
70 Fed. Reg. 43904 (July 29, 2005) ................................................. 37, 38

System of Records Notice,
82 Fed. Reg. 24147 (May 25, 2017) ................................................. 37, 38

U.S. Dep't of Justice, Civil Rights Division,
*Before the Voting Rights Act*, https://www.justice.gov/crt/introduction-federal-voting-rights-laws ............................... 12, 20, 27

U.S. Dep't of Justice, Civil Rights Division,
*The Voting Rights Act of 1965*,
https://www.justice.gov/crt/history-federal-voting-rights-laws .. 12, 13, 20

U.S. Dep't of Justice, Office of Privacy & Civil Liberties,
*E-Government Act of 2002*, https://www.justice.gov/opcl/
e-government-act-2002 ................................................................ 39

U.S. Dep't of Justice, Office of Privacy & Civil Liberties,
*Overview of the Privacy Act: 2020 Edition, Agency Requirements*,
https://www.justice.gov/opcl/overview-privacy-act-1974-2020-
edition/agency-requirements ....................................................... 36

U.S. Dep't of Justice, Office of Privacy & Civil Liberties,
*Overview of the Privacy Act: 2020 Edition, Introduction*,
https://www.justice.gov/opcl/overview-privacy-act-1974-2020-
edition/introduction .................................................................... 33

## INTRODUCTION

This is a case about federalism and the separation of powers. The Elections Clause of the U.S. Constitution entrusts states with the administration of elections, which serve as the hallmark and bedrock of our democracy. U.S. Const. art. I, § 4, cl. 1. Since the framing of the Constitution, that diffusion of power has served as a check against centralized power and control over the democratic process.

Nevertheless, the United States now seeks to assert federal executive control over state election systems by (1) creating a national voter roll, and (2) using that federal list to direct who may receive a ballot through the mail. As an apparent means to that (unconstitutional) end, plaintiff United States sued defendants, the State of Oregon and Oregon Secretary of State, to compel disclosure of a digital copy of the state's voter roll of more than three million Oregonians, unredacted to include sensitive information like driver's license and Social Security numbers that state law otherwise protects and prohibits from disclosure. O.R.S. § 247.948. Plaintiff is pursuing such lawsuits against 30 states and the District of Columbia.

The district court dismissed plaintiff's complaint for failure to state a claim. Plaintiff had charged that the state's refusal to create and produce an electronic, unredacted copy of Oregon's voter roll (in violation of Oregon law) violated the National Voter Registration Act of 1993 ("NVRA"), the Help America Vote Act of 2002 ("HAVA"), and Title III of the Civil Rights Act of 1960 ("Title III"). But the

2

district court explained that the NVRA directs *states* to "make[] a reasonable effort" to manage their voter rolls, 52 U.S.C. § 20507(a); that HAVA provides funding for a computerized state voter roll but leaves implementation "to the discretion of the State," 52 U.S.C. § 21085; and that Title III was enacted to remedy a history of denying the right to vote based on race, allowing only for the inspection of voter-registration records without preempting state data privacy laws.

This Court should affirm. Perhaps recognizing that the NVRA and HAVA provide no independent basis for their unprecedented request, plaintiff abandoned those claims. Instead, plaintiff now contends only that a stated desire to investigate compliance with those laws compels disclosure under Title III. That cannot be reconciled with the text, context, or history of the law, which authorizes inspection of individual voter-registration records in certain circumstances, none of which exist here. Even if the statute's text could be stretched that far, the major questions doctrine forecloses plaintiff's newfound reimagining of the 66-year-old law.

Separately, the Court also can affirm under two federal privacy statutes. The Privacy Act of 1974, 5 U.S.C. § 552a, constrains the federal government's ability to collect, maintain, and disseminate a database of sensitive citizen data. Likewise, the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, requires a privacy assessment before an agency collects sensitive electronic data on 10 or more persons. Plaintiff's demand for a database of millions fails under both.

3

## STATEMENT OF JURISDICTION

Plaintiff sued defendants under 52 U.S.C. § 20501, 52 U.S.C. § 20901, and 52 U.S.C. § 20701. ER-169. The district court thus had jurisdiction over the case under 28 U.S.C. § 1331.

Plaintiff appeals the district court's dismissal of their complaint for failure to state a claim. The district court entered final Judgment on February 5, 2026. ER-4. Plaintiff timely appealed on February 25, 2026. ER-199. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether a bare asserted interest in investigating state voter-list maintenance under the National Voter Registration Act (NVRA), 52 U.S.C. § 20507, and the Help America Vote Act (HAVA), 52 U.S.C. § 21083, constitutes a valid "basis and purpose" to seek records under Title III of the Civil Rights Act of 1960, 52 U.S.C. § 20703, which pertains to individual voter-registration records.

2. Whether an electronic copy of a state's entire unredacted voter-roll data file constitutes a voting "record and paper" that comes into a state's possession "relating to any application, registration, payment of poll tax, or other act requisite to voting" under Title III, 52 U.S.C. § 20701.

3. Whether an electronic copy of a state's entire unredacted voter-roll data file constitutes a record "retained and preserved" under Title III, 52 U.S.C.

4

§ 20703, when the composite data file is a byproduct of voter-registration efforts, and HAVA otherwise directs states to regularly update it, 52 U.S.C. § 21083(a).

4.      Whether the U.S. Department of Justice's unbounded request for an electronic copy of a state's entire unredacted voter roll, without notice in the Federal Register or a privacy assessment, violates the Privacy Act of 1974, 5 U.S.C. § 552a, and the E-Government Act, Pub. L. No. 107-347, § 208(a).

## STATEMENT OF THE CASE

### A.      Proceedings Below

### 1.      The federal government demands a digital copy of Oregon's entire voter roll, unredacted to include sensitive personal data.

In July 2025, plaintiff sent defendants a letter demanding, for the first time in history, that the state provide the federal government with a "current electronic copy of Oregon's computerized statewide voter registration list." ER-104. The letter also requested the names of all state and local officials charged with voter-list maintenance and, further, asked a series of questions about the state's responses to a survey from the Election Assistance Commission, which indicated that Oregon has a high rate of voter registration. ER-104–05. As authority for the demand, plaintiff cited only the NVRA. ER-104. Plaintiff gave a 14-day deadline to submit the data to the U.S. Department of Justice "in electronic form." ER-105–06.

In August 2025, plaintiff sent a new demand letter. Plaintiff wrote to "clarify" that the federal government sought an electronic copy of Oregon's entire

5

statewide voter registration list with "*all fields*," including each registered voter's "full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." ER-95 (emphasis in original). The letter explained *in toto* that "[t]he purpose of the request is to ascertain Oregon's compliance with the list maintenance requirements of the NVRA and HAVA"; it cited as legal authority for the demand the NVRA, HAVA, and Title III of the Civil Rights Act of 1960. ER-95–96. As to privacy concerns, plaintiff summarily stated, without citation or explanation, that the sensitive personal data would be "treated consistently with the Privacy Act." ER-97. At the same time, plaintiff suggested that the U.S. Department of Justice would be free to share the data with other governmental agencies. ER-96.

The Oregon Secretary of State quickly responded to the updated demand letter. The Secretary explained that "[e]ach of Oregon's 36 counties administers its own voter-registration program and maintains its own voter list," and the state had recently developed uniform data-reporting standards and procedures. ER-99. He gave the names of election officials charged with voter-list maintenance. ER-101. But he flagged that the narrative questions asked details that lacked a basis in federal law to request and that likely would violate state law to disclose. ER-101.

Similarly, the Secretary stated that the cited federal law did not warrant the creation and production of an electronic copy of the state's entire, unredacted voter

6

roll, and state law in fact prohibited its disclosure. ER-99–100. He found legally insufficient the unsupported assertion of complying with the Privacy Act, where the U.S. Department of Justice had not published the requisite notice in the Federal Register "that explains what data your agency is collecting, why you need it, and how you intend to use and store it." ER-100. However, the Secretary added how the U.S. Department of Justice could request a copy of Oregon's voter roll with sensitive data redacted once the agency complied with the Privacy Act. ER-100.

**2. The district court dismisses plaintiff's complaint for lack of congressional authorization to seek such sensitive personal data.**

Plaintiff sued instead, seeking to compel the creation and production of an electronic copy of Oregon's unredacted voter roll with the sensitive personal data of millions of registered Oregonians. (ECF 1). As in the August 2025 demand letter, plaintiff cited the NVRA, HAVA, and Title III as legal bases for the federal government's unprecedented request. (ECF 1 at 19–20).

The district court granted defendants' motion to dismiss the complaint for failure to state a claim. ER-5–30. At the outset, the court explained that the Elections Clause of the Constitution "explicitly empowers, in the first instance, the states to regulate and administer elections." ER-6 (citing U.S. Const. art. I, § 4, cl. 1). The court then concluded that the three invoked statutes "create specific and narrow roles for the federal government in the states' regulation of elections," none of which compels disclosure of a state's unredacted voter roll in the circumstances

7

here.  ER-7.  As a result, the court declined to reach defendants' alternative argument that plaintiff's request also violated federal privacy statutes.  ER-13.

On the NVRA, the court ruled that the statute governs state *programs* for voter-roll maintenance, and case law establishes that states thus can redact sensitive voter data of *individuals* in disclosing information under it.  ER-14–16.  On HAVA, the court reasoned that the statute does not include any disclosure provisions at all.  ER-16–17.  And the court concluded that plaintiff's request also lacked a legal basis under Title III.  ER-17–28.

As to Title III, the district court found plaintiff's demand legally deficient in several respects.  First, the plain text of the statute requires plaintiff to issue a "demand in writing" to the custodian of information identifying a lawful "basis" and "purpose" for the information, but plaintiff had failed to identify either.  ER-17 (quoting 52 U.S.C. § 20703).  In particular, only the August 2025 demand letter invoked Title III, yet that letter "contains no statement of a factual basis for believing Oregon violated the NVRA or HAVA."  ER-21.  In addition, the letter's stated purpose was to investigate Oregon's voter-roll maintenance procedures, but the statute's text, context, and legislative history require that "a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights."  ER-24.  Moreover, unredacted voter-roll data did not constitute individual voter-registration records under the law; the statute did not require the

creation and disclosure of an electronic voter-roll file; nor did the statute preempt state privacy laws that prohibit disclosing such sensitive data.  ER-27–28.

> **3.      Plaintiff sues states across the country seeking to amass digital copies of all states' unredacted voter rolls.**

As added procedural backdrop, plaintiff's claims against Oregon are novel but no longer unique.  Plaintiff has requested unredacted voter rolls from states across the country.  A small number have complied with the request, but plaintiff has now sued 30 states and the District of Columbia seeking to compel disclosure of a digital copy of their unredacted voter rolls, most recently adding Idaho to the list of defendant states.  Press Release, *Justice Department Sues Idaho for Failure to Produce Voter Rolls* (Apr. 1, 2026), https://www.justice.gov/opa/pr/justice-department-sues-idaho-failure-produce-voter-rolls.

To date, no court has ordered the disclosure, and plaintiff has appealed in three, including here.  Plaintiff's suit against California is also before this Court. *United States v. Weber*, No. 26-1232 (9th Cir.).  Plaintiff's suit against Michigan is currently before the Sixth Circuit.  *United States v. Benson*, No. 26-1225 (6th Cir.).

**B.      Legal Overview**

> **1.      The Elections Clause and Oregon law**

In the Elections Clause, the framers of the Constitution assigned to states, and to state law, the primary role of administering free and fair elections.  The text of the Elections Clause provides: "The Times, Places and Manner of holding

9

Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . ." U.S. Const. art. I, § 4, cl. 1. As the Supreme Court has explained, that provision encompasses the full range of election administration, including "registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of elections returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). In short, the Constitution "invests the States with responsibility for the mechanics" of elections. *Foster v. Love*, 522 U.S. 67, 69 (1997).

Oregon law establishes and regulates elections in Oregon Revised Statutes title 23, Chapters 246 through 260. As pertinent here, Oregon law provides that any person may request a list of registered voters. O.R.S. § 247.945(1).

For privacy reasons, however, the Oregon legislature limits the voter-roll information that is publicly available. Available information is limited to a registered voter's name, address, phone number, year of birth, party affiliation (if any), whether the person voted previously, the voter's precinct, and the administrative number for the voter used by the Secretary of State's office. O.R.S. § 247.948(1)(a). Oregon law prohibits disclosing a registered voter's birth month or day, Social Security number, or driver's license number. O.R.S. § 247.948(2). Oregon law also protects against disclosure voter information deemed confidential

10

for safety reasons.  O.R.S. 247.945(1); *see, e.g.*, O.R.S. § 192.826(3)(a) (domestic

violence victims); O.R.S. § 247.965(2) (election workers).

## 2. The National Voter Registration Act of 1993 (NVRA)

The NVRA, colloquially known as the motor-voter law, establishes national

standards for increasing voter participation and protecting election integrity.

52 U.S.C. § 20501(b).  In enacting the law, Congress found that the right to vote is

a fundamental right, that all levels of government must "promote the exercise of

that right," and that discriminatory registration laws and procedures harm voter

participation.  *Id.* § 20501(a).  In turn, one hallmark of the law is that states must

allow citizens to register to vote when issued a driver's license.  *Id.* § 20504.

The NVRA also requires that states actively maintain their voter registration

lists.  In particular, each state must "conduct a general program that makes a

reasonable effort to remove the names of ineligible voters from the official lists of

eligible voters."  *Id.* § 20507(a)(4).  The list-maintenance program must be both

"uniform" and "nondiscriminatory."  *Id.* § 20507(b)(1).  The program cannot

remove a person registered to vote solely for their failure to exercise that right.  *Id.*

§ 20507(b)–(d).  Required maintenance activities includes removing individuals

upon death or a change of residence, provided that certain conditions are met first.

*Id.* § 20507(a)–(f).

11

In addition, the NVRA requires states to maintain records on their list maintenance efforts and to allow for public inspection of those records. *Id.* § 20507(i). Specifically, each state must maintain "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* § 20507(i)(1). Such records "shall include lists of the names and addresses of all persons" sent a confirmation notice "and information concerning whether or not each such person has responded to the notice." *Id.* § 20507(i)(2). The NVRA requires states to make list maintenance program records available for "public inspection" and, "where available, photocopying at a reasonable cost." *Id.* § 20507(i)(1).

### 3. The Help America Vote Act of 2002 (HAVA)

HAVA arose in the wake of the 2000 election to provide states with federal funding and guidance for replacing old punch-card and lever-pull voting machines. 52 U.S.C. §§ 20901–21072. In doing so, the law instituted a series of state voting technology and registration changes. *Id.* §§ 21081–21085.

Most pertinently, HAVA requires that states implement and administer a computerized statewide voter registration list. *Id.* § 21083(a). States must maintain the list and remove ineligible voters in accordance with the NVRA. *Id.* §§ 21083(a)(2), (4). Unlike the NVRA, however, HAVA does not include any provision that authorizes any inspection, public or otherwise, of the state's

12

electronic voter list or maintenance practices.  Instead, HAVA expressly leaves the

law's implementation "to the discretion of the State."  *Id.* § 21085.

### 4. Title III of the Civil Rights Act of 1960 (Title III)

Congress enacted the Civil Rights Act of 1960 as the second in a series of

four civil-rights statutes that sought to remedy pervasive and longstanding race

discrimination in access to the ballot, which ultimately culminated in the Voting

Rights Act of 1965.  In the words of plaintiff:

> Congress passed legislation in 1957, 1960, and 1964 that contained voting-related provisions.  The 1957 Act created the Civil Rights Division within the Department of Justice and the Commission on Civil Rights; the Attorney General was given authority to intervene in and institute lawsuits seeking injunctive relief against violations of the 15th Amendment.  The 1960 Act permitted federal courts to appoint voting referees to conduct voter registration following a judicial finding of voting discrimination.  The 1964 Act also contained several relatively minor voting-related provisions.

U.S. Dep't of Justice, Civil Rights Division*, Before the Voting Rights Act*,

https://www.justice.gov/crt/introduction-federal-voting-rights-laws.  However,

faced with "the grip of state disenfranchisement," those three statutes "achieved

only modest success overall and in some areas had proved almost entirely

ineffectual."  U.S. Dep't of Justice, Civil Rights Division, *The Voting Rights Act of*

*1965*, https://www.justice.gov/crt/history-federal-voting-rights-laws.

As a result, Congress enacted the Voting Rights Act of 1965.  By that point,

the "[d]iscriminatory administration of voting qualifications" constituted "the

13

principal method" to disenfranchise Black Americans. *South Carolina v. Katzenbach*, 383 U.S. 301, 312 (1966). Title III of the Civil Rights Act of 1960 had given the Attorney General access to state and local voting-registration records. *Id.* at 313. But enforcement of the law proved ineffective, as "combing through registration records" took a substantial amount of time, and determined election officials just adopted new (discriminatory) registration practices whenever one got enjoined. *Id.* at 314. The Voting Rights Act thus "contained special enforcement provisions targeted at those areas of the country where Congress believed the potential for discrimination to be the greatest." U.S. Dep't of Justice, Civil Rights Division, *The Voting Rights Act of 1965*.

Amidst that backdrop, Title III was enacted in 1960 specifically to combat race discrimination in voter-registration procedures. The law thereby requires the retention of voter-registration records and allows the Attorney General to request to inspect them. 52 U.S.C. §§ 20701, 20703.

Precisely, Title III requires an election official to preserve for 22 months "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." *Id.* § 20701. The Attorney General can make a "demand in writing" to the records' custodian with a "statement of the basis and purpose therefor," and the records must "be made available for inspection, reproduction, and copying at the principal

14

office of such custodian." *Id.* § 20703. As the legislative history explained, "[t]o assemble the necessary proof of discrimination is impracticable, if not impossible, without access to detailed information concerning applications, registrations, or other acts, tests, and procedures requisite to voting." ER-10 (quoting 86 Cong. Rec. H5208 (daily ed. Mar. 10, 1960) (statement of Rep. McCulloch)).

## SUMMARY OF THE ARGUMENT

The district court correctly granted defendants' motion to dismiss plaintiff's complaint for failure to state a claim.

Plaintiff's invocation of Title III lacks merit in four primary ways, any one of which requires affirming the district court's order of dismissal. First, plaintiff's bare asserted interest in investigating voter-list maintenance under the NVRA and HAVA does not constitute a "basis and purpose" for records under Title III, 52 U.S.C. § 20703. Second, a digital copy of a state's unredacted voter roll does not constitute a voter-registration "record and paper" that "come[s] into" a state's possession within the ambit of Title III, *id.* § 20701. Third, a state's electronic statewide voter roll is not a voter-registration paper that is "retained and preserved" by an election official, *id.* § 20703; instead, HAVA requires that states regularly alter the roll by removing ineligible voters. 52 U.S.C. §§ 21083(a)(1)(A), (2)(A). Fourth, Title III does not preempt state data privacy laws like Oregon's, O.R.S. § 247.948, because there is no clear intent to override state police powers.

15

This Court also can affirm under either of two pertinent federal privacy statutes on which the district court did not rule. The Privacy Act prohibits federal agencies from collecting, maintaining, or disseminating records on a First Amendment right, like voting; it also prohibits such activities for groups of records without first following specific procedures that plaintiff has not followed. 5 U.S.C. §§ 552a(a)(3), (a)(5), (e)(4), (e)(7), (f). Further, the E-Government Act requires a privacy assessment before collecting sensitive digital data on 10 or more persons, which plaintiff also has not done. Pub. L. No. 107-347, § 208, 116 Stat. 2899.

## STANDARD OF REVIEW

The Court reviews de novo a district court's grant of a motion to dismiss for failure to state a claim. *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998). In doing so, the Court construes allegations of material fact in the light most favorable to the plaintiff, but "[c]onclusions of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996) (citation omitted). In addition, "[i]f support exists in the record, the dismissal may be affirmed on any proper ground, even if the district court did not reach the issue or relied on different grounds or reasoning." *Steckman*, 143 F.3d at 1295.

## ARGUMENT

Plaintiff's quest to compel the creation and disclosure of a digital copy of Oregon's unredacted statewide voter roll, with the sensitive personal information of millions of Oregonians, lacks any legal basis under Title III. Indeed, plaintiff's efforts also violate the Privacy and E-Government Acts, both of which constrain the federal government from collecting and maintaining sensitive citizen data. This Court can affirm the dismissal of plaintiff's complaint on either basis.

## A.     Plaintiff's invocation of Title III of the Civil Rights Act of 1960 fails.

The gravamen of plaintiff's argument is that Title III authorizes the federal government to request a copy of any voting-related record, paper, or dataset—or of *any* state record, if the federal government states a desire to investigate compliance with *any* federal law. Such a sweeping interpretation of the statute cannot be reconciled with Title III's text, context, or legislative history. Plaintiff's claim lacks merit in four primary ways, any one of which requires affirming the district court's judgment of dismissal.

### 1.     Principles of statutory construction constrain plaintiff's invocation of newfound authority under Title III.

At the outset, it bears emphasizing that plaintiff invokes a 66-year-old federal statute as the source for its newfound authority. In doing so, plaintiff elides foundational principles of statutory interpretation.

To interpret a statute, courts "afford the law's terms their ordinary meaning at the time Congress adopted them." *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021). To do so, the Court looks to the statute's text, context, and legislative history. As the Supreme Court has explained, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *W. Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). Courts "interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 573 U.S. 169, 179 (2014) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)).

In other words, the statutory text must "be read against the background of the legislative history" as well as "the historical context from which the Act arose." *United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 201 (1979). As this Court has explained, "a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers." *Doe v. Kamehameha Schs./Bernice Pauahi Bishop Est.*, 470 F.3d 827, 846 (9th Cir. 2006) (en banc) (quoting *Weber*, 443 U.S. at 201). At the same time, a core canon of construction is that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or

18

insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn,* 542 U.S. 88, 101 (2004)).

In addition, under the major questions doctrine, courts require a "clear congressional authorization" when a federal agency seeks to assert "extravagant statutory power" over an area of economic or political significance. *W. Virginia*, 597 U.S. at 723–24 (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)). Under the doctrine, "both separation of powers principles and a practical understanding of legislative intent" render courts "'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there." *Id.* (quoting *Utility Air*, 573 U.S. at 324). That is because, as a rule, "Congress would not have delegated 'highly consequential power' through ambiguous language." *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 639 (2026) (plurality opinion) (quoting *W. Virginia*, 597 U.S. at 723–24).

The doctrine applies with particular force when an agency seeks to invoke a statute to exercise broad newfound power after a statute's "half century of existence." *Id.* (quoting *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 119 (2022)). In such scenarios, a "lack of historical precedent" along with "the breadth of authority" claimed are together a "telling indication" that the statutory text has been stretched beyond its "legitimate reach." *Id.* (quoting *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 119). In short, Congress does not "hide

'elephants in mouseholes.'" *W. Virginia*, 597 U.S. at 746 (Gorsuch, J., concurring) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).

### 2. Plaintiff's Article III demand letter failed to identify a lawful "basis and purpose" under 52 U.S.C. § 20703.

Under those principles of statutory construction, plaintiff's invocation of Title III fails for several textual reasons. First, plaintiff's Title III demand letter in August 2025 lacks the requisite statutory predicates of identifying, in writing, a lawful "basis and purpose" for seeking the requested records. *See* ER-17–24 (the district court so holding).

The text of Title III provides:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General . . . be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. *This demand shall contain a statement of the basis and the purpose therefor*.

52 U.S.C. § 20703 (emphasis added). The plain meaning of "basis" is "something on which something else is established or based." *Basis*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/basis. And the plain meaning of "purpose" is "something set up as an object or end to be attained: intention." *Purpose*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/purpose.

Importantly, the precise meaning of those terms here is not determined "in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski*, 573 U.S. at 179 (quoting *Maracich*, 570 U.S. at 76). As recounted above, the context, structure, history, and purpose of Title III was to combat discriminatory efforts to prevent people from registering to vote; historically, those efforts included literacy tests and a "good-morals requirement." *Katzenbach*, 383 U.S. at 312; 86 Cong. Rec. H5208 (daily ed. Mar. 10, 1960) (statement of Rep. McCulloch); U.S. Dep't of Justice, Civil Rights Division, *Before the Voting Rights Act*, https://www.justice.gov/crt/introduction-federal-voting-rights-laws. To be sure, Title III's efficacy in achieving those ends is debatable. *E.g.*, U.S. Dep't of Justice, Civil Rights Division, *The Voting Rights Act of 1965*, https://www.justice.gov/crt/history-federal-voting-rights-laws. But the law's purpose is indisputable: Congress enacted Title III to enable the Attorney General to request individual voter-registration records when there is a basis to believe that individuals have been discriminatorily denied access to the ballot.

Consequently, by its plain terms, Title III requires that the Attorney General make a written demand for specified records under § 20703. The letter must identify a "basis" for the demand: the factual grounds for believing or suspecting the existence of a discriminatory voter-registration practice. And the letter must identify a lawful "purpose": a legal nexus to investigating those practices. The

Fifth Circuit held exactly that shortly after the law's passage, explaining that the requisite basis for a written demand under Title III is "that there are reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights in a given county." *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962). Moreover, the requisite purpose for such a demand is "to inspect the voting records such as are here involved upon" that discriminatory denial. *Id.* In the 60-plus years since Title III was enacted, defendants are aware of no court that held otherwise before plaintiff embarked on its national voter-roll-collection efforts.

Here, plaintiff's pertinent demand letter fails both threshold requirements. Plaintiff made a written demand under Title III only in its August 2025 letter. ER-95–96. Nowhere in that letter does plaintiff provide any factual basis for the request whatsoever, nor does plaintiff identify a valid purpose of investigating discriminatory denials of the right to vote. Instead, plaintiff cites an interest in investigating Oregon's efforts to maintain its voter list under two different statutes, the NVRA and HAVA. ER-96. As the district court concluded, plaintiff's demand "lacked any reference or relation to the purposes for which Title III was enacted" and, therefore, "cannot trigger any duty to produce such records." ER-24. To the extent that plaintiff wishes to investigate defendants' list-maintenance efforts, plaintiff can ask to see defendants' list-maintenance records as provided and required by the NVRA, 52 U.S.C. § 20507(i). But Title III is inapt to that desire.

22

Plaintiff makes a series of arguments to the contrary. None has merit.

Plaintiff first contends that the district court impermissibly "second-guess[ed]" the basis in the demand letter. Appellant's Br. 20. The central difficulty, however, is that the August 2025 demand letter never proffered any basis at all, much less one that falls within the ambit of Title III. Rather than second-guess a factual assertion in the letter, the district court merely assessed the legal sufficiency of the asserted basis (or lack thereof) for plaintiff's invocation of the district court's authority. Plaintiff also maintains that the letter provided a sufficient "basis" because it identified the "purpose" of investigating voter-list maintenance. Appellant's Br. 23. That interpretation, however, would render the term "basis" as "superfluous," directly contravening a core canon of construction. *Corley*, 556 U.S. at 314.

Plaintiff alternately argues that the August 2025 letter should be read "in concert" with the July 2025 letter, which did not invoke Title III but did inquire about Oregon's list-maintenance efforts. Appellant's Br. 24. As an initial matter, doing so would contravene the plain text of the statute, which requires that a demand for records under Title III "shall" be in writing and, further, that "*[t]his* demand shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703 (emphasis added). Congress thereby required the Attorney General to specify the reasonable grounds for the demand *in the demand itself* before allowing

a federal intrusion into the sovereignty of state election officials. In any event, even if the letters were read in concert, plaintiff's efforts would fare no better. By plaintiff's own admission, the demand has nothing to do with the purpose for which Congress authorized such record requests in Title III—investigating discriminatory voter-registration practices.

Lastly, plaintiff ultimately advances a sweeping reading of the statute: that Title III entitles the Attorney General to demand *any* election-related record merely by stating that the federal government is investigating compliance with *any* federal statute, regardless of that law's investigative purpose, power, or scope. Appellant's Br. 28. For the reasons just discussed, that unbounded interpretation cannot be reconciled with the statute's context, structure, history, and purpose. More to the point: The major questions doctrine forecloses it.

As recounted above, the major questions doctrine reflects an understanding of how Congress respects the constitutional separation of powers. Courts thus expect "clear congressional authorization" when a federal agency seeks to assert "extravagant statutory power" over an area of political significance. *W. Virginia*, 597 U.S. at 723–24; *see Learning Resources*, 146 S. Ct. at 638–39 (plurality opinion) (collecting cases). Courts are particularly skeptical when an agency seeks to assert newfound extensive authority by invoking a long-extant statute. *Learning Resources*, 146 S. Ct. at 640–41 (collecting cases).

That is the precise scenario here. Elections are "essential to the functioning of our participatory democracy." *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 521 (2026) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam)). The Elections Clause assigns to *states* the primary task of administering them. U.S. Const. art. I, § 4, cl. 1. Now, more than 66 years after Title III's enactment to combat racially discriminatory voter-registration practices, plaintiff seeks to discover for the first time in its text practically limitless investigative powers: for the federal executive to have the authority to demand any and all election-related records and data, steamrolling the express separation of powers in the U.S. Constitution on the bedrock democratic process of election administration.

As the source for such a breathtaking assertion of federal executive power, plaintiff cites a law that had nothing to do with digital voter data at all. By any measure, Congress enacted Title III to authorize the Attorney General to inspect individual voter-registration practices and paper documents. HAVA would not fund the creation of electronic statewide voter rolls for 42 more years. And to the extent that Congress has spoken on digital data, both on First Amendment activity and as to databases of sensitive, personal citizen data, Congress has placed stringent guardrails if not outright prohibitions on the collection and maintenance of it, via the Privacy Act and E-Government Act, as explained below in Part B.

Indeed, plaintiff does not leave to the imagination the scale and import of the demand here. Left unsaid in the Appellant's Brief, but disclosed in court proceedings against Rhode Island, is that the U.S. Department of Justice intends to share all sensitive voter-roll data with the U.S. Department of Homeland Security to aid immigration-enforcement efforts. *E.g.*, Jude Joffe-Block, *As DOJ prepares to share state voter data with DHS, a key privacy officer resigns*, NPR (Apr. 3, 2026), https://www.npr.org/2026/04/03/nx-s1-5768455/privacy-doj-dhs-voter-data. In addition, the President has directed Homeland Security to develop a national voter roll using "relevant Federal databases" and, further, directed the U.S. Postal Service to deliver mail-in ballots only to those on an approved federal voter list. Exec. Order No. 14,399 §§ 2(a), 3(b)(iii), 91 Fed. Reg. 17,125 (Apr. 3, 2026). That would effectively control Oregon's elections, which are all conducted by mail-in ballot. O.R.S. § 254.465.

In sum, notwithstanding the Elections Clause, the federal government seeks sensitive personal data on every registered voter in Oregon, and of tens and hundreds of millions of registered voters across the country, with which to assemble a "State Citizenship List" for directing, at a minimum, election administration and immigration enforcement. Exec. Order No. 14,399. That newfound reimagining of Title III "is 'extravagent' by any measure." *Learning Resources*, 146 S. Ct. at 641 (quoting *Utility Air*, 573 U.S. at 324). Plaintiff must,

26

but cannot, "point to clear congressional authorization" to justify it. *Id.* (quoting

*Biden v. Nebraska*, 600 U.S. 477, 506 (2023)). The district court thus correctly

dismissed plaintiff's unprecedented demand as lacking any basis in federal law.

> **3.      A state's voter roll is not a voter-registration "record" or "paper" that comes into a state's possession under 52 U.S.C. § 20701.**

The second textual reason that plaintiff's demand fails is because the subject

of the demand—a digital copy of a state's unredacted voter roll and the sensitive

personal information therein—is not a "record and paper" that comes into a state's

possession within the meaning of Title III to trigger the statute's retention and

concomitant disclosure duties. *See* ER-28 (the district court so holding).

Under Title III, the Attorney General can issue a written demand for the

"inspection, reproduction, and copying" of "[a]ny record or paper required

by section 20701 of this title to be retained and preserved." 52 U.S.C. § 20703.

The plain text of Title III defines those pertinent records and papers as, for each

election official, "all records and papers which come into his possession relating to

any application, registration, payment of poll tax, or other act requisite to voting in

such election." 52 U.S.C. § 20701.

The Court construes those terms in light of "the statutory context, 'structure,

history, and purpose.'" *Abramski*, 573 U.S. at 179 (quoting *Maracich*, 570 U.S. at

76). As discussed above, the Civil Rights Act of 1960 was enacted to strengthen

the protections of the Civil Rights Act of 1957, and Title III in particular was

enacted to combat discriminatory voter-registration requirements and practices like literacy tests and good-morals requirements. *Katzenbach*, 383 U.S. at 312; 86 Cong. Rec. H5208 (daily ed. Mar. 10, 1960) (statement of Rep. McCulloch); U.S. Dep't of Justice, Civil Rights Division, *Before the Voting Rights Act*, https://www.justice.gov/crt/introduction-federal-voting-rights-laws. The law therefore requires the retention of such individual voter-registration records in § 20701 and allows for the federal inspection of them in § 20703.

By any plain meaning of those terms, a digital copy of a state's unredacted voter roll is not an individual voter-registration paper or record that comes into the possession of an election official. Put simply, a state's voter roll is not given to an elections official as part of registering someone to vote. To the contrary, as HAVA provides, such electronic statewide voter rolls are created "at the State level" to identify those individuals who *are and have been* registered to vote. 52 U.S.C. § 21083(a)(1)(A). That is, the voter roll, and the sensitive personal date therein, have no bearing on whether an individual was denied the right to vote due to a discriminatory registration practice; they are a byproduct created by the state after individuals have been registered. Such data therefore falls outside the ambit of Title III's voter-registration "records and papers" as defined by 52 U.S.C. § 20701.

To contend otherwise, plaintiff focuses on the definitional term "come into . . . possession" in § 20701. Plaintiff argues only that, by defining relevant records

as those that "come" into possession of an elections official, rather than those that "are" in the possession of the official, Congress chose "to focus on *how* and *when* the officer gains possession of the records." Appellant's Br. 36. Defendants agree. And for the reasons discussed above, the pertinent records for Title III purposes are those that come into an official's possession as part of registering (or not registering) an individual to vote. Because a state's voter roll is instead created by the state to reflect those already registered, it falls outside the ambit of § 20701.

The gravamen of plaintiff's argument also once again runs afoul of the major questions doctrine. State laws across the country protect the sensitive personal information contained in a state's voter roll, and Oregon is no exception. O.R.S. § 247.948. Those laws serve the traditional state police powers of protecting privacy and preventing crimes like identity theft. Congress provided federal funding for the creation of such computerized statewide voter lists in enacting HAVA in 2002. 52 U.S.C. § 21083. But neither HAVA nor the NVRA authorize the Attorney General (or anyone else in the federal government) to demand a copy of all sensitive data of the entire American citizenry; HAVA in fact has no inspection provisions at all. *See* 52 U.S.C. § 20507(i)(1) (NVRA providing for public inspection only of state records of list-maintenance *programs*). Plaintiff cannot lean on the ambiguous term of "papers and records" from Title III in 1960, more than 40 years before HAVA, to assert such highly consequential power.

29

### 4. A state's voter roll is not a voter-registration record "retained and preserved" under 52 U.S.C. § 20703.

The third textual reason that plaintiff's demand fails is because a state's

voter roll is not a voter-registration record that is "retained and preserved" within

the meaning of Title III to trigger the statute's retention and disclosure duties.

As just discussed, the text of Title III defines the pertinent records as those

that "come into" an election official's possession in registering a voter. 52 U.S.C.

§ 20701. The text of the statute further constrains its remit by limiting duties to

only such records that are "retained and preserved." 52 U.S.C. § 20703. The plain

meaning of "retain" is "to hold secure or intact." *Retain*, Merriam-Webster.com

Dictionary, https://www.merriam-webster.com/dictionary/retain. The plain

meaning of "preserve" is "to keep safe from injury, harm, or destruction; protect."

*Preserve*, Merriam-Webster.com Dictionary, https://www.merriam-

webster.com/dictionary/preserve.

Under the plain meaning of those terms, a state's electronic statewide voter

roll is not a voter-registration paper that is "retained and preserved" by an election

official. As plaintiff emphasizes, states in fact have a responsibility under the

NVRA and HAVA to maintain their voter rolls—that is, to constantly change and

update them. Indeed, HAVA requires states to implement an electronic statewide

voter roll that is "defined, maintained, and administered at the State level" by

regularly removing ineligible voters. 52 U.S.C. §§ 21083(a)(1)(A), (2)(A). Put

another way, Congress defines a state's voter roll—the very object that plaintiff seeks to have disclosed—as something that is *not* retained and preserved.

In arguing otherwise, plaintiff appears to contend that Title III's duties are "temporal," such that the duties attach once an elections official comes into possession of a pertinent record. Appellant's Br. 37. That is true for a document used to register (or deny registration to) a voter. Such documents can and should be retained and preserved under Title III, consistent with the statutory construction discussed above. But that argument cannot be reconciled with a state's electronic voter-roll file both logically, given Congress's directive to regularly update the file, and practically, given the reality of a changing data file. That inconsistency further forecloses plaintiff's unprecedented demand under the major questions doctrine.

**5.     Title III does not preempt state data privacy laws.**

Finally, plaintiff's request fails because Oregon law prohibits and protects from disclosure the sensitive voter data that plaintiff demands, and Title III does not preempt state law on that protection. *See* Appellant's Br. 38–42 (arguing federal preemption).

As an initial matter, plaintiff's preemption argument is not preserved. Plaintiff did not raise a meaningful preemption argument before the district court, which plaintiff does not dispute on appeal. *See* ER-27 (the district court so stating); Appellant's Br. 38–42 (plaintiff not disputing). Preemption arguments are

"waived if not raised below." *Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1266 (9th Cir. 1996).  That alone resolves the issue.

In any event, plaintiff's preemption argument also lacks merit.  When faced with a question of federal preemption, courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

Here, Oregon law plainly prohibits the disclosure of the sensitive personal data that plaintiff demands.  O.R.S. § 247.948.  That state law serves the traditional state police powers of protecting privacy and preventing crimes like identity theft. *E.g.*, *United States v. Morrison*, 529 U.S. 598, 618–19 & n.8 (2000) (discussing the police power reserved to the states to prevent crime).  And Title III is silent on the topic—reflective of the fact that plaintiff invokes a law from decades before such electronic data files even existed.

Indeed, plaintiff concedes that the only law that allows for the inspection of state voter-roll records, the NVRA, does *not* displace state privacy protections. Appellant's Br. 38 (citing the NVRA's public-inspection provisions, 52 U.S.C. § 20507(i)).  Plaintiff further concedes that HAVA, which regulates the creation and maintenance of state digital voter-role files, has no inspection provisions at all. Appellant's Br. 39.  Plaintiff contends that the "better inference" is to engraft one

into HAVA, via the text of Title III, thereby displacing state data privacy laws across the country in the process. But silence from Congress does not constitute a "clear and manifest purpose of" preemption. *Wyeth*, 555 U.S. at 565.

**B.      Plaintiff's request violates the Privacy Act and E-Government Act.**

Even if plaintiff's demand fell within the ambit of Title III, the Court still should affirm. Plaintiff's efforts here violate the plain terms of both the Privacy Act of 1970, 5 U.S.C. § 552a, as well as the E-Government Act of 2002, Pub. L. No. 107-347, § 208, 116 Stat. 2899, 2921–23. Although the district court did not reach these issues, ER-13, the Court "may affirm the district court's dismissal on any ground that is supported by the record, whether or not the district court relied on the same ground." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1121 (9th Cir. 2013). And as discussed below, in those statutes, Congress created substantive and procedural protections against plaintiff's attempt here to create and widely use a federal database of sensitive personal citizen data.

**1.      The Privacy Act prohibits plaintiff from collecting or maintaining records of an individual's First Amendment activity, like voting.**

First, the Privacy Act creates substantive protections that bar plaintiff's efforts. Congress enacted the Privacy Act "in the wake of the Watergate and Counterintelligence Program . . . scandals involving illegal surveillance on opposition political parties and individuals deemed to be 'subversive.'" U.S. Dep't of Justice, Office of Privacy & Civil Liberties, *Overview of the Privacy Act: 2020*

33

*Edition, Introduction*, https://www.justice.gov/opcl/overview-privacy-act-1974-2020-edition/introduction.  In doing so, Congress "sought to restore trust in government and to address what at the time was seen as an existential threat to American democracy."  *Id.*  As the law's chief sponsor stated, "there must be limits upon what the Government can know about each of its citizens."  *Id.* (quoting S. Comm. on Gov't Operations & H.R. Comm. on Gov't. Operations, 94th Cong., *Legislative History of the Privacy Act of 1974 S. 3418 (Public Law 93-579): Source Book on Privacy* at 4, https://www.justice.gov/opcl/paoverview_sourcebook (statement of Sen. Sam Ervin, Chairman, S. Judiciary Comm.)).

As pertinent here, the Privacy Act prohibits federal agencies from collecting or maintaining records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."  5 U.S.C. § 552a(e)(7).  As this Court has explained, the "law enforcement activity" exception requires that the federal agency invoking it "carr[y] its burden of demonstrating that the maintenance . . . is pertinent to an authorized law enforcement activity."  *Garris v. FBI*, 937 F.3d 1284, 1294 (9th Cir. 2019).  The agency must have "good reason to believe that the record [is] relevant on a continuing basis in the fulfillment of the agency's statutory responsibilities."  *Id.* at 1299 (cleaned up) (quoting *Bassiouni v. FBI*, 436

F.3d 712, 724–25 (7th Cir. 2006)).  Otherwise, an agency could engage in "a fishing expedition," and the exception "'would swallow the rule.'"  *Id.* at 1299 n.3 (quoting *MacPherson v. IRS*, 803 F.2d 479, 484 (9th Cir. 1986)).

Plaintiff's demand falls directly within the Privacy Act's bar on collecting and maintaining records of protected First Amendment activity.  The requested voter list contains extensive sensitive information on millions of Oregonians, including each voter's personal information, party affiliation, and choice of whether to participate in an election.  O.R.S. § 247.948.  This conduct by Oregon voters is a paradigmatic form of political expression protected by the First Amendment.  *See, e.g.*, *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999) ("political thought and expression"); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 68, 75–76 (1990) ("political affiliation").

Plaintiff also fails to carry its burden of demonstrating good reason to believe that Oregon's unredacted electronic voter file is relevant to an ongoing authorized law enforcement activity, as required to fall within § (e)(7)'s exception. *Garris*, 937 F.3d at 1299.  Plaintiff ignores this issue entirely in its merits brief.  In its demand letter, plaintiff argued only that the unredacted voter file was necessary "to ascertain Oregon's compliance with the list maintenance requirements of the NVRA and HAVA."  ER-96.  But plaintiff has never explained why that was so.

35

Even taking the list-maintenance rationale at face value—an assertion that now appears pretextual given the federal executive's subsequent efforts to develop and operationalize a federal voter-roll database—the sensitive personal data that plaintiff seeks for millions of Oregonians is not pertinent to the list-maintenance *program* requirements that the NVRA and HAVA impose. The NVRA requires that Oregon "conduct a general program that makes a reasonable effort" to remove ineligible voters due to death or a change in residence, and HAVA incorporates that requirement. 52 U.S.C. § 20507(a)(4) (NVRA); 52 U.S.C. §§ 21083(a)(2), (4) (HAVA). NVRA then allows for the public inspection of "all records concerning the implementation of [those] programs and activities." 52 U.S.C. § 20507(i)(1). Plaintiff never articulates why those inspection provisions are legally insufficient.

Moreover, it bears emphasizing that Oregon offered to make a redacted version of its statewide voter file available to plaintiff, consistent with Oregon law. ER-100. Plaintiff never responded to that offer (beyond filing a lawsuit), much less identified why an unredacted voter file containing the sensitive personal data of millions is necessary to investigate list-maintenance program efforts. Plaintiff's unspoken reasoning "has at best only speculative relevance to an unstated law enforcement purpose," which fails to carry plaintiff's burden for invoking the Privacy Act's "law enforcement activity" exception. *Garris*, 937 F.3d at 1299.

36

### 2. The Privacy Act requires notice in the Federal Register before plaintiff can collect and maintain a sensitive database of millions.

Plaintiff's demand here also contravenes the Privacy Act's procedural protections. As Congress sought to limit what federal agencies could compile and maintain on American citizens, the Privacy Act established procedural requirements whenever an agency establishes or alters a "system of records," which the statute defines as a "group of records under the control of any agency from which information is retrieved by the name of the individual" or by some other individual identifier. 52 U.S.C. §§ 552a(a)(5), (e).

Specifically, an agency must publish a System of Records Notice ("SORN") in the Federal Register before "establish[ing] or revis[ing]" a "system of records." *Id*. § 552a(e)(4); *see* U.S. Dep't of Justice, Office of Privacy & Civil Liberties, *Overview of the Privacy Act: 2020 Edition, Agency Requirements*, https://www.justice.gov/opcl/overview-privacy-act-1974-2020-edition/agency-requirements (discussing an agency's SORN obligations). This procedural requirement is a critical safeguard and bulwark against improper federal data collection, as it requires any federal agency—including the U.S. Department of Justice—to put any new system of records up for public notice and comment regarding the nature, scope, and routine uses of the records *before* the federal government starts to collect and maintain citizens' data. 5 U.S.C. § 552a(e)(4).

37

Here, Plaintiff's attempt to obtain unredacted voter records from multiple states falls within the plain meaning of a "system of records" under the Privacy Act. *Id.* § 552a(a)(5). Plaintiff demands a digital copy of Oregon's electronic voter-roll file, containing the personal, individualized data for millions of Oregonians, including their name, address, telephone number, full birthday, driver's license number, and Social Security number. O.R.S. § 247.948.

Critically, the U.S. Department of Justice has not published any SORN that would permit the widescale collection and maintenance of that sensitive, individualized voter data. Plaintiff again makes no mention of these issues in its merits brief. Before the district court, plaintiff alleged that the data requested falls under the SORN titled "Central Civil Rights Division Index File and Associated Records, CRT–001," published at 68 Fed. Reg. 47610 (Aug. 11, 2003), 70 Fed. Reg. 43904 (July 29, 2005), and 82 Fed. Reg. 24147 (May 25, 2017). That assertion cannot bear scrutiny, as none of those published SORNs address collecting and maintaining voter lists complete with names, addresses, party affiliation, and voting history, much less driver's license numbers, Social Security numbers, and full dates of birth.

In particular, the SORN at 68 Fed. Reg. 47610 states only that it applies to "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights

Division." *Id.* at 47611. The SORN at 70 Fed. Reg. 43904 adds a new routine use of records related to closed investigations of public concern. And the SORN at 82 Fed. Reg. 24147 modified SORNs related to breaches of personally identifying information.

In short, plaintiff cannot shoehorn and obscure its national voter-roll-collection efforts under existing SORNs for maintaining standard investigatory files. Congress enacted the Privacy Act's procedural protections precisely to safeguard against such surreptitious data collection by a federal agency, and plaintiff's publicly stated intent to share such sensitive data across federal agencies further compounds the unlawfulness of the efforts.

### 3. The E-Government Act requires a privacy impact assessment before plaintiff can start collecting a database of millions.

Finally, plaintiff's unprecedented efforts to compile and maintain a database with sensitive personal information on millions of registered Oregonians, and tens and hundreds of millions of Americans, further run afoul of the procedural requirements and protections of the E-Government Act, § 208, 116 Stat. at 2921. In plaintiff's words, Congress enacted the E-Government Act because "technological changes in computers, digitized networks, internet access, and the creation of new information products" all "have important ramifications for the protection of personal information contained in government records and systems."

U.S. Dep't of Justice, Office of Privacy & Civil Liberties, *E-Government Act of 2002*, https://www.justice.gov/opcl/e-government-act-2002.

As a result, the statute requires federal agencies to conduct a "privacy impact assessment" prior to "initiating a new collection of information" that "includes any information in an identifiable form permitting the physical or online contacting of a specific individual" if the information encompasses "10 or more persons."  E-Government Act § 208(b), 116 Stat. at 2921.  By the statute's plain terms, the assessment and its procedural requirements must be completed "*before*" the agency initiates a new collection of information.  *Id.* § 208(b)(1)(A)(ii) (emphasis added).

Plaintiff's efforts here trigger the provisions and protections of the E-Government Act.  Plaintiff seeks, for the first time in the nation's history, to compile a data file with the names, addresses, and sensitive voter information for millions of registered voters, thereby comprising a collection of personal identifying information for 10 or more persons.  *Id.* § 208(b)(1)(A)(ii)(II); *see* Exec. Office of the President, Office of Mgmt. & Budget, *M-03-22, OMB Guidance for Implementing the Privacy Provisions of the E-Government Act of 2002* (Sept. 26, 2003), https://www.justice.gov/opcl/page/file/1131721/dl (providing guidance to agencies on how to comply with the Act's requirements).

Plaintiff's efforts also fail the E-Government Act's requirements.  Despite the extreme privacy risks inherent in compiling, maintaining, and sharing a data

40

file with the sensitive personal information of millions of individuals, the U.S. Department of Justice has not even conducted the initial privacy impact assessment required by the law, much less implemented technological systems to safeguard such sensitive data. Without having complied with even those baseline steps mandated by Congress in the Act, plaintiff cannot now seek to compel the creation and disclosure of a digital copy of Oregon's unredacted voter roll.

## CONCLUSION

The Court should affirm the judgment of the district court.

Respectfully submitted,

DAN RAYFIELD  #064790
Attorney General
PAUL L. SMITH  #001870
Solicitor General


/s/  Robert A. Koch
_____
ROBERT A. KOCH  #072004
Attorney-in-Charge,
Civil & Administrative Appeals
JONA J. MAUKONEN  #043540
Assistant Attorney-in-Charge,
Civil & Administrative Appeals
robert.a.koch@doj.oregon.gov
jona.j.maukonen@doj.oregon.gov

Attorneys for Defendants-Appellees
State of Oregon and Tobias Read

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, undersigned counsel is aware of one related case: *United States v. Weber*, No. 26-1232 (9th Cir.). The two cases raise closely related issues, and the Court has calendared them for argument and submission on the same day before the same panel.

DATED: April 17, 2026

/s/ Robert A. Koch
_____
ROBERT A. KOCH  #072004
Attorney-in-Charge,
Civil & Administrative Appeals
robert.a.koch@doj.oregon.gov

Attorney for Defendants-Appellees
State of Oregon and Tobias Read

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7), Federal Rules of Appellate Procedure, I certify that the Appellees' Brief is proportionately spaced, has a typeface of 14 points or more, and contains 9,245 words.

DATED:  April 17, 2026

/s/  Robert A. Koch
_____
ROBERT A. KOCH  #072004
Attorney-in-Charge,
Civil & Administrative Appeals
robert.a.koch@doj.oregon.gov

Attorney for Defendants-Appellees
State of Oregon and Tobias Read

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2026, I directed the Appellees' Brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/  Robert A. Koch
_____
ROBERT A. KOCH  #072004
Attorney-in-Charge,
Civil & Administrative Appeals
robert.a.koch@doj.oregon.gov

Attorney for Defendants-Appellees
State of Oregon and Tobias Read

RAK:kw5/1018021381