No. 26-1231

IN THE

# United States Court of Appeals
## for the Ninth Circuit

———

UNITED STATES OF AMERICA,

*Plaintiff – Appellant,*

*v.*

STATE OF OREGON;
TOBIAS READ, OREGON SECRETARY OF STATE,

*Defendants – Appellees,*

OUR OREGON; DAN DIIULIO;
EMMA CRADDOCK; STEPHEN GOMEZ,

*Intervenor-Defendants – Appellees.*

———

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

———

**BRIEF FOR *AMICUS CURIAE***
**CAMBRIDGE CENTER FOR JUSTICE**
**IN SUPPORT OF APPELLEES STATE OF OREGON, ET AL.**

———

Paul Fricke
FRICKE & BARNES LAW
701 Palomar Airport Road, Ste. 300
Carlsbad, CA 92011
Tel: (626) 807-5524
paulfricke@frickebarnes.com

*Counsel for Amicus Curiae*

ii

# TABLE OF CONTENTS

Page

Table of Authorities ............................................................. iii

Interest of *Amicus Curiae* ...................................................... 1

Summary of Argument ............................................................. 1

Argument ....................................................................... 4

  I. TITLE III SHOULD BE CONSTRUED IN OREGON'S FAVOR TO AVOID CONSTITUTIONAL DOUBT ...................................... 4

    A. The United States' Disclosure Demand Is Subject To Exacting Scrutiny ............................................... 5

      1. Voter registration with a political party is association protected by the First Amendment. ........ 5

      2. The disclosure demand threatens to chill political association, thus subjecting it to scrutiny. ........... 7

      3. The applicable standard is exacting scrutiny with a narrow tailoring requirement. ......................... 17

      4. The United States cannot distinguish this case from the compelled-disclosure precedents. ........... 18

    B. The United States' Demand Fails Exacting Scrutiny ........... 22

      1. The United States' specific compliance interest fails narrow tailoring. .................................. 22

      2. The government's broader interest amounts to administrative ease, which is not sufficiently important ............................................. 26

Conclusion ..................................................................... 29

Certificate of Compliance ...................................................... 30

Certificate of Service ......................................................... 31

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Commc'ns Assn. v. Douds,*
339 U. S. 382 (1950) ..................................................................... 20

*Ams. for Prosperity Found. v. Bonta,*
594 U. S. 595 (2021) ............................................................... passim

*Anderson v. Celebrezze,*
460 U. S. 780 (1983) ..................................................................... 18

*Bellitto v. Snipes,*
935 F.3d 1192 (11th Cir. 2019) ..................................................... 24

*Brown v. Socialist Workers Comm.,*
459 U. S. 87 (1982) ....................................................................... 17

*Buckley v. Valeo,*
424 U. S. 1 (1976) ......................................................................... 17

*Burdick v. Takushi,*
504 U. S. 428 (1992) ..................................................................... 18

*California Democratic Party v. Jones,*
530 U. S. 567 (2000) ................................................................... 5, 6

*Clark v. Martinez,*
543 U. S. 371 (2005) ....................................................................... 4

*DeBartolo Corp. v. Gulf Coast Trades Council,*
485 U. S. 568 (1988) ....................................................................... 4

*Democratic Party of United States v.*
*Wisconsin ex rel. La Follette,*
450 U. S. 107 (1981) ........................................................................ 6

*Doe v. Reed,*
561 U. S. 186 (2010) ................................................................. 17, 25

## Cases—Continued

*Greidinger v. Davis*,
988 F.2d 1344 (4th Cir. 1993)................................................................. 20

*Kusper v. Pontikes*,
414 U. S. 51 (1973)..................................................................... 7, 10

*McCutcheon v. Federal Election Commission*,
572 U. S. 185 (2014).................................................................... 18

*NAACP v. Alabama ex rel. Patterson*,
357 U. S. 449 (1958).............................................................. passim

*Pub. Int. Legal Found. v. Benson*,
136 F.4th 613 (6th Cir. 2025) ......................................................... 24

*Roberts v. U. S. Jaycees*,
468 U. S. 609 (1984)....................................................................... 5

*Shelton v. Tucker*,
364 U. S. 479 (1960)................................................................. passim

*Tashjian v. Republican Party of Conn.*,
479 U. S. 208 (1986)....................................................................... 6

*United States v. Jones*,
565 U. S. 400 (2012)...................................................................... 15

*United States v. Weber*,
No. 2:25-cv-09149-DOC-ADS,
2026 BL 14053 (C.D. Cal. Jan. 15, 2026)........................................... 15

## Other Authorities

Bobby Allyn, *How Palantir, the Secretive Tech Company,
Is Rising in the Trump Era*, NPR (May 3, 2025),
https://perma.cc/EVV4-J3GV ......................................................... 15

*How Eric Works*, ERIC, https://perma.cc/N3ZA-7GK7
(last visited Apr. 17, 2026) ........................................................... 21

v

Jen Fifield & Zach Despart, *"Not Ready for Prime Time."*
*A Federal Tool to Check Voter Citizenship Keeps*
*Making Mistakes.*, ProPublica (Feb. 13, 2026),
https://perma.cc/K3AB-EXPU ......................................................... 13

Jude Joffe-Block & Miles Parks, *The Trump*
*Administration Is Building a National*
*Citizenship Data System*, NPR (June 29, 2025),
https://perma.cc/8PFL-6FMV ..................................................... 11, 28

Miles Parks & Jude Joffe-Block, *How a U.S. Citizen Lost*
*His Voter Registration to a Federal Database Error*,
NPR (Dec. 13, 2025), https://perma.cc/RPD7-BBFT .......................... 14

Oregon Sec'y of State, Oregon Voter Registration Card
(Form SEL 500) (rev. Jan. 2024),
https://perma.cc/K7RC-6QQT........................................................ 6, 28

*Technology & Security Overview*, ERIC,
https://perma.cc/LC2J-FN9U
(last visited Apr. 17, 2026) ............................................................. 21

*Verification Process, About SAVE*, USCIS,
https://perma.cc/5RQZ-BZE4
(last visited Apr. 17, 2026) ....................................................... 11, 28

1

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus* Cambridge Center for Justice is a Massachusetts registered nonprofit organization whose mission is to advance constitutional justice by defending individual liberties, opposing abusive government policies, protecting immigrants, and promoting expanded access to education.

Because this case involves a government action that threatens to curtail First Amendment rights, and in particular the rights of recently naturalized citizens, it implicates the same interests that Cambridge Center for Justice seeks to secure. Further, *amicus*'s brief advances a constitutional argument that may not be explored by the parties, but offers this Court an additional basis for affirming the judgment below.

## SUMMARY OF ARGUMENT

This case turns on a dispute over statutory interpretation, but *amicus* writes to lend an independent constitutional perspective that can guide this Court's reading of the statute. The parties dispute whether Title III of the 1960 Civil Rights Act authorizes the United States'

---

[1] This brief was not authored in whole or part by counsel for a party, and no one other than *amicus curiae* or their counsel made a monetary contribution to the preparation or submission of the brief. Counsel for all parties have consented to its filing.

2

present demand of Oregon's unredacted voter roll. Oregon has argued persuasively that it does not. However, in the event this Court finds ambiguity in the statute's text, and in light of the First Amendment danger *amicus* demonstrates below, the Court should favor Oregon's plausible reading to avoid constitutional doubt.

**A.** Americans should enjoy the ability to declare their political party affiliation while registering to vote without fearing privacy invasions or government reprisals—in fact, the First Amendment's protection of political association guarantees it so.

The United States' present demand for Oregon's complete, unredacted voter lists would burden that right. In *Shelton v. Tucker*, the Supreme Court held that a compelled disclosure can chill association by virtue of the government's capability to make the disclosure consequential—without any showing of public exposure or retaliation. That doctrine controls here, and rests on three features of the demand: the disclosure is tethered to a protected associational choice (the voter's party declaration); the unique identifiers sought—last four digits of a Social Security number, driver's license number, and date of birth—are the keys linking that choice to a citizen's identity from the government's

vantage point, from taxes and employment to immigration status and welfare eligibility; and the recipient is the federal government, whose leverage over the citizen gives the linkage its force. The administration has already announced it will exercise that capability, running voter rolls through the error-prone SAVE system to flag suspected noncitizens for criminal referral. For many citizens, the rational response will be to opt out by forgoing voter registration. That chilling effect flies in the face of the First Amendment, and for more than sixty years the Supreme Court has held that only exacting scrutiny with a narrow tailoring requirement can justify it.

**B.** The United States falls well short. Its stated interest in ensuring Oregon's compliance with federal voting statutes could be understood in two ways: *specifically*, by verifying Oregon's bookkeeping practices, or *broadly*, by running the voter roll through a federal citizenship database to identify noncitizens. But the specific interest fails because the government's demand is not narrowly tailored—it seeks wholesale production of sensitive data when procedural checks would suffice. And the broader interest amounts, in reality, to administrative ease: stockpiling data the government cannot currently use, including driver's

4

license numbers that can't even be inputted into the SAVE database, so that it is "close at hand, just in case." Neither justification survives exacting scrutiny.

## ARGUMENT

### I. TITLE III SHOULD BE CONSTRUED IN OREGON'S FAVOR TO AVOID CONSTITUTIONAL DOUBT

When a court faces two plausible interpretations of a statute, one raising constitutional problems and the other avoiding them, it must adopt the latter. *DeBartolo Corp. v. Gulf Coast Trades Council*, 485 U. S. 568, 575 (1988); *Clark v. Martinez*, 543 U. S. 371, 380–381 (2005).

That principle controls here. Oregon and the United States dispute what Title III of the 1960 Civil Rights Act requires of the Attorney General to bring a valid demand for state election records. The United States contends, *inter alia*, that the statute's "purpose" requirement should be construed loosely to greenlight any purpose the Attorney General states in writing, ER-78, and that "records" means all unredacted fields of voter data in Oregon's possession. ER-81–82. Oregon counters, and the district court agreed, that the Attorney General's "purpose" must relate to a voting-rights investigation, ER-24, and that "records" permits redaction of sensitive voter information. ER-28.

5

Oregon's reading should prevail. As discussed at length below, the United States' request for Oregon's unredacted voter list risks chilling the First Amendment right to political association, thus subjecting it to exacting scrutiny with a narrow tailoring requirement. And the federal government cannot satisfy this level of scrutiny. Thus, this Court should adopt Oregon's plausible reading of Title III to avoid constitutional doubt.

## A. The United States' Disclosure Demand Is Subject To Exacting Scrutiny

### 1. Voter registration with a political party is association protected by the First Amendment.

Political association stands among the bedrock liberties enjoyed in our republic. Stemming from a broader First Amendment "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends," *Roberts v. U. S. Jaycees*, 468 U. S. 609, 622 (1984), the right of political association is especially vital, because "[r]epresentative democracy … is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views." *California Democratic Party v. Jones*, 530 U. S. 567, 574 (2000).

This case puts one particular exercise of political association in sharp focus: registering to vote. Registration in Oregon requires citizens to either declare an affiliation with a political party or attest they have none. Oregon Sec'y of State, Oregon Voter Registration Card (Form SEL 500) (rev. Jan. 2024), https://perma.cc/K7RC-6QQT. This act constitutes political association protected by the First Amendment, for two reasons.

*First*, political parties are protected by the "freedom to join together in furtherance of common political beliefs," *California Democratic Party*, 530 U. S. at 574 (quoting *Tashjian v. Republican Party of Conn.,* 479 U. S. 208, 214–215 (1986)), so presupposed is their "freedom to *identify* the people who constitute the association …" *Id.* (emphasis added) (quoting *Democratic Party of United States v. Wisconsin ex rel. La Follette*, 450 U. S. 107, 122 (1981)). Voter registration, then, is a paradigmatic way political parties *identify* the citizens who constitute the collective, thus serving as an "associational opportunit[y] at the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community." *Tashjian v. Republican Party of Conn.*, 479 U. S. 208, 216 (1986).

7

*Second*, the individual voter's ability to declare a party affiliation is protected. See *Kusper v. Pontikes*, 414 U. S. 51, 57 (1973) (striking down Illinois law burdening voters' ability to switch party affiliations as an impermissible encroachment on "[t]he right to associate with the political party of one's choice").

That a citizen's declaration of party on a registration form is not her *sole* means of political association is inconsequential: In Oregon, this declaration dictates which primary elections she may participate in, and preventing participation in primary elections represents a substantial abridgement of associational rights. See *id.* at 58.

**2. The disclosure demand threatens to chill political association, thus subjecting it to scrutiny.**

"[I]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute … a restraint on freedom of association." *NAACP v. Alabama ex rel. Patterson*, 357 U. S. 449, 462 (1958). Since *NAACP*, the Supreme Court has clarified that burdens on associational rights are not limited to *public* disclosures: "disclosure requirements can chill association even if there is no disclosure to the general public." *Ams. for Prosperity Found. v. Bonta*, 594 U. S. 595, 616 (2021) (quoting *Shelton v. Tucker*, 364 U. S. 479, 486

(1960)) (internal quotation marks omitted). The dispositive consideration is instead whether the disclosure demand "may have the effect of curtailing the freedom to associate, and … the possible deterrent effect of disclosure." *Id.* (quoting *NAACP*, 357 U. S. at 460–461) (internal quotation marks omitted).

The origin of that rule is *Shelton* itself, and its reasoning bears articulation. The Court there struck down an Arkansas statute requiring every public-school teacher to file affidavits listing their memberships in political organizations. *Shelton*, 364 U. S. at 480. What the Court found chilling was not *publication* of the teachers' affiliations; in fact, as enforced, the affidavits reached only school authorities. *Id.* at 486.

Rather, three factors about the statute's disclosure requirement combined to give school administrators a capability that chilled association. First, requiring teachers to disclose all their political affiliations implicated their right of free association. *Id.* at 485–486. Second, the affidavits, signed and submitted by each teacher individually, tied each teacher directly to the list of memberships she reported. *Id.* at 480. And third, the school officials' status as employers gave them the power to reward or punish teachers based on their

9

reported associational ties. *Id.* at 486 (noting the "absolute will of those to whom the disclosure must be made"). These three features were enough to generate a capability that exerted "constant and heavy" pressure on teachers "to avoid any ties which might displease those who control his professional destiny." *Id.* The Court required no showing that school boards had ever used the affidavits to penalize any teacher, or even intended to. The capability—born from these three factors—was the chill.

*i.* In this case, the United States demands Oregon provide it with "an electronic copy of the state's voter registration list containing *all fields*, which … must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number …" ER-11 (emphasis in original). The same three features observed by the Court in *Shelton* are present in the United States' instant demand — and they combine to produce the same capability-based chill found in *Shelton*.

*First,* the compelled disclosure is tethered to a protected associational choice. As shown above, a voter's declaration of party affiliation on the Oregon registration form is an exercise of the First Amendment right of political association. *Supra* Part I.A.1. That the

10

compelled disclosure implicates a protected activity separates this case from hypotheticals involving innocuous administrative compilation, such as collection of vehicle registration, tax, or welfare records. Rather, the United States is seeking the field on the voter registration form that records the voter's "right to associate with the political party of [her] choice," *Kusper*, 414 U. S. at 57—bundled with the identifying keys necessary to act on it.[2]

*Second*, the unique voter identifiers (UVIs) the United States demands—the last four digits of the voter's Social Security number, her driver's license number, and her date of birth—function as cross-domain keys enabling the United States to link voters' political affiliations with their identities and federal records. Oregon's publicly accessible list, containing just names, addresses, and party affiliations, cannot be systematically queried against federal databases. See Press Release,

---

[2] That *Shelton*'s disclosure was a condition on employment, and this demand is a condition on voting, does not distinguish the two. The *Shelton* Court did not rest its chilling analysis on the severity of the consequence; compelled disclosures, by definition, carry some consequence for noncompliance. Here, the consequence of withholding one's sensitive identifiers from the federal government is the inability to register to vote — analogous to *NAACP*, where refusing to reveal one's NAACP membership to the State meant forgoing participation in the organization altogether. See generally *NAACP*, 357 U. S. 449.

U. S. Citizenship & Immigr. Servs., *USCIS Deploys Common Sense Tools to Verify Voters* (May 22, 2025), https://perma.cc/8FRE-EEED. But that changes with UVIs, which contain the requisite data that the SAVE tool needs to identify an individual: the last four digits of an individual's Social Security number, in addition to her full name and birthdate. See *Verification Process*, *About SAVE*, USCIS, https://perma.cc/5RQZ-BZE4 (last visited Apr. 17, 2026); Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR (June 29, 2025), https://perma.cc/8PFL-6FMV.

But the significance of those fields runs farther. The last four digits of a Social Security number, paired with full name and date of birth, is sufficient to match a voter record against Social Security Administration files, against Internal Revenue Service returns, against federal immigration records, and against the federal employment and benefits databases—E-Verify, SNAP, Medicaid—that share the same identifiers. Driver's license numbers unlock connections to State DMV records, which the administration has announced it intends to integrate with SAVE as well. *Id.* Paired with a voter's party declaration, the UVIs permit the federal government to map that affiliation onto almost any

12

federal record generated during a citizen's lifetime. Put simply, UVIs enable the infrastructure of linkage between a voter's protected associational choice and the government's entire record of that voter.

*Third*, the recipient here is the federal government. The school boards in *Shelton* held leverage only over the professional destinies of the teachers they employed. See 364 U. S. at 486. But the federal government and its agents may hold leverage over a citizen's employment authorization, tax liability, welfare and Medicare eligibility, Social Security benefits, immigration status, and even exposure to federal criminal investigation—the full sweep of the administrative and regulatory state her life touches. If the school boards' leverage was enough in *Shelton*, then *a fortiori* the federal government's far broader influence over life outcomes—now armed with UVIs—would generate a chilling effect on citizens who might be deterred from declaring their party affiliations when registering to vote.

Under *Shelton*, the mere capability arising from the convergence of these three factors is enough to trigger scrutiny, so this Court need not wait to see it exercised. "The possible deterrent effect of disclosure" triggers scrutiny. *Bonta*, 594 U. S. at 616 (quoting *NAACP*, 357 U. S. at

460–461) (internal quotation marks omitted). Even so, the argument here is no abstraction: The federal administration has announced it *will* exercise the capability—and has postured in a manner that makes associational chilling far more than a reasonable probability.

*ii.* The Justice Department has admitted that it intends to share state voter rolls with the Department of Homeland Security (DHS), which will run the lists through SAVE to identify noncitizens. See Transcript on Motion to Compel and Motions to Dismiss at 50, *United States v. Amore*, No. 25-CV-639 (D. R.I. Mar. 26, 2026), Dkt. 47.

But SAVE is unreliable. It relies on Social Security Administration records that are frequently "outdated or incomplete," particularly for people not born in the U. S. Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/K3AB-EXPU. The consequences are well documented: In Boone County, Missouri, "more than half" of voters identified as noncitizens were actually citizens. In Denton County, Texas, twelve flagged voters proved their citizenship within weeks, yielding "an error rate in the county of at least 14%." *Id.*

14

These errors do not remain administrative. USCIS has confirmed that "when SAVE flags voters as noncitizens, they are also referred to DHS for possible criminal investigation." *Id.* The risk of criminal referral falls hardest on naturalized citizens: Because SSA records often lag behind updated citizenship status, naturalized Americans are the most likely to be misidentified. Consider Anthony Nel, a naturalized citizen who immigrated from South Africa as a child. SAVE flagged him among 2,724 Texas voters as a "potential noncitizen." See Miles Parks & Jude Joffe-Block, *How a U.S. Citizen Lost His Voter Registration to a Federal Database Error*, NPR (Dec. 13, 2025), https://perma.cc/RPD7-BBFT. Faced with a thirty-day demand to upload his passport online to prove his citizenship, Nel—reasonably wary of transmitting such sensitive documents—missed the deadline, triggering cancellation of his registration. *Id.* A naturalized citizen who wishes to exercise her associational right but reasonably fears the prospect of a wrongful criminal referral or the threat of deregistration faces the very sort of unconstitutional dilemma that *NAACP*'s progeny have long forbidden: Register and expose herself to the federal government's cross-domain scrutiny, or forgo the exercise altogether. That is the *Shelton* dilemma in

operation, made even more acute by the risk of wrongful criminal referral.

Worse still, the SAVE pipeline is not even the outer bound of what the administration has planned. A parallel district court found that the DOJ's voter-data initiative "lays the groundwork to amass the personal information of millions of Americans in a centralized database," enlisting the contractor Palantir to "build a massive repository that can house data collected from multiple federal agencies such as the Internal Revenue Service, the Social Security Administration, and the Department of Health and Human Services." *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 BL 14053, at *12–13 (C.D. Cal. Jan. 15, 2026); *see also* Bobby Allyn, *How Palantir, the Secretive Tech Company, Is Rising in the Trump Era*, NPR (May 3, 2025), https://perma.cc/EVV4-J3GV.

Justice Sotomayor anticipated precisely this kind of aggregation in *United States v. Jones*, warning that the government's capacity to mine data on citizens' "familial, political, professional, religious, and sexual associations" can "alter the relationship between citizen and government in a way that is inimical to democratic society." 565 U. S. 400, 416 (2012) (Sotomayor, J., concurring). This evidence merely bolsters the conclusion

16

*Shelton*'s doctrine already supplies: The *capability* enabled by disclosure in this case—whether one looks to SAVE alone or to the broader federal repository—is enough to chill associational rights for *all* citizens who might be thinking of registering to vote.[3]

\* \* \*

To be sure, the chilling effects described here are not certainties. But First Amendment jurisprudence has never so required. Scrutiny is "triggered by [government] action which *may have* the effect of curtailing the freedom to associate and by the *possible deterrent effect* of disclosure." *Bonta*, 594 U. S. at 616 (quoting *NAACP*, 357 U. S. at 460–461) (emphasis added and internal quotation marks omitted). In similar compelled disclosure contexts, the Court has warned against "unduly strict requirements of proof [that] could impose a heavy burden" on challengers, thus only requiring "a reasonable probability that the compelled disclosure … will subject [challengers] to threats, harassment, or reprisals from either Government officials or private parties." *Brown*

---

[3] Though *Jones* concerned the Fourth Amendment, Justice Sotomayor's concern applies with equal force to First Amendment associational rights. Political affiliation is a central facet of the mosaic her concurrence warned against the government aggregating.

17

*v. Socialist Workers Comm.*, 459 U. S. 87, 93 (1982) (quoting *Buckley v. Valeo*, 424 U. S. 1, 74 (1976)).

**3. The applicable standard is exacting scrutiny with a narrow tailoring requirement.**

Less than five years ago, in *Bonta,* the Supreme Court clarified the level of scrutiny that applies when a government's compelled disclosure demand threatens to chill associational rights: exacting scrutiny with a narrow tailoring requirement.

To begin, "there must be a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* at 607 (quoting *Doe v. Reed*, 561 U. S. 186, 196 (2010)) (internal quotation marks omitted). The *Bonta* Court crucially emphasized that "[a] substantial relation is necessary *but not sufficient* to ensure that the government adequately considers the potential for First Amendment harms …" *Id.* at 609–610 (emphasis added). Thus, "[w]here exacting scrutiny applies, the challenged requirement *must be narrowly tailored to the interest it promotes*, even if it is not the least restrictive means of achieving that end." *Id.* (emphasis added); *see also Shelton,* 364 U. S. at 488 (holding that "purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end

18

can be more narrowly achieved"); *McCutcheon v. Federal Election Commission*, 572 U. S. 185, 218 (2014) (plurality opinion) (requiring "a fit ... that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective").[4]

**4. The United States cannot distinguish this case from the compelled-disclosure precedents.**

The United States may raise two arguments to distinguish this case from the Supreme Court's compelled-disclosure precedents which required exacting scrutiny with narrow tailoring. *First*, that because significant voter data is already public, the UVIs sought here would not deanonymize voters; and *second*, that because Oregon already shares comparable data with ERIC, the DOJ's demand creates no additional chill. Neither passes muster.

---

[4] The *Anderson-Burdick* balancing test does not apply here. *Burdick* governs when States regulate the mechanics of elections—such as ballot access rules, ID requirements, and deadlines—that directly frustrate the ability to exercise electoral rights. See *Burdick v. Takushi*, 504 U. S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U. S. 780, 789 (1983). The *NAACP* line applies when compelled disclosure of information would burden the right of political association via chilling. See *NAACP*, 357 U. S. at 462. This case is a paradigmatic instance of the latter. And the government is acting as an *investigator* in this context, just like the governmental actors did in *NAACP*, *Shelton*, and *Bonta*. The compelled-disclosure precedents apply.

19

*i. First*, the United States may argue that previous compelled-disclosure cases all involved deanonymizing members of causes or parties, and that because voter identities here are already public, its demand is distinguishable. Not so.

To be sure, the bulk of the Supreme Court's previous compelled disclosure cases *did* involve a risk of deanonymizing. But the UVIs sought by the United States here would accomplish the same practical effect as the deanonymizing considered in the precedents; the UVIs would uniquely deanonymize voters *in the eyes of the federal government* by enabling systematic matching across databases for immigration enforcement and broader data aggregation. See *supra*, at 10–12.

Even if not so, the Supreme Court has never held deanonymization *necessary* for a compelled-disclosure program to offend the First Amendment. Cases since *NAACP* have instead treated the ultimate *consequence* of chilling as paramount, regardless of the mechanism. The central question has always been whether a governmental action has the "*practical effect* of discouraging the exercise of constitutionally protected political rights." *NAACP*, 357 U. S. at 461 (emphasis added and internal

20

quotation marks omitted) (quoting *Am. Commc'ns Assn. v. Douds*, 339 U. S. 382, 393 (1950)).[5]

*ii. Second*, the United States may argue its demand is distinct from prior cases because Oregon already shares comparable data with the Electronic Registration Information Center (ERIC), run by twenty-five states. See ER-82 ("… the data the United States has requested under the CRA is the same that twenty-five states and the District of Columbia routinely share through [ERIC]"); see also Amicus Br. for America's Future and Citizens United, at 19.

But the Supreme Court rejected this reasoning in *Bonta*. There, California argued its Schedule B disclosure requirement did not burden associational rights "because tax-exempt charities already provide their Schedule Bs to the IRS." 594 U. S. at 615–616. The Court swiftly

---

[5] Perhaps the United States then contends that the compelled disclosure precedents have all involved disclosures of political *associations* themselves, whereas this case involves disclosures of UVIs, not the already-public associations. But as with the deanonymizing argument, the fact that voter data is not systematically actionable by federal officials *without* UVIs makes the demand for UVIs, in effect, also a disclosure of associations. Plus, courts have not interpreted the compelled disclosure precedents so narrowly. See *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993) (following the compelled disclosure precedents in finding impermissible First Amendment chilling, even though the compelled disclosure comprised voters' SSNs, not their actual associations).

21

dispatched the argument: "each governmental demand for disclosure brings with it an additional risk of chill," *id.* at 618, and disclosures to different governmental entities pose *varying* risks of chill. *Id.* That reasoning carries well to this case—ERIC operates under specific data-use limitations and security protocols that find no parallel in the DOJ's demand. See, *e.g.*, *How Eric Works*, ERIC, https://perma.cc/N3ZA-7GK7 (last visited Apr. 17, 2026); *Technology & Security Overview*, ERIC, https://perma.cc/LC2J-FN9U (last visited Apr. 17, 2026). And at minimum, the demand constitutes a disclosure *beyond* ERIC, thus "bring[ing] with it an additional risk of chill." *Bonta*, 594 U. S. at 618.[6]

All told, this case fits squarely within the compelled-disclosure jurisprudence. UVIs uniquely enable the government's twin objectives—searching voters in SAVE and feeding them into a national database—each of which independently chills association. Exacting scrutiny therefore applies.

---

[6] This fact also explains why it is inconsequential that citizens consented to making their party affiliations public when registering to vote. First, these registered voters certainly did not consent to their party affiliations being linked to their identities *in the eyes of the federal government*. Second, whether or not already-registered citizens consented says nothing to diminish the chilling effect, which would only apply to future, prospective registrants.

## B. The United States' Demand Fails Exacting Scrutiny

To overcome exacting scrutiny in the compelled disclosure context, the United States must demonstrate that its demand for Oregon's complete, unredacted voter roll is substantially related to a sufficiently important government interest, and that the demand is narrowly tailored to that interest. See *supra*, at 17–18.

The government has characterized its interest as verifying Oregon's compliance with the NVRA and HAVA. See U. S. Br., at 29. That interest could be served in two ways: *specifically*, by verifying Oregon's data collection and handling under the NVRA and HAVA; or *broadly*, by running the roll through SAVE to identify noncitizen voters. Neither survives exacting scrutiny.

### 1. The United States' specific compliance interest fails narrow tailoring.

Ensuring State compliance with federal election law is an important interest. But even crediting the government's stated purpose, its demand for Oregon's entire unredacted voter roll is not narrowly tailored. Under *Bonta*, "the challenged requirement must be narrowly tailored to the interest it promotes, even if it is not the least restrictive means of achieving that end." 594 U. S. at 609–610. The government's

demand fails this requirement for two reasons: *First*, it is far from necessary to achieve its stated compliance purpose; *second*, the government has not demonstrated that it genuinely considered less intrusive alternatives before resorting to wholesale data collection.

*i.* Cases involving narrow tailoring have typically required the government to show that its compelled disclosure program is *necessary* for achieving its ends. See, *e.g.*, *Shelton*, 364 U. S. at 488; *Bonta*, 594 U. S. at 614 (finding California's Schedule B disclosure program insufficiently tailored because "there are multiple alternative mechanisms through which the Attorney General can obtain Schedule B[s] after initiating an investigation").

The United States claims it needs Oregon's unredacted voter rolls to assess the State's compliance with federal statutes: "The only way that the Attorney General can assess whether Oregon is actually collecting the driver's license and SSN4 information required … is to examine those election records." U. S. Br., at 30. This, despite the fact that the ordinary method of assessing compliance with the HAVA is to scrutinize list maintenance *procedures*, without a need for the voter lists themselves. As Oregon points out, the United States has, in fact, "investigated NVRA

24

and HAVA compliance for decades without requiring states to produce an unredacted statewide voter registration list," instead alleging violations "by describing the state's *program* [and] alleging specific *programmatic* deficiencies" (emphasis added). ER-46 n.7.

Indeed, courts have traditionally understood NVRA and HAVA compliance verification as procedural rather than results-based—the statutes dictate *processes* and *methods* States must implement, not outcomes they must guarantee. See, *e.g.*, *Bellitto v. Snipes*, 935 F.3d 1192, 1205 (11th Cir. 2019) (holding that the NVRA allows States to "meet the requirement" of the statute simply by implementing "*a method to satisfy the statute*" (emphasis added)); *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625–626 (6th Cir. 2025) (rejecting the idea that the NVRA promulgates a requirement for States to meet "quantifiable, objective standards"). Thus, it is unclear that even results-based deficiencies in Oregon's voter roll would necessarily qualify as violations of these procedural statutes, further undermining the necessity of the demand.[7]

---

[7] These facts alone distinguish the present case from *Doe v. Reed*, where the compelled disclosure served interests that "to an extent other measures cannot." 561

As the United States suggests itself, obtaining Oregon's unredacted list would simply be "helpful," "useful," and "convenient" towards its "ability to assess the State's compliance with its recordkeeping requirements." See U. S. Br., at 33 (arguing that "necessary" does not mean "essential or indispensable"). The district court below likewise struggled to identify necessity in the demand. See ER-24 n.4 (highlighting the United States' omission of "any reasonable explanation for why the Sensitive Voter Data in particular serves those purposes [of investigating NVRA or HAVA compliance]").

*ii.* Further, narrow tailoring independently requires the government to demonstrate that it genuinely considered less intrusive alternatives before resorting to broad compelled disclosure. In *Bonta*, the Court held that the government must demonstrate its need "in light of any less intrusive alternatives," 594 U. S. at 613, and found dispositive that California had "not even considered alternatives to the current disclosure requirement." *Id.* at 615. The record here reveals the same

---

U. S. at 199. Further, *Doe* is a pre-*Bonta* case where the Court did not apply a narrow tailoring requirement to its exacting scrutiny analysis; *Bonta* has since clarified the need for narrow tailoring. 594 U. S. at 609–610.

failure. The Department of Justice *did* gesture at less intrusive procedural alternatives in its July 16 letter to Oregon—but in the same breath demanded Oregon's complete, unredacted voter list. See ER-104– 106. That simultaneity, set against decades of federal compliance investigations that never required unredacted voter rolls, see ER-46 n.7, shows that DOJ did not exhaust procedural alternatives and find them wanting; it demanded the unredacted list before even *attempting* them. Under *Bonta*, a government that has "not even considered" less restrictive alternatives cannot satisfy exacting scrutiny. 594 U. S. at 615.

## 2. The government's broader interest amounts to administrative ease, which is not sufficiently important.

Broadly construed, the federal government's interest is to run voters through SAVE to identify noncitizens, which could speak to Oregon's compliance with HAVA. But scope and context reveal that, "in reality," this interest is "less in investigating [compliance with federal law] and more in ease of administration"—which fails exacting scrutiny. *Bonta*, 594 U. S. at 614. After all, "[m]ere administrative convenience does not remotely reflect the seriousness of the actual burden that the demand for [unredacted voter rolls] imposes on [voters'] association

27

rights." *Id.* at 615 (internal quotation marks omitted). The United States' interest here is no different.

The mismatch between the scope of the government's data request and what it will actually use is the strongest evidence of administrative ease. The Court in *Bonta* engaged in similar analysis, comparing the required disclosure (charities' Schedule B forms) with how California actually used them. Because the data contributed to California's enforcement efforts "in only a small number of cases," *id.* at 614, the Court concluded that administrative ease (by having "every charity's information close at hand, just in case"), not investigating fraud, was the real interest served. *Id.* at 615.

Here, the mismatch between what data the government wants and what data it will actually use is no less stark. The United States demands from Oregon *all* data fields on all its registered voters, including "…his or her state driver's license number or the last four digits of the registrant's social security number …" ER-11. Oregon's voter registration process defaults to requiring citizens to provide their "valid Oregon Driver License, Permit or ID number" as the unique identifier, only asking for the last four digits of their SSN if registrants declare they "do

28

not have valid Oregon ID." Oregon Voter Registration Card, *supra*. The substantial majority of Oregon's voter records therefore contain a driver's license number, not SSN digits.

Yet SAVE cannot do *any* citizenship verification using driver's license numbers. The system requires "first and last name; and date of birth and at least one unique identifier such as … Social Security number" (capitalization and emphasis deleted). *Verification Process, About SAVE*, USCIS, https://perma.cc/5RQZ-BZE4 (last visited Apr. 17, 2026). USCIS itself confirms: "SAVE cannot verify [an individual's] immigration status or U. S. citizenship using a *driver's license number* … without another immigration enumerator" (emphasis added). *Id*. Driver's license integration is a future upgrade officials merely *hope* to implement. See Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR (June 29, 2025), https://perma.cc/8PFL-6FMV (citing sources familiar with future SAVE upgrades).

A large chunk of the data the government demands would thus have no current value for assessing compliance. The United States seeks to stockpile sensitive voter information *now* in anticipation of *later*

29

upgrades to SAVE—it wants the data "close at hand, just in case." *Bonta*, 594 U. S. at 614. That is precisely what led the Court to conclude that a similar disclosure requirement served, "in reality," an interest in administrative ease. *Id.* This Court should conclude the same.

## CONCLUSION

For the foregoing reasons, this Court should construe Title III of the 1960 Civil Rights Act in Oregon's favor to avoid serious constitutional doubt, and the judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Paul Fricke

PAUL FRICKE
*Counsel for Amicus Curiae*
*Cambridge Center for Justice*[8]

APRIL 21, 2026

---

[8] *Amicus* acknowledges Benjamin Who of the Cambridge Center for Justice for drafting this brief.

30

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-1231.

I am the attorney or self-represented party.

**This brief contains 5620 words,** including 0 words manually counted in any

visual images, and excluding the items exempted by FRAP 32(f). The brief's type

size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

**[x]** is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Paul Fricke             **Date** April 21, 2026
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**             *Rev. 12/01/22*

31

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Paul Fricke

PAUL FRICKE

*Counsel for Amicus Curiae*
*Cambridge Center for Justice*