**No. 26-1231**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

THE STATE OF OREGON, *et al.*,

*Defendants-Appellees*,

OUR OREGON; DAN DIIULIO; EMMA CRADDOCK; STEPHEN
GOMEZ,

*Defendants-Intervenors-Appellees*,

On Appeal from the United States District Court
for the District of Oregon
No. 6:25-cv-01666-MTK
Hon. Mustafa T. Kasubhai

---

**BRIEF OF PROPOSED *AMICI CURIAE* LEAGUE OF UNITED LATIN
AMERICAN CITIZENS AND LEAGUE OF WOMEN VOTERS OF
OREGON IN SUPPORT OF AFFIRMANCE**

---

Maura Eileen O'Connor (NY4312302)*
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
777 6th St. NW, Ste. 1100
Washington, DC 20001
Tel: (202) 249-7190

Robert Brent Ferguson (NY4890620)
Daniel S. Lenz (WI1082058)
Sejal Jhaveri (NY5396304)*
Renata O'Donnell (NY5767561)*
Alexis Grady (DC90017620)*
Kate Hamilton (DC90006168)

oconnore@brennan.law.nyu.edu

Andrew B. Garber (NY5684147)*
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Ste. 1750
New York, NY 10271
Tel: (646) 292-8310
Fax: (212) 463-7308
garbera@brennan.law.nyu.edu

Norman Eisen (DC435051)*
Pooja Chaudhuri (DC888314523)*
Sofia Fernandez Gold (DC90010196)*
Zsa'Queria Martin (DC90043047)*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE, Ste. 15180
Washington, DC 20003
Tel: (202) 601-8678
norman@democracydefenders.org
pooja@democracydefenders.org
sofia@democracydefenders.org
zsaqueria@democracydefenders.org
pooja@statedemocracydefenders.org

CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
bferguson@campaignlegalcenter.org
dlenz@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
agrady@campaignlegalcenter.org
khamilton@campaignlegalcenter.org

*Applications for admission
forthcoming

Counsel for Proposed Amici Curiae
League of United Latin American
Citizens and League of Women Voters
Oregon

**TABLE OF CONTENTS**

INTEREST OF *AMICI CURIAE* ................................................................1

INTRODUCTION ..................................................................................5

BACKGROUND ....................................................................................6

ARGUMENT .......................................................................................7

I.       Summary of Argument .................................................................7

II.      The district court correctly exercised judicial review to find that Appellant's demand failed to meet the CRA's requirements..............................7

III.     The United States' purported justifications for its demands for Oregon's sensitive voter information are pretext. ........................................9

         A.       President Trump's executive orders reveal the federal government's day-one campaign to amass sensitive information, culminating in the Mail Voting EO. ...............................................11

         B.       The administration has engaged in systematic, unlawful efforts to centralize Americans' data. ................................................13

         C.       The administration's inconsistent reasons for seeking this data cast doubt on its justifications for demanding the sensitive voter data in this case. ..................................................................18

IV.      DOJ's blanket demand for sensitive voter data will deter voter registration and participation, particularly among Latino voters. ...................19

         A.       DOJ's demand for Oregon's sensitive voter data has a chilling effect on voter registration and participation. ...............................20

         B.       The chilling effect is amplified for Latino voters and the organizations that serve them........................................................21

CONCLUSION....................................................................................25

CERTIFICATE OF COMPLIANCE....................................................................27

CERTIFICATE OF SERVICE........................................................................28

i

**TABLE OF AUTHORITIES**

**Cases**                                                                      **Pages**

*California v. U.S. Department of Health & Human Services*, No. 25-cv-05536-VC, 2025 WL 3751931 (N.D. Cal. Dec. 29, 2025)...................................................14

*Center for Taxpayer Rights v. Internal Revenue Service*, No. 1:25-cv-00457-CKK, 2025 WL 3251044 (D.D.C. Nov. 21, 2025) .............................................................13

*Center for Taxpayer Rights v. Internal Revenue Service*, No. 1:25-cv-00457-CKK, 2026 WL 551105 (D.D.C. Feb. 26, 2026) ........................................................13

*Community Economic Development Center of Southeastern Massachusetts v. Bessent*, No. 1:25-cv-12822-IT, 2026 WL 309281 (D. Mass. Feb. 5, 2026).....14

*Department of Commerce v. New York*, 588 U.S. 752 (2019)...............................8, 9

*League of United Latin American Citizens v. Executive Office of the President*, 808 F. Supp. 3d 29 (D.D.C. 2025)............................................................................5

*Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025).....................................22

*Olagues v. Russoniello*, 797 F.2d 1511 (9th Cir. 1986) .........................................20

*Russoniello v. Olagues*, 484 U.S. 806 (1987).........................................................20

*United States v. Amore*, No. 25-cv-00639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026) ...................................................................................................10

*United States v. Markwood*, 48 F.3d 969 (6th Cir. 1995)..........................................8

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ............................................8

*United States v. Tan Duc Nguyen*, 673 F.3d 1259 (9th Cir. 2012).........................20

*United States v. Weber*, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026) ................................6, 8, 9, 20, 24

**Constitutional Provisions**

U.S. Const. art. I, § 4................................................................................................5

**Statutes**

52 U.S.C. § 20705 ..................................................................................................7

**Other Authorities**

Abby Vesoulis & Ari Berman, *New Docs Show DHS Gathering Driver's License Data in Voter Fraud Crusade*, Mother Jones (Nov. 14, 2025), https://perma.cc/KA7T-N2EK...................................................................16

*An Assessment of Minority Voting Rights Access in the United States*, U.S. Commission on Civil Rights, (2018), https://perma.cc/J923-SHFJ...................16

*DOGE and state voter rolls*, Protect Democracy (July 15, 2025), https://perma.cc/TFD6-J8TC. ..............................................................15

Eli Hager, *DHS Seeks Access to Massive Employment, Salary and Family Database Legally Restricted to Use in Child Support Cases*, ProPublica (Mar. 11, 2026), https://perma.cc/KN7R-ERA8 ........................................................17

Executive Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025)...........................11

Executive Order No. 14,243, 90 Fed. Reg. 13681 (Mar. 20, 2025) ........................11

Executive Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ........................12

Executive Order No. 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026) ........................12

Hamed Aleaziz, *Immigration Agents Are Using Air Passenger Data for Deportation Effort*, New York Times (Dec. 12, 2025), https://www.nytimes.com/2025/12/12/us/politics/immigration-tsa-passenger-data.html.......................................................................................14

Jacob Bogage, Jeff Stein & Perry Stein, *IRS improperly disclosed confidential immigrant tax data to DHS*, Washington Post (Feb. 11, 2026), https://www.washingtonpost.com/business/2026/02/11/immigrants-irs-dhs-tax-data/ ..................................................................................17

Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*, Brennan Center for Justice (July 21, 2025), https://perma.cc/HN98-8N2Q .............................................................................15

Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica and Texas Tribune (Feb. 13, 2026), https://perma.cc/T2ER-EDCH ..............................15, 22

Jonathan Shorman, *Homeland Security wants state driver's license data for sweeping citizenship program*, Stateline (Nov. 25, 2025), https://stateline.org/2025/11/25/homeland-security-wants-state-drivers-license-data-for-sweeping-citizenship-program/.............................................................17

Joseph Cox, *Here's the document giving ICE 80 million Medicaid patients' data*, Freedom of the Press Foundation (Jan. 5, 2026), https://perma.cc/J9JT-MSHE...

Jude Joffe-Block, *The USDA wants states to hand over food stamp data by the end of July*, NPR (July 19, 2025), https://perma.cc/J3G3-QBSK. .............................14

Letter from Nancy Morales Gonzalez, Associate General Counsel, Social Security Administration Office of the General Counsel to Jon Sherman, Litigation Director & Senior Counsel, Fair Elections Center, (July 13, 2023), https://perma.cc/Y5U9-UTU8 ...................................................................15, 21

Motion to Dismiss Hearing Transcript, *United States v. Amore*, No. 25-cv-639-MSM, (Mar. 26, 2026)............................................................................18, 19

Motion to Dismiss Hearing Transcript, *United States v. Bellows*, No. 1:25-cv-468-LEW, (Mar. 26, 2026) ..............................................................15, 18, 19, 22

Meryl Kornfield, Elizabeth Dwoskin & Lisa Rein, *Whistleblower claims ex-DOGE member says he took Social Security data to new job*, Washington Post (Mar. 10, 2026), https://www.washingtonpost.com/politics/2026/03/10/social-security-data-breach-doge-2/ ..........................................................................17

iv

Nicole Alvarez, *The Trump Administration Is Using Americans' Sensitive Data to Build a Digital Watchtower*, Center for American Progress (Aug. 25, 2025), https://www.americanprogress.org/article/the-trump-administration-is-using-americans-sensitive-data-to-build-a-digital-watchtower ....................................13

Notice of Corrections to the Record, *American Federation of State, County, and Municipal Employees v. Social Security Administration*, No. 1:25-cv-00596-ELH (D. Md. Jan. 16, 2026), ECF No. 197 ......................................................16

Press Release, Department of Homeland Security, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025), https://perma.cc/Y8A5-YX3M ...........................................................................15

Rachel Siegel, Hannah Natanson & Laura Meckler, *DOGE is collecting federal data to remove immigrants from housing, jobs*, Washington Post (Apr. 15, 2025), https://perma.cc/JPP7-JJH4 ...................................................................17

Stephen Fowler & Jude Joffe-Block, *The Trump administration admits even more ways DOGE accessed sensitive personal data*, NPR (Jan. 30, 2026), https://perma.cc/3CNL-YHUK .........................................................................17

Tierney Sneed, *Internal documents shed light on Trump's crusade to vet state voter rolls*, CNN (Apr. 21, 2026), https://www.cnn.com/2026/04/21/politics/state-voter-rolls-trump-justice-department .......................................................................9

William Turton, Christopher Bing & Avi Asher-Schapiro, *The IRS Is Building a Vast System to Share Millions of Taxpayers' Data With ICE*, ProPublica (July 15, 2025), https://perma.cc/F2N2-GWNV .....................................................13

## INTEREST OF *AMICI CURIAE*[1]

**League of United Latin American Citizens** (LULAC) is the largest and oldest Latino civil rights organization in the United States with more than 400 councils nationwide and over 570,000 members. Founded in 1929, LULAC's mission is to improve the lives of Latino families throughout the United States and to protect their civil rights, including their voting rights.

LULAC Oregon has five local councils and one youth council with more than 60 members across the state, including many who are naturalized citizens. The councils are made up of community members who are committed to furthering LULAC Oregon's core mission—increasing civic engagement through voter registration, advocating for equitable higher education opportunities, affordable housing, and immigration issues, and creating pathways to academic excellence for Latino youth.

The vast majority of LULAC's members and volunteers are registered voters whose personal information is at stake in this litigation, including their dates of birth, state driver's license numbers, non-driver photo ID numbers, or last four digits of their social security numbers. Approximately 70% are registered to vote, and nearly

---

[1] Counsel for all the parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting this brief; and no other person contributed money intended to fund this brief.

1

80% of LULAC's registered members voted in 2020 and approximately 62% voted in 2022. As a result, LULAC has a strong interest in the confidentiality of its members' personal information, the potential deterrence effects on voter registration, its goal of ensuring that election information is appropriately handled, and the potential resources it may have to expend educating voters about the United States Department of Justice's (DOJ) use of their information. LULAC and its members have an interest in this litigation because they want to protect LULAC's mission to improve the lives of Latino families throughout the United States and to protect their civil rights, including voting rights.

LULAC Oregon has a strong interest in appearing as *amicus* in this case. DOJ's demand for the unredacted voter files, including personal and sensitive voter information, has already had a chilling effect on its members. Since DOJ filed its lawsuit, members and constituents who are registered to vote have expressed fear in their sensitive data being released. Similarly, members and constituents who are eligible to vote, but have not registered yet, have expressed reluctance to register and vote due to their sensitive data being shared. At events, volunteers have observed that potential voters are reluctant to engage with volunteers and discuss voting. As a result, there has been a decline in interactions with volunteers and the number of voter registration forms completed by LULAC. This undermines the organization's

2

mission to help register eligible, unregistered voters in the state, particularly those in the Latino community, and encourage them to vote.

DOJ's lawsuit also jeopardizes the credibility of LULAC Oregon as an organization. For decades, LULAC has been viewed as a trusted and reliable organization in the community. In the past, LULAC was able to reassure prospective registrants that their information was safe and secure. Relying on these assurances, members of the community registered to vote with LULAC volunteers. Now, individuals who the organization previously assisted have returned to express concern that LULAC misguided them when it explained that their information would remain confidential.

Founded in 1920, the **League of Women Voters of Oregon** (LWVOR) is a nonpartisan, non-profit, grassroots, membership organization committed to protecting the right to vote and promoting participation in the democratic process and civic engagement for all eligible people. LWVOR is the Oregon affiliate of the League of Women Voters (LWV), which was also founded in 1920 as an outgrowth of the struggle for women's right to vote. To further this mission, LWVOR's over 1,500 members engage in voter registration drives, host candidate forums, conduct numerous voter education activities, issue studies, and take positions relating to voters' rights, including privacy and data security. For over 100 years, LWVOR has been a consistent supporter of voters' rights, election security, and Oregonians' right

3

to privacy. Recent advocacy for election privacy includes testimony in support of Oregon House Bill 4144 in February of 2022, Oregon Senate Bill 293 in March of 2021, Oregon House Bill 3464 in July 2017, and a year-long Privacy and Cyber Security Study and Position published in 2020. Additionally, LWVOR has recently advocated for legislation in support of voting rights and expansion of voting access through testimony on Oregon Senate Bill 210 in March 2025, Oregon House Bill 166 in March 2023, Oregon Senate Bill 576 in January 2023, Oregon House Bill 2004 in March of 2023, and an Elections Methods Study and Informational Update in June 2023. LWVOR also presented testimony in March 2025 in opposition to Senate Bill 210, legislation that would have harmed voter access. As *amicus*, LWVOR seeks to protect Oregon voters' privacy and ensure that Appellant's unlawful requests do not chill voter engagement and participation in the political process. LWV affiliates have moved to intervene in parallel cases Appellant has brought in California, Kentucky, Maine, Minnesota, New Jersey, New York, Oklahoma, Pennsylvania, and Utah.[2]

---

[2] *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. filed Sept. 25, 2025), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Bellows*, No. 1:25-cv-00468-KFW (D. Me filed Sep. 16, 2025); *United States v. Simon*, No. 0:25-cv-03761-KMM-EMB (D. Minn. filed Sep. 25, 2025); *United States v. Caldwell*, No. 3:26-cv-02025-ZNQ-JTQ (D.N.J. filed Feb. 26, 2026); *United States v. Bd. of Elections of the State of N.Y.*, No. 1:25-cv-01338-MAD-PJE (N.D.N.Y. filed Sep. 25, 2025).

4

**INTRODUCTION**

The Constitution delegates election administration primarily to the states, subject to regulation by Congress. *See* U.S. Const. art. I, § 4. The Executive Branch has only a small role in elections and enjoys only the authority Congress grants. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 808 F. Supp. 3d 29, 41–42 (D.D.C. 2025) (permanently enjoining parts of an executive order on elections). Nonetheless, the Department of Justice has taken the unprecedented step of pressing the State of Oregon, and almost every other state, for its unredacted voter files, which contain, *inter alia*, driver's license numbers, months and days of birth, and the last four digits of voters' social security numbers. DOJ provided no basis or purpose to justify the request for this data under the Civil Rights Act of 1960 (CRA), though the statute expressly requires both.

The district court's decision to dismiss should be affirmed because DOJ's demand was insufficient on its face, and the Complaint therefore failed as a matter of law. Rather than having any basis or lawful purpose, DOJ's plans for this data seem to be part of President Trump's efforts to "take over" and "nationalize," elections in a move that would unlawfully expand the Executive's role into election administration. *See infra* Argument III.A.

The United States has sued 29 other states and the District of Columbia in an effort to obtain their unredacted statewide voter registration lists. Courts addressing

these cases have concluded that Appellant's demands amount to an "overreach and misuse" of its role in election administration beyond constitutional limits. ER-29; *see also Weber*, 2026 WL 118807, at \*20 ("The Executive may not unilaterally usurp the authority over elections . . . ."). If granted, Appellant's demand would make voters, whose information could be used "in unprecedented ways," ER-29, less likely to register and turn out to vote. *See, e.g.*, *Weber*, 2026 WL 118807, at \*20. "This risk threatens the right to vote which is the cornerstone of American democracy." *Id.*

## BACKGROUND

During the summer of 2025, DOJ sent a series of letters to the State of Oregon demanding various types of data about Oregon voters and elections. Oregon responded to each letter, offering to make its voter registration list available with only a few fields of sensitive information redacted if DOJ promised compliance with the Privacy Act, and answering DOJ's questions. Over the course of the correspondence, DOJ addressed the CRA once, stating in an August 14, 2025 letter that Section 301 of the CRA requires the preservation of certain election records and that Section 303 provides that any paper retained "shall, upon demand in writing by the Attorney General or his representative . . . be made available for inspection, reproduction, and copying[.]" ER-96. DOJ maintained "[t]he purpose of the [CRA] request is to ascertain Oregon's compliance with the list maintenance requirements

6

of the NVRA and HAVA." *Id.* After Oregon, complying with state law, declined to provide its unredacted file, the United States sued. ER-168. The district court dismissed Appellant's Complaint on February 5, 2026, and this appeal followed.

## ARGUMENT

### I. Summary of Argument

This Court should affirm the decision below because Appellant failed to include the requisite statement of basis and purpose required under the CRA, which ends the inquiry. Standard judicial review is appropriate under the CRA, and courts should look closely at the Appellant's unprecedented demand for the sensitive voting data of millions of Americans. The record in this case and similar cases across the country show that the justifications for the requests are pretextual and risk chilling voter participation in elections.

### II. The district court correctly exercised judicial review to find that Appellant's demand failed to meet the CRA's requirements.

The CRA provides that a district court "shall have jurisdiction by appropriate process to compel the production of" a document that the Attorney General demands. 52 U.S.C. § 20705 (emphasis added). Appellant argues that the district court erred by engaging in any judicial review whatsoever. It claims the district court should have just accepted Appellant's demand, *i.e.*, the court must approve DOJ's request so long as the Attorney General has stated in writing the basis and purpose of the demand. *See* Appellant Br. at 14-17. But nothing in the statute requires the

7

court to ratify the federal government's demand for a state's unredacted voter list without inquiring into the truth of Appellant's representations and the nature of its request. Appellant's arguments would make the court's review a mere "rubber stamp" of its requests rather than the appropriate process required by statute, and that is not the standard applied in a 12(b)(6) motion. *See* Appellant Br. 14-15 (arguing that Title III provides for summary proceedings and that the usual pleading standard does not apply); *but see Weber*, 2026 WL 118807, at *8 ("[n]othing in the text of Title III requires a special statutory proceeding or any abbreviated procedures"); *see also United States v. Markwood*, 48 F.3d 969, 979 (6th Cir. 1995) ("[A] district court is not a 'rubber stamp' for agency demands for the production of information.").

Judicial review of Appellant's demands for sensitive data is both appropriate and necessary. In reviewing agency action, the Supreme Court has emphasized that judicial review is "more than an empty ritual" and that "[a]ccepting contrived reasons would defeat the purpose of the enterprise." *Dep't of Com. v. New York*, 588 U.S. 752, 784–85 (2019). Federal agency demands for information warrant the same scrutiny. *See United States v. Morton Salt Co.*, 338 U.S. 632, 640 (1950); *Markwood*, 48 F.3d at 978. With the sensitive data of Oregon's voters at stake, this Court should apply the same procedural standards it would apply to any complaint and analyze whether Plaintiff's alleged reasons substantiate a claim under Title III. Courts need

8

not "ignore the disconnect between the decision made and the explanation given," nor are they "required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com.*, 588 U.S. at 785. (citation omitted). The district court rightfully found that Appellant's Title III claims must be dismissed because the DOJ's "proffered statement and purpose, as required under the statute, is both lacking in depth and is contrived." *Weber*, 2026 WL 118807, at *8; *see also* ER-26–28 ("When Plaintiff, in this case, conveys assurances that any private and sensitive data will remain private and used only for a declared and limited purpose, it must be thoroughly scrutinized and squared with its open and public statements to the contrary.").

## III. The United States' purported justifications for its demands for Oregon's sensitive voter information are pretext.

In addition to the legal deficiencies in Appellant's arguments, its demand for Oregon's sensitive voter data is based on thin and obvious pretext, which further undermines its contention that it provided sufficient information to support its demand for records. Recent reports suggest DOJ officials have advised that the department keep some state officials in the dark about what the administration was intending to do with unredacted state voter roll.[3] Ex. A, DOJ Email Obtained in FOIA. In November 2025, Voting Section Chief, Eric Neff referred to inquiries from

---

[3] Tierney Sneed, *Internal documents shed light on Trump's crusade to vet state voter rolls*, CNN (Apr. 21, 2026), https://www.cnn.com/2026/04/21/politics/state-voter-rolls-trump-justice-department.

9

state officials about DOJ's intended use of the data as "fishing to try to trap [DOJ] with contradictory statements" ahead of its appearance before the California district court. *Id.* Mr. Neff instructed that DOJ should not provide information about its intended purpose for the data and that it's replies to such inquiries should always be: "We will use the data in a manner consistent with Federal law" and "nothing more," because "HAVA, NVRA, CRA—none of them require [DOJ] to give the states information about what [DOJ is] going to do with the data." *Id.* Five months later, DOJ continues to represent that its purpose for the data is to evaluate compliance with the NVRA and HAVA. But other public actions and statements from federal officials reveal DOJ's true objective: "a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." ER-25 (quoting *Weber*, 2026 WL 118807, at *10). The four other courts to consider whether the CRA entitles DOJ to the information it seeks in parallel cases have accordingly rejected Appellant's contrived justification for uses of "highly sensitive voter information." ER-26; *see also Galvin*, 2026 WL 972129, at *1; *United States v. Amore*, No. 25-cv-00639-MSM-PAS, 2026 WL 1040637, at *5-6 (D.R.I. Apr. 17, 2026).

### A. President Trump's executive orders reveal the federal government's day-one campaign to amass sensitive information, culminating in the Mail Voting EO.

Appellant's actions reveal that its arguments regarding list maintenance are pretextual. In his first three months in office, President Trump signed three executive orders to enable an extraordinary consolidation of data by the federal government. In January 2025, the President issued Executive Order No. 14,158 (DOGE EO), which "establish[ed]" a "Department of Government Efficiency" (DOGE or USDS) and provided that "Agency Heads shall take all necessary steps . . . to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." 90 Fed. Reg. 8441, 8442 §§ 1, 4(b) (Jan. 20, 2025).

Shortly after, in March 2025, President Trump issued Executive Order No. 14,243 (Information EO), requiring federal agencies to "ensure the Federal Government has unfettered access to comprehensive data from all State programs that receive Federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases." 90 Fed. Reg. 13681, §§ 3(b), (c) (Mar. 20, 2025).

Days later, President Trump issued Executive Order No. 14,248 (Elections EO), directing the Department of Homeland Security (DHS) to provide state and local officials access to government systems for verifying citizenship and to

coordinate with DOGE to review various data sources "for consistency with Federal requirements" and to "identify unqualified voters registered in the States." 90 Fed. Reg. 14005, 14006–07 §§ 2(b), 2(b)(iii) (Mar. 25, 2025). The DOGE EO, Information EO, and Elections EO marshaled federal resources toward a unified, unprecedented goal: giving federal agencies authority over voter list maintenance, a role that is reserved solely for the states.

The President's March 31, 2026, Executive Order No. 14,399, "Ensuring Citizenship Verification and Integrity in Federal Elections" (Mail Voting EO) is the culmination of these efforts to unlawfully and hastily build a nationwide citizenship database. The Mail Voting EO directs DHS to create lists of citizens eligible to vote using information from USCIS, SSA, and "other relevant Federal databases." 91 Fed. Reg. 17125, § 2(a) (Mar. 31, 2026). It also directs the U.S. Postal Service (USPS) and other federal agencies to create a list of those who are eligible to receive mail ballots and directs USPS to not mail ballots to voters not on that list. The Mail Voting EO is only the latest in a series of orders designed to enable an extraordinary consolidation of data by the federal government—one that could be facilitated by the data DOJ seeks in this case. The demands at issue in this case, along with similar demands to nearly every state, are necessary to effectuate this goal and should be viewed in the context of this larger data consolidation project.

12

**B.** **The administration has engaged in systematic, unlawful efforts to centralize Americans' data.**

The administration has repeatedly established that it will not use the information it is compiling lawfully or appropriately. Instead, it has reappropriated and centralized that information, engaging in unauthorized "secondary use[s]" of data, "where information that an individual has given to one agency for a specific purpose is later reused by that agency or by another agency or entity for an entirely different purpose without the individual's consent."[4] These secondary uses have included directing the Internal Revenue Service (IRS) to provide confidential tax information to Immigration and Customs Enforcement (ICE), which courts found unlawful.[5] *See Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, No. 1:25-cv-00457-CKK, 2025 WL 3251044, at *2 (D.D.C. Nov. 21, 2025); *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, No. 1:25-cv-00457-CKK, 2026 WL 551105, at *3 (D.D.C. Feb. 26, 2026) ("[T]he IRS violated the [Internal Revenue Code] approximately 42,695 times by disclosing last known taxpayer addresses to ICE through TIN Matching without confirming that ICE's request set forth the address of the taxpayer

---

[4] Nicole Alvarez, *The Trump Administration Is Using Americans' Sensitive Data to Build a Digital Watchtower*, Ctr. for Am. Progress (Aug. 25, 2025), https://www.americanprogress.org/article/the-trump-administration-is-using-americans-sensitive-data-to-build-a-digital-watchtower.

[5] William Turton, Christopher Bing & Avi Asher-Schapiro, *The IRS Is Building a Vast System to Share Millions of Taxpayers' Data With ICE*, ProPublica (July 15, 2025), https://perma.cc/F2N2-GWNV.

13

with respect to whom the requested return information related.") (internal quotations omitted); *Cmty. Econ. Dev. Ctr. of Se. Mass. v. Bessent*, No. 1:25-cv-12822-IT, 2026 WL 309281, at *1 (D. Mass. Feb. 5, 2026) (enjoining ICE's use of taxpayer addresses provided by IRS).

The Transportation Security Administration is likewise reported to be providing names and birthdates of travelers to ICE for use in immigration enforcement.[6] And the Centers for Medicare & Medicaid Services agreed to provide extraordinary levels of detail about Medicaid recipients, including "social security number (SSN), date of birth, sex, phone number, locality, ethnicity and race,"[7] only to have that agreement narrowed following litigation. *See California v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-05536-VC, 2025 WL 3751931, at *3 (N.D. Cal. Dec. 29, 2025).

As the administration has engaged in this unprecedented effort to gather Americans' data, it has also centralized data across the government. Beginning in the first half of 2025, DHS and DOGE transformed the Systematic Alien Verification for Entitlements (SAVE) program from a relatively limited system into

---

[6] Hamed Aleaziz, *Immigration Agents Are Using Air Passenger Data for Deportation Effort*, N.Y. Times (Dec. 12, 2025), https://www.nytimes.com/2025/12/12/us/politics/immigration-tsa-passenger-data.html.

[7] Joseph Cox, *Here's the document giving ICE 80 million Medicaid patients' data*, Freedom of the Press Found. (Jan. 5, 2026), https://perma.cc/J9JT-MSHE.

one which searches multiple databases, including SSA data—a notoriously unreliable source of citizenship information.[8] In a recent hearing regarding litigation similar to this case, in which Appellant sought to obtain Rhode Island's unredacted voter rolls, DOJ confirmed its plans to run voter data through SAVE, which is administered by DHS. R.I. MTD Hr'g Tr. at 50:17–23. But SAVE has made "persistent mistakes" where it has been used to review state voter rolls, erroneously identifying eligible U.S. citizen voters as noncitizens.[9] SSA itself states that its data does not provide "definitive information about an individual's citizenship status."[10] Nor has DHS shown that it conducts proper data matching.[11] Both government agencies and nonprofits have warned against relying on SAVE, and its underlying

---

[8] *See* Press Release, Dep't of Homeland Sec., *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025), https://perma.cc/Y8A5-YX3M; Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*, Brennan Ctr. for Just. (July 21, 2025), https://perma.cc/HN98-8N2Q.

[9] Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica and Texas Tribune (Feb. 13, 2026), https://perma.cc/T2ER-EDCH. In one Missouri county, more than half of the voters identified by SAVE as noncitizens were actually U.S. citizens. *Id.* DHS has also had to correct information provided to five states after SAVE misidentified U.S. citizen voters as noncitizens. *Id.*

[10] Letter from Nancy Morales Gonzalez, Assoc. Gen. Couns., SSA Off. of Gen. Couns. to Jon Sherman, Litig. Dir. & Senior Couns., Fair Elections Ctr., at 2 (July 13, 2023), https://perma.cc/Y5U9-UTU8.

[11] *DOGE and state voter rolls*, Protect Democracy (July 15, 2025), https://perma.cc/TFD6-J8TC.

15

USCIS data, for voter verification.[12] The demonstrated risks of false negatives and wrongful voter purges jeopardize voters' rights and can be used to support debunked claims of noncitizen voting.

Recent examples of Appellant's mishandling of Americans' sensitive information undermine any assurances it makes about the security of voter files. In ongoing litigation over SSA data—which includes private information about the health, income, and assets of millions of Americans—Appellant disclosed that DOGE team members "were potentially outside of SSA policy and/or noncompliant with the [court's] temporary restraining order." Notice of Corrections to the Record, *Am. Fed'n of State, Cnty., and Mun. Emps. v. SSA*, No. 1:25-cv-00596-ELH (D. Md. Jan. 16, 2026), ECF No. 197 at 1. This included potentially transferring personally identifiable information to DOGE employees and executing a "Voter Data Agreement" with a non-governmental group looking to "find evidence of voter fraud and to overturn election results in certain States." *Id.* at 2–3, 5. Whistleblower reports have similarly exposed how DOGE employees mishandled SSA data, including a report that a DOGE employee attempted to transfer SSA data onto a thumb drive

---

[12] *See, e.g.*, *An Assessment of Minority Voting Rights Access in the United States*, U.S. Comm'n on C.R., 148–50 (2018), https://perma.cc/J923-SHFJ; Abby Vesoulis & Ari Berman, *New Docs Show DHS Gathering Driver's License Data in Voter Fraud Crusade*, Mother Jones (Nov. 14, 2025), https://perma.cc/KA7T-N2EK.

16

and intended to take it to a subsequent employer.[13] The IRS illegally and inadvertently shared taxpayer information with DHS—beyond even what DHS requested.[14] Despite its demonstrated inability to handle this information properly, the administration has sought to gather driver's license[15], Supplemental Nutrition Assistance Program (SNAP)[16], Department of Housing and Urban Development[17], and child support[18] data, including social security numbers. These examples make clear that Appellant would use the data it seeks not for a limited, lawful purpose, but instead would mishandle and use the data for whatever purpose it pleases.

---

[13] Stephen Fowler & Jude Joffe-Block, *The Trump administration admits even more ways DOGE accessed sensitive personal data*, NPR (Jan. 30, 2026), https://perma.cc/3CNL-YHUK; Meryl Kornfield, Elizabeth Dwoskin & Lisa Rein, *Whistleblower claims ex-DOGE member says he took Social Security data to new job*, Wash. Post (Mar. 10, 2026), https://www.washingtonpost.com/politics/2026/03/10/social-security-data-breach-doge-2/.

[14] Jacob Bogage, Jeff Stein & Perry Stein, *IRS improperly disclosed confidential immigrant tax data to DHS*, Wash. Post (Feb. 11, 2026), https://www.washingtonpost.com/business/2026/02/11/immigrants-irs-dhs-tax-data/.

[15] Jonathan Shorman, *Homeland Security wants state driver's license data for sweeping citizenship program*, Stateline (Nov. 25, 2025), https://stateline.org/2025/11/25/homeland-security-wants-state-drivers-license-data-for-sweeping-citizenship-program/.

[16] Jude Joffe-Block, *The USDA wants states to hand over food stamp data by the end of July*, NPR (July 19, 2025), https://perma.cc/J3G3-QBSK.

[17] Rachel Siegel, Hannah Natanson & Laura Meckler, *DOGE is collecting federal data to remove immigrants from housing, jobs*, Wash. Post (Apr. 15, 2025), https://perma.cc/JPP7-JJH4.

[18] Eli Hager, *DHS Seeks Access to Massive Employment, Salary and Family Database Legally Restricted to Use in Child Support Cases*, ProPublica (Mar. 11, 2026), https://perma.cc/KN7R-ERA8.

17

**C.    The administration's inconsistent reasons for seeking this data cast doubt on its justifications for demanding the sensitive voter data in this case.**

The administration has sought Americans' private data in lawsuits against 30 states and the District of Columbia but has been unable to maintain a consistent stated reason for doing so. And despite making the same request to each of these states, DOJ's basis and purpose for these requests has changed between its letters and lawsuits, and over time. While DOJ initially claimed that it was entitled to sensitive voter information under the NVRA and HAVA, DOJ now proceeds only under the CRA. And while DOJ initially claimed that the "purpose of [its] request is to ascertain Oregon's compliance with the list maintenance requirements of the NVRA and HAVA," ER-96, DOJ in later hearings stated more vaguely that its purpose in these lawsuits "has to be something related to the governance of federal elections," Me. MTD Hr'g Tr. at 66:12-24, *United States v. Bellows*, No. 1:25-cv-468-LEW (D. Me. Mar. 26, 2026), and most recently admitted that it planned to share the data with DHS for citizenship checks, R.I. MTD Hr'g Tr. at 65:1–11, *Amore*, No. 25-CV-639-MSM. This has been the pattern in its other cases: Appellant continues trying on new justifications for demanding sensitive voter information when its original reasons are rejected or shown to be implausible. Appellant's pattern indicates that any reason it may provide is pretextual, and this Court need not accept such justifications without appropriate inquiry. *See* ER-26 ("The presumption of

18

regularity that has been previously extended to Plaintiff that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds.")

There is every reason for this Court to believe that the federal government would misuse the voter data sought here just as it has misused other sensitive data over the past year. Despite asserting that the sensitive data it seeks is not being compiled in "a nationwide voter registration database" and is being used "solely for the purposes that [the United States] stated in the letters," Me. MTD Hr'g Tr. at 104:11-22, *Bellows*, No. 1:25-cv-468-LEW, the administration admitted in another hearing the *same day* that it planned to share this data with DHS to find non-citizens on the voter rolls, R.I. MTD Hr'g Tr. at 65:1-11, *Amore*, No. 25-CV-639-MSM. Before even receiving any of the information it seeks, DOJ has already publicly stated that the data will be used for an entirely different purpose than that which it alleges here.

## IV. DOJ's blanket demand for sensitive voter data will deter voter registration and participation, particularly among Latino voters.

DOJ's demand for "*all fields*" of Oregon's voter registration rolls, including dates of birth and the last four digits of social security numbers, has a chilling effect on the registration and participation of eligible voters. ER-29-30 (citing *Weber*, 2026 WL 118807, at *10). This chilling effect is particularly severe among Latino voters, who are uniquely vulnerable to being misidentified as "ineligible voters" and fearful of being wrongfully targeted for immigration enforcement efforts. These voters—

19

indeed all voters—have ample reason to question DOJ's demand for this information, given the mounting evidence of pretext and Appellant's shifting explanations. *See supra* Argument III; *see also Weber*, 2026 WL 118807, at \*10 (noting the American people deserve to know what exactly the sensitive information of millions of Americans is going to be used for).

## A. DOJ's demand for Oregon's sensitive voter data has a chilling effect on voter registration and participation.

The district court observed that DOJ is seeking "sensitive voter data," and its "quest to gather the sensitive, private information of millions of Americans" raised significant concerns. ER-25 (citing *Weber*, 2026 WL 118807, at \*10). This sensitive voter data would be "neatly packaged in one tranche of data, organized by the name of the voter," for a "contrived" purpose. *Weber*, 2026 WL 118807, at \*2. Appellant's effort to centralize this data in the federal government risks jeopardizing the "inherent level of trust that comes along with Americans voting locally," and "stands to have a chilling effect on American citizens like political minority groups and working-class immigrants who may consider not registering to vote or skip casting a ballot because they are worried about how their information will be used." *Id.* This Court has long recognized the harm caused by chilling political participation. *See Olagues v. Russoniello*, 797 F.2d 1511, 1516 (9th Cir. 1986), *vacated on mootness grounds sub nom.*, *Russoniello v. Olagues*, 484 U.S. 806 (1987); *United States v. Tan Duc Nguyen*, 673 F.3d 1259, 1265 (9th Cir. 2012). Appellant's demands for

personal voter data, coupled with its elusive rationales and demonstrated inability to handle that data responsibly, are uniquely suited to chill voter participation for voters who are reasonably concerned about their private information and its use.

**B.  The chilling effect is amplified for Latino voters and the organizations that serve them.**

The chilling effect of DOJ's demand is even more acute for LULAC and LWVOR's membership, which includes naturalized citizens, voters with Spanish surnames, and voters from mixed-status families.

First, many naturalized citizen members fear being misidentified as "ineligible voters" if DOJ obtains unredacted state voter rolls, which could make them subject to disenfranchisement or even criminal investigation. Naturalized citizens generally have multiple registration numbers assigned to them by DHS. Different databases regularly contain a naturalized citizen's previous immigration numbers, such as their alien registration number, from before they became a citizen, and these databases are often not updated to reflect their status as a naturalized citizen. *Supra* Argument III.B. Similarly, SSA citizenship data is prone to being outdated, as citizenship status is only updated when individuals interact with the Agency.[19] The outdated nature of the data increases the likelihood of naturalized

---

[19] Letter from SSA Off. of Gen. Counsel to Fair Elections Ctr. 2 (July 13, 2023), https://fairelectionscenter.org/wp-content/uploads/2025/07/SSA-Touhy-Decision-letter.July-13-2023signed.pdf.

citizens being flagged as noncitizens when stale data contained in federal databases is compared to state voter registration lists. Such errors are not a remote possibility; DOJ confirmed its plans to run voter data through SAVE. R.I. MTD Hr'g Tr. at 50:17–23. Documented issues with SAVE's citizenship verification processes ensure naturalized citizens are more likely to be incorrectly labeled as noncitizens. *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 723 (9th Cir. 2025) (noting disproportionate impact on naturalized citizens' right to vote when local registrars run immigration numbers of naturalized citizens or noncitizens through SAVE database). These serious flaws and problems persist. When Texas ran its whole voter list through SAVE in late 2025, the process was rife with errors that disenfranchised eligible voters.[20]

Second, LULAC and LWVOR members with Spanish surnames face additional challenges related to the accuracy of their information in federal databases. Some naturalized citizens have multiple Spanish surnames, as is the custom in Hispanic families. This means these individuals often have variations of their names on different documents. For instance, an individual named Gloria Elena Perez Martinez could appear inconsistently across databases. In some, her first name may be listed as "Gloria" or "Gloria Elena"; in others, her last name might appear

---

[20] Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH.

as "Martinez" or "Perez Martinez." Still other databases might record "Perez" as a middle name or "Elena" as a middle name. Hyphenations, such as "Gloria-Elena" or "Perez-Martinez" would further complicate things. And Spanish language accents— á, é, í, ó, ú—placed over vowels complicate things even further. These individuals are more likely to be flagged as ineligible to vote if their information is run through multiple databases.

Appellant's attempted collection and misuse of sensitive voter data deters participation in protected civic activity. Some voters will refrain from voting to protect themselves and their loved ones from being targeted by the federal government. The current political and immigration climate has amplified concerns that DOJ will engage in improper secondary uses of voter data without regard for legal limitations on its use or applicable privacy protections. As a result, the possibility that sensitive information could be shared or repurposed for immigration-related enforcement has discouraged eligible individuals in these communities from registering or voting in the future.

Similarly, voter registration and civic participation events for the organizations that serve these voters are undermined by the threat of collection and misuse of sensitive voter data. LULAC conducts year-round voter registration events serving the Latino community and has built a trusted reputation among community members as a reliable voter registration organization. LWVOR likewise conducts

23

year-round voter registration and education events for its membership and constituency and has developed a reputation as a trusted source of voter information. DOJ's sweeping demand for "*all fields*" of unredacted voter data weakens that trust, deterring participation in voter registration and outreach efforts. And, as predicted by the district court, the threat of the centralization of this data "may very well lead to an erosion of voting rights and voter participation." ER-30; *see also Weber*, 2026 WL 118807, at *20 ("The centralization of this information by the federal government would have a chilling effect on voter registration[.]").

As a result of these developments, LWVOR and LULAC will be required to devote additional resources to reassuring members and mitigating fear. This will require the organizations to develop robust plans to educate voters about the risks that could occur if their unredacted voter data is released, including reworking voter education and registration materials in both English and Spanish. To the extent that Appellant runs the lists through SAVE or otherwise requires Oregon to remove voters, *see supra* Argument III.B, the organizations will also need to create a plan to respond to improper removals of voters who are incorrectly identified as non-citizens or purged from voting lists and assist them in getting the record corrected and enabling them to vote. These efforts will undoubtedly strain the organizations' resources in Oregon. These efforts will not take away the fear members and constituents will face if their sensitive voter data is released.

24

## CONCLUSION

For the reasons stated above, the League of United Latin American Citizens and League of Women Voters of Oregon ask that the Court affirm the district court's dismissal of the Complaint in this matter.

Date: April 24, 2026

Maura Eileen O'Connor (NY4312302)*
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
777 6th St. NW, Ste. 1100
Washington, DC 20001
Tel: (202) 249-7190
oconnore@brennan.law.nyu.edu


Andrew B. Garber (NY5684147)*
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Ste. 1750
New York, NY 10271
Tel: (646) 292-8310
Fax: (212) 463-7308
garbera@brennan.law.nyu.edu


Norman Eisen (DC435051)*
Pooja Chaudhuri (DC888314523)*
Sofia Fernandez Gold (DC90010196)*
Zsa'Queria Martin (DC90043047)*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE, Ste. 15180
Washington, DC 20003
Tel: (202) 601-8678
norman@democracydefenders.org

Respectfully Submitted,

/s/ Robert Brent Ferguson
Robert Brent Ferguson (NY4890620)
Daniel S. Lenz (WI1082058)
Sejal Jhaveri (NY5396304)*
Renata O'Donnell (NY5767561)*
Alexis Grady (DC90017620)*
Kate Hamilton (DC90006168)
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
bferguson@campaignlegalcenter.org
dlenz@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
agrady@campaignlegalcenter.org
khamilton@campaignlegalcenter.org


*Applications for admission forthcoming


Counsel for Proposed Amici Curiae
League of United Latin American

25

pooja@democracydefenders.org
sofia@democracydefenders.org
zsaqueria@democracydefenders.org
pooja@statedemocracydefenders.org

*Citizens and League of Women Voters Oregon*

26

## CERTIFICATE OF COMPLIANCE

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s): 26-1231**

_____

I am the attorney or self-represented party.

**This brief contains _____5,738_____ words,** including ___0_____ words manually counted in any visual images, and excluding the items exempted by

FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ x ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Robert Brent Ferguson_____* **Date** April 24, 2026

27

## CERTIFICATE OF SERVICE
### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** 26-1231

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[X] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Brief of Proposed *Amici Curiae* League of United Latin American Citizens and League of Women Voters of Oregon in Support of Affirmance.

**Signature** */s/ Robert Brent Ferguson*          **Date** April 24, 2026

# EXHIBIT A

| From: | Neff, Eric (CRT) (b)(6) |
| --- | --- |
| | (b)(6) |
| Sent: | 11/18/2025 11:01:54 PM |
| To: | Osete, Jesus (CRT) [ (b)(6) ]; Riordan, Maureen (CRT) (b)(6) @usdoj.gov] |
| CC: | Zandi, Matt (CRT) [ (b)(6) ] |
| Subject: | RE: Letters from Secretaries of State to DOJ and DHS |

This is likely fishing to try to trap us with contradictory statements later (or tomorrow, as CA is one of the states) in court. The claim that data has been shared with DHS has no citation and is too vague to even know what they are referring to.

I believe our reply should always be: "We will use the data in a manner consistent with Federal law" and say nothing more. HAVA, NVRA, CRA – none of them require to give the states information about what we are going to do with the data. No judge will have authority to limit us beyond a promise of Federal law compliance.

# duplicated in

**CREW v. DOJ - CRT - 001155-001158**

**duplicated in** CREW v. DOJ - CRT - 001155-001158

CREW v. DOJ - CRT - 001155-001158

**duplicated in**

**duplicated in**

CREW v. DOJ - CRT - 001155-001158

CREW v. DOJ – CRT – 001166