No. 26-1231

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

THE STATE OF OREGON, *et al.*,

Defendants-Appellees

OUR OREGON; DAN DIIULIO; EMMA CRADDOCK; STEPHEN GOMEZ,

Defendants-Intervenors-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

REPLY BRIEF FOR THE UNITED STATES AS APPELLANT

HARMEET K. DHILLON
  Assistant Attorney General
JESUS A. OSETE
  Principal Deputy Assistant
  Attorney General
ANDREW G. BRANIFF
DAVID N. GOLDMAN
MEREDITH L. BAKER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 532-3803

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION................................................................1

ARGUMENT

I.    The Attorney General properly demanded production of federal election records under Title III. ................................................................2

    A.    Title III demands a summary procedure......................3

    B.    Title III authorizes the DOJ to demand records for the purpose of enforcing all voting laws. ....................................................6

        1.    The DOJ's records demand does not fall under the major questions doctrine......................7

        2.    Defendants' remaining arguments fail..............11

    C.    The DOJ adequately stated its basis for demanding Oregon's SVRL.........................................15

    D.    Oregon's SVRL is a record within the meaning of the CRA.................................................17

        1.    Oregon's SVRL is a record that comes into an officer of election's possession and relates to voters' registrations....................17

        2.    The SVRL must be retained and preserved under Title III. ..................................22

**TABLE OF CONTENTS (continued):** **PAGE**

II. Privacy laws do not foreclose the DOJ's demand for an electronic, unredacted copy of Oregon's SVRL. ..................................................................24

    A. The CRA preempts any contrary state privacy laws...................................................24

        1. The DOJ did not waive its preemption argument. ..........................................24

        2. Title III preempts contrary Oregon privacy laws. ......................................25

    B. The Privacy Act does not warrant dismissal of the DOJ's CRA claim..............................27

    C. The E-Government Act does not prevent the DOJ from obtaining an electronic, unredacted copy of Oregon's SVRL. ...............................31

CONCLUSION ................................................................35

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF CONTENTS

**CASES:**                                                                                   **PAGE**

*Action Recycling Inc. v. United States,*
    721 F.3d 1142 (9th Cir. 2013) ....................................................... 4

*Alabama Ass'n of Realtors v. Department of Health & Hum. Servs.,*
    594 U.S. 758, 760 (2021) (per curiam) ..........................................8-9

*Alabama ex rel. Gallion v. Rogers,*
    187 F. Supp. 848 (M.D. Ala. 1960) ................................................. 11

*Brnovich v. Democratic Nat'l Comm.,* 594 U.S. 647 (2021)................ 30

*Coleman v. Kennedy,* 313 F.2d 867 (5th Cir. 1963) (per curiam) ........... 11

*Donaldson v. United States,* 400 U.S. 517 (1971) ................................... 5

*EEOC v. Karuk Tribe Hous. Auth.,*
    260 F.3d 1071 (9th Cir. 2001) ....................................................... 5

*Electronic Privacy Info. Ctr. v. United States Dep't of Com.,*
    356 F. Supp. 3d 85 (D.D.C.), *vacated and remanded*
    *on other grounds,* 928 F.3d 95 (D.C. Cir. 2019).................... 33-34

*Gray v. Main,* 309 F. Supp. 207 (M.D. Ala. 1968) ................................. 26

*Hearn v. Western Conf. of Teamsters Pension Tr. Fund,*
    68 F.3d 301 (9th Cir. 1995) ......................................................... 11

*Honeycutt v. United States,* 581 U.S. 443 (2017) ..............................19-20

*Huddleston v. United States,* 415 U.S. 814 (1974) ................................ 20

*Kennedy v. Bruce,* 298 F.2d 860 (5th Cir. 1962) ..................................... 5

*Kennedy v. Lynd,* 306 F.2d 222 (5th Cir. 1962)............................ *passim*

**CASES (continued):**                                                **PAGE**

*Niz-Chavez v. Garland*, 593 U.S. 155 (2021) ........................................... 16

*Peters v. United States*, 853 F.2d 692 (9th Cir. 1988) .............................. 5

*Rotkiske v. Klemm*, 589 U.S. 8 (2019) ...................................................... 21

*Smiley v. Hohn*, 285 U.S. 355 (1932) ....................................................... 13

*United States v. Benson*, No. 1:25-cv-1148,
    2026 WL 362789 (W.D. Mich. Feb. 10, 2026),
    *appeal pending*, No. 26-1225 (6th Cir.) .................................... 12, 21

*United States v. Duke*, 332 F.2d 759 (5th Cir. 1964) ............................. 26

*United States v. Mississippi*, 229 F. Supp. 925
    (S.D. Miss. 1964), *rev'd*, 380 U.S. 128 (1965) ........................... 26-27

*United States v. Mohrbacher*, 182 F.3d 1041 (9th Cir. 1999) ................ 20

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ........................... 4

*United States v. Powell*, 379 U.S. 48 (1964) .......................................... 3-6

*United States v. Prasad*, 18 F.4th 313 (9th Cir. 2021) .......................... 20

*United States v. Union Oil Co. of Cal.*,
    343 F.2d 29 (9th Cir. 1965) ........................................................... 5

*United States Dep't of Just. v. Tax Analysts*, 492 U.S. 136 (1989) ......... 19

*Utility Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ............................. 7-9

**CASES (continued):**                                                      **PAGE**

*Voter Reference Found., LLC v. Torrez*, No. 24-2133,
2025 WL 3280300 (10th Cir. Nov. 25, 2025)..................................25

*West Virginia v. EPA*, 597 U.S. 697 (2022).........................................7-9

**CONSTITUTION:**

U.S. Const. Art. I, § 4, Cl. 1..............................................................12-13

**STATUTES:**

Civil Rights Act of 1960 (CRA)
52 U.S.C. 20701-20706....................................................................4
52 U.S.C. 20701............................................................... *passim*
52 U.S.C. 20702...............................................................................23
52 U.S.C. 20703................................................................ *passim*
52 U.S.C. 20704....................................................................14, 26-27

Help America Vote Act of 2002 (HAVA)
52 U.S.C. 21083(a).........................................................................33
52 U.S.C. 21083(a)(1)(A) ..............................................................33
52 U.S.C. 21144(a)..........................................................................30

National Voter Registration Act of 1993 (NVRA)
52 U.S.C. 20501(a)(3) ....................................................................11
52 U.S.C. 20501(b)(2) .....................................................................11
52 U.S.C. 20510(d)(1) .....................................................................23

Privacy Act of 1974
5 U.S.C. 552(f)(1)............................................................................28
5 U.S.C. 552a(a)(1) .........................................................................28
5 U.S.C. 552a(b)...............................................................................27
5 U.S.C. 552a(e)(4) ...................................................................29, 31
5 U.S.C. 552a(e)(7) .........................................................................28

**STATUTES (continued):** **PAGE**

Uniform and Overseas Citizen Absentee Voting Act (UOCAVA)
52 U.S.C. 20301-20311 ......................................................................9-10

26 U.S.C. 7605(b) ..............................................................................3-4

44 U.S.C. 3501 note
E-Government Act of 2002,
Pub. L. No. 107-347, 116 Stat. 2921-2922 ...................................31
§ 208(b)(1)(A)(ii) ........................................................32-34
§ 208(b)(1)(A)(ii)(II) ........................................................ 32
§ 208(b)(1)(B)(i) ..........................................................32

44 U.S.C. 3502 ............................................................................. 32-33

44 U.S.C. 3502(3)(A) .....................................................................32-34

44 U.S.C. 3502(10) ..............................................................................32

**LEGISLATIVE HISTORY:**

106 Cong. Rec. 7767 (1960) ...................................................................11

**REGULATIONS:**

28 C.F.R. 0.50(a) ................................................................................. 30

68 Fed. Reg. 47,610 (Aug. 11, 2003) ........................................... 29-30

70 Fed. Reg. 43,904 (July 29, 2005) ................................................ 29

82 Fed. Reg. 24,147 (May 25, 2017) ................................................ 29

## MISCELLANEOUS:                                                 PAGE

7 Oxford English Dictionary (1933) ......................................................20

Black's Law Dictionary (12th ed. 2024) .................................................18

Merriam-Webster.com Dictionary,
     https://www.merriam-webster.com/dictionary ............................22

*Merriam-Webster's Collegiate Dictionary* (10th ed. 2002)..................34

*The American Heritage College Dictionary* (4th ed. 2002).................34

U.S. Citizenship & Immigr. Servs., SAVE Agency Search Tool,
     https://tinyurl.com/n7fpu4zz (last visited Apr. 24, 2026)..............31

U.S. Dep't of Just.,
     Mem. of Understanding between the United States and
     Texas (May 13, 2008), available at
     https://www.justice.gov/media/1173461/dl?inline
     (last visited Apr. 24, 2026) ......................................................10-11

## INTRODUCTION

The American people deserve elections they can trust, and accurate voter rolls are an essential precondition for that trust. The Department of Justice (DOJ) seeks to obtain Oregon's statewide voter registration list (SVRL) to ensure that our federal elections are deserving of such trust and to assist Oregon with carrying out its proper duties under the National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act of 2002 (HAVA). This is not extraordinary. The request for the State's SVRL is a lawful exercise of DOJ authority under Title III of the Civil Rights Act of 1960 (CRA), and it is made for the lawful purpose of ensuring the State's compliance with the list-maintenance requirements of the NVRA and the HAVA.

Oregon, Secretary Read, and intervenors (collectively, defendants) raise numerous arguments, largely based on atextual considerations and privacy laws.[1] But none of their arguments overcome the plain text of

---

[1] "U.S. Br. __" refers to the page numbers of the United States' Opening Brief filed with this Court. "Or. Br. __" refers to the page numbers of Oregon's Response Brief filed with this Court. "Ints. Br. __" refers to the page numbers of Intervenors' Response Brief filed with this Court. "DNC Br. __" refers to the page numbers of Democratic National Committee's *Amicus Curiae* Brief filed with this Court. "Former Employees Br. __" refers to the page numbers of the Former Employees

Title III, which gives the Attorney General authority to demand a wide range of election records, including Oregon's SVRL. This Court should reverse and remand with instructions directing the district court to compel Secretary Read to produce the unredacted version of Oregon's SVRL to the DOJ forthwith.

## ARGUMENT

**I.  The Attorney General properly demanded production of federal election records under Title III.**

Section 301 of Title III of the CRA imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962), to "retain and preserve, for a period of twenty-two months from the date of any [federal] general, special, or primary election . . . *all* records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701 (emphasis added). The Attorney General is authorized to inspect these records upon written demand "contain[ing] a

---

of the U.S. Department of Justice *Amici Curiae* Brief filed with this Court. "ER-__" refers to the page number of the Excerpts of Record the United States filed with its Opening Brief. "Add. _" refers to the page number of the Addendum the United States included with this Reply Brief.

- 2 -

statement of the basis and the purpose therefor." 52 U.S.C. 20703. The

Attorney General properly demanded to inspect Oregon's SVRL, which is

a record within the scope of Title III. The district court erred in holding

otherwise.

## A.    Title III demands a summary procedure.

The district court erred in subjecting the DOJ to a full-scale judicial

inquiry under the Federal Rules of Civil Procedure, in contravention of

*Lynd. See* ER-18-19. Intervenors argue that *United States v. Powell*, 379

U.S. 48 (1964), which involved an IRS administrative summons under

the Internal Revenue Code (IRC), and the Federal Rules of Civil

Procedure mandate applying the ordinary pleading standards. Ints. Br.

22-23. They do not.

The Supreme Court explained in *Powell* that judicial inquiry was

appropriate to determine "if the summons had been issued for an

improper purpose, such as to harass the taxpayer or to put pressure on

him to settle a collateral dispute, or for any other purpose reflecting on

the good faith of the particular investigation." *Powell*, 379 U.S. at 58. But

that inquiry was specifically authorized by Section 7605(b) of the IRC,

which prohibited the Government from subjecting a taxpayer "to

- 3 -

unnecessary examination or investigations." *Id.* at 52-53 (quoting 26 U.S.C. 7605(b)). No similar language limits the Attorney General's authority under the CRA. *See* 52 U.S.C. 20701-20706.

Intervenors seek to expand *Powell* beyond the IRC statute at issue. Ints. Br. 24. But this Court has explicitly linked the requirements of legitimate purpose, relevancy, and procedural compliance expressed in *Powell* with 26 U.S.C. 7605, the IRC provision at issue in that case. *See Action Recycling Inc. v. United States*, 721 F.3d 1142, 1144-1145 (9th Cir. 2013).

Moreover, when interpreting the IRC's limiting language, the Supreme Court rejected an interpretation that would "seriously hamper the Commissioner in carrying out investigations he thinks warranted, forcing him to litigate and prosecute appeals on the very subject which he desires to investigate." *Powell*, 379 U.S. at 54. Instead, the Government "'can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.'" *Id.* at 57 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642-643 (1950)). Intervenors argue that review under *Powell* "has teeth." Ints. Br. 25. But they cite as examples of *Powell*'s teeth cases this Court decided based on

- 4 -

the reach of a statute—not second-guessing of the Executive Branch's factual support or purpose. *See* Ints. Br. 25 (citing *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071 (9th Cir. 2001); *Peters v. United States*, 853 F.2d 692 (9th Cir. 1988); *United States v. Union Oil Co. of Cal.*, 343 F.2d 29 (9th Cir. 1965)).

As the Supreme Court subsequently made clear in *Donaldson v. United States*, "*Powell* was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." 400 U.S. 517, 529 (1971). Such is the case here, where the "matter should be set down without delay for suitable hearing on the matters open for determination"—in particular, "whether the written demand has been made" and "whether the custodians against whom orders are sought have been given reasonable notice of the pendency of the proceeding." *Lynd*, 306 F.2d at 226. Actions by the Attorney General to compel election records cannot "be plagued by the injection of collateral issues" because it "would make the investigation interminable." *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962) (citation omitted).

- 5 -

The CRA does not contemplate full-scale judicial proceedings when it requires only written demand, a statement of basis and purpose, and that the records demanded be within the scope of Section 20701. *See* 52 U.S.C. 20703. Even if the full panoply of Federal Rules applied ordinarily here, then, the only inquiries on a Rule 12(b)(6) motion would be "whether the written demand has been made" and the custodians given notice, not "the factual foundation for, or the sufficiency of, the Attorney General's statement of the basis and the purpose contained in the written demand." *Lynd*, 306 F.2d at 226 (citation modified). The district court erred in applying full pleading standards and granting the motion to dismiss, forcing the DOJ "to litigate and prosecute [an] appeal[] on the very subject which [it] desires to investigate." *Powell*, 379 U.S. at 54.

**B.    Title III authorizes the DOJ to demand records for the purpose of enforcing all voting laws.**

Title III of the CRA authorizes the DOJ to demand "[a]ny record or paper required by section 20701 to be retained and preserved" so long as the demand states its basis and purpose. 52 U.S.C. 20703. Nothing in Title III limits that purpose to enforcement against race-based discrimination targeting individual voting rights.

Attempting to place atextual restrictions on Title III, defendants raise immaterial "context, history, statutory framework, and constitutional presumptions" to limit its application. Ints. Br. 37; *see* Or. Br. 20.

### 1. The DOJ's records demand does not fall under the major questions doctrine.

Oregon invokes "the major questions doctrine" to cabin the reach of Title III. Or. Br. 18, 28. This doctrine is inapplicable for multiple reasons. First, this doctrine applies when a statute is ambiguous and there is no clear congressional authorization for an agency's arrogated power. *See West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (rejecting the EPA's claim of authority when the EPA had "located" its "newfound power in the vague language of an "ancillary provision") (citation modified); *see also Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("EPA's interpretation is also unreasonable because it would bring about an enormous and transformative expansion in EPA's regulatory authority *without clear congressional authorization.*" (emphasis added)). But here, Title III gives the DOJ "clear congressional authorization," *Utility Air Regul. Grp.*, 573 U.S. at 324, to demand production of "all records and papers which come into [an officer of election's] possession relating to any

- 7 -

application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. 20701; *see* 52 U.S.C. 20703. Defendants point to no ambiguity suggesting otherwise.

Second, these precedents analyze the scope of delegations of traditionally congressional authority, not an executive official's mode of investigation based on a concededly lawful federal statute. In these cases, an agency claimed a delegation of authority that explicitly belonged to Congress. *See, e.g.*, *West Virginia*, 597 U.S. at 706 (regulatory power); *Utility Air Regul. Grp.*, 573 U.S. at 324 (same).

By contrast, here the DOJ asserts only the investigative authority that naturally belongs to the Executive Branch. The DOJ is not exercising delegated authority or regulating private conduct or exercising some other authority typically enjoyed by Congress. *West Virginia*, 597 U.S. at 724 ("[T]he Agency's discovery allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."); *Alabama Ass'n of Realtors v. Department of Health & Hum. Servs.*, 594 U.S. 758, 760 (2021) (per curiam) ("The new, administratively imposed moratorium went further than its statutory predecessor,

- 8 -

covering all residential properties nationwide and imposing criminal penalties on violators.").

Finally, in this arena, the Supreme Court looks at whether the agency's power is "newfound." *West Virginia*, 597 U.S. at 724; *see Utility Air Regul. Grp.*, 573 U.S. at 324. The enforcement of federal election law is nothing new; it has been done before, including enforcement of the NVRA.[2] The DOJ has long utilized the CRA to investigate possible violations of federal election laws other than laws addressing voting-related racial discrimination, such as the Uniform and Overseas Citizen Absentee Voting Act (UOCAVA), 52 U.S.C. 20301-20311. In *United States v. Alabama*, No. 2:08-cv-920 (M.D. Ala.), the United States sued Alabama for the State's noncompliance with 42 U.S.C. 1973ff-1(c),[3] which required the State to report to the Election Assistance Commission, not

---

[2] *See* Compl. at 1-2, *United States v. Alabama*, No. 2:24-cv-1329 (N.D. Ala. Sept. 27, 2024) (Doc. 1). Add. 8-25. DOJ sent a letter to state election officials explaining that DOJ had "reviewed reports" (which it cited) suggesting that the State was implementing within 90 days of the 2024 federal election a "program" to identify and remove registrants identified as noncitizens, in violation of the Quiet-Period Provision. Letter at 1-2, *Alabama, supra* (Doc. 11-7). Add. 26-29.

[3] 42 U.S.C. 1973ff-1 was transferred to 52 U.S.C. 20302.

later than ninety days after a regularly scheduled general election for federal office, certain data regarding ballots from absent uniformed services voters and overseas voters. Add. 1-4. The United States sought data from 21 counties under the CRA on the number of UOCAVA ballots counted, and the parties agreed that the records encapsulating the data were within the scope of the CRA. Add. 5-7.[4] Finally, the United States previously has pursued successful matters, including in litigation, to obtain SVRLs under Title III of the CRA. For example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and last four digits of social-security numbers, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[5]

---

[4] The Former Employees Brief (at 24-27) selective list of other uses of the CRA avoids the mention of this case as it does not fit into their narrative that the CRA has only been used to investigate discriminatory voting practices.

[5] *See* Compl., *United States v. Georgia*, No. 1:06-cv-2442 (N.D. Ga. Oct. 12, 2006) (Doc. 1). Add. 30-34 . The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See* Consent Judgment and Decree, *Georgia, supra* (Doc. 4) (Oct. 27, 2006). Add. 35-41. The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), *available at*

In sum, the major questions doctrine does not apply.

## 2. Defendants' remaining arguments fail.

Intervenors point to legislative history showing that "[Title III] [wa]s designed to secure a more effective protection of the right to vote." Ints. Br. 35 (quoting *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960)); *see also* Or. Br. 20 (citing legislative history). "But legislative history—no matter how clear—can't override statutory text." *Hearn v. Western Conf. of Teamsters Pension Tr. Fund*, 68 F.3d 301, 304 (9th Cir. 1995). Moreover, the legislative history supports the contrary understanding that the basis and purpose requirement could be satisfied by "the assertion that the demand was made for the purpose of investigating *possible violations* of a Federal statute." *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (emphases added) (quoting 106 Cong. Rec. 7767 (1960) (statement of Sen. Keating)).

In any case, the purpose of the NVRA fits nicely within Title III's purpose of securing "a more effective protection of the right to vote." Ints. Br. 35; *see* 52 U.S.C. 20501(a)(3), (b)(2) (listing one purpose of the NVRA

---

https://www.justice.gov/media/1173461/dl?inline (last visited Apr. 24, 2026). Add. 42-43.

- 11 -

as "enhanc[ing] the participation of eligible citizens as voters in elections for Federal office" and finding that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities"). Instead of limiting the purpose of a records demand, Congress required the written demand itself to state a purpose—a pointless exercise if only one permissible purpose existed. As the district court held in *United States v. Benson*, "the CRA's text includes no such limitation, and courts 'have no warrant to elevate vague invocations of statutory purpose over the words Congress chose.'" No. 1:25-cv-1148, 2026 WL 362789, at *8 (W.D. Mich. Feb. 10, 2026) (quoting *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 463 (2022)), *appeal pending*, No. 26-1225 (6th Cir. oral argument scheduled for May 13, 2026).

Defendants also argue that the Constitution's Elections Clause "assigns to *states* the primary task of administering" elections. Or. Br. 24 (citing U.S. Const. Art. I, § 4, Cl. 1); *see* Ints. Br. 36. But unlike other areas of law that the Constitution leaves to the exclusive domain of the States, the ability to regulate the "[m]anner of holding" federal

elections—which includes laws concerning "registration," *Smiley v. Hohn,* 285 U.S. 355, 366 (1932)—is within the purview of Congress, if it chooses to legislate. U.S. Const. Art. I, § 4, Cl. 1. In enacting Title III, Congress did so.

Intervenors also appeal to "common sense" showing that "Congress did not haphazardly grant DOJ a power of such 'political magnitude' in a six-decade old civil rights law that no court has *ever* applied outside of voting rights investigations." Ints. Br. 36; *see* Ints. Br. 56 (referring to "unchecked supervisory power"). Oregon too, calls the DOJ's demand a "breathtaking assertion of federal executive power" and an attempt to "discover for the first time in [Title III's] text practically limitless investigative powers." Or. Br. 24.

These hyperbolic assertions overlook several key points: First, the power at issue is simply the authority to inspect records—not a regulatory power. *See* 52 U.S.C. 20703. Second, given the "pervasive and longstanding race discrimination in access to the ballot" prior to the CRA (Or. Br. 12), it was reasonable, not "haphazard[]" (Ints. Br. 36), for Congress to give the Attorney General "sweeping" access to voter records, *Lynd,* 306 F.2d at 226, including voter lists. Third, the persons with the

- 13 -

most interest in the data at issue—the voters—have already surrendered this data to a government agency for the purpose of voting, and Oregon's accession to the DOJ's demand would simply be one government agency sharing records with another in accordance with a Congressional mandate. *See* Ints. Br. 50 ("Oregon's voter list . . . is accessible to and maintained by *all* state and local election officials."); *cf.* 52 U.S.C. 20704 (recognizing that documents obtained under Title III may ordinarily be shared with other "governmental agencies").

Intervenors further argue that the NVRA and HAVA "govern list maintenance" and that the NVRA's public-inspection provision, as the more specific provision, controls here. Ints. Br. 19, 30-31. But the NVRA's public-inspection provision is just that: a *public*-inspection provision. It says nothing about the Attorney General's inspection authority and therefore covers a different-in-kind inspection process. The statute regulating the Attorney General's ability to demand voting-related documents (that are specifically not subject to public disclosure, 52 U.S.C. 20704) remains 52 U.S.C. 20703. Even the Former DOJ Employees recognize (Former Employees Br. 3) that "DOJ may use the

- 14 -

1960 CRA to seek some information that cannot be disclosed under the NVRA."

### C. The DOJ adequately stated its basis for demanding Oregon's SVRL.

At the outset, the district court erred in its detailed inquiry into the "factual basis for believing Oregon violated the NVRA or HAVA." ER-21; *see* Part I.A., *supra* (discussing that ordinary pleading rules do not apply). Oregon also mistakenly argues that the DOJ's basis was lacking. Or. Br. 21; Ints. Br. 40-41.

The DOJ stated a factual basis for its demand. In its August 14, 2025, letter to Secretary Read, it invoked the NVRA, HAVA, and the CRA, demanded "an electronic copy of Oregon's copy of Oregon's complete and current [S]VRL" pursuant to those authorities, and stated that "[t]he purpose of the request is to ascertain Oregon's compliance with the list maintenance requirements of the NVRA and HAVA." ER-95-96. Under any reasonable interpretation of this statement the basis for the DOJ's demand is clear—that Oregon's list maintenance program may violate the NVRA and HAVA. And the DOJ's preceding July 16, 2025 letter to Secretary Read provided factual bases for that concern: several anomalies in Oregon's responses to the Election Assistance Commission's

- 15 -

Election Administration and Voting Survey (EAVS), including that "Oregon, by far, has reported the lowest numbers of removals" for failing to vote in two federal elections or return a confirmation notice. ER-105.

Defendants argue that the written demand must appear in one document, with intervenors in particular relying on *Niz-Chavez v. Garland*, 593 U.S. 155 (2021). *See* Or. Br. 22; Ints. Br. 39-40. But in *Niz-Chavez*, the Supreme Court construed an alien-removal statute referring to "a notice to appear" to mean providing the alien with one document containing all the statutorily required elements—hardly similar to requiring state officers with no personal rights at stake to respond to a demand by producing certain records they are statutorily obligated to preserve. 593 U.S. at 158, 172. And the Court's decision in *Niz-Chavez* largely hinged on the word "a." *Id.* at 161. Here, the statute refers to "demand in writing," not "a" demand in writing, and its use of "a" is in the context of the "statement of the basis and the purpose" that forms *part* of this demand. 52 U.S.C. 20703. Nothing in the statute or in *Niz-Chavez* mandates that a complete written demand for an SVRL appear in one document.

- 16 -

**D.  Oregon's SVRL is a record within the meaning of the CRA.**

Title III imposes on officers of election a duty to "retain and preserve . . . all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701. Despite the statute's use of the expansive words "all" and "relating," defendants try to narrow the statute to apply only to papers or records "given to an elections official as part of registering someone to vote." Or. Br. 27; *see* Ints. Br. 45 ("Title III covers only static documents like voter application forms submitted by voters."). Their reading is wrong.

**1.  Oregon's SVRL is a record that comes into an officer of election's possession and relates to voters' registrations.**

A plain reading of Section 20701 covers Oregon's SVRL. Oregon tries to excise the SVRL from the statute's scope, arguing that the SVRL is "a byproduct created by the state after individuals have been registered" and that "the pertinent records for Title III purposes are those that come into an official's possession as part of registering (or not registering) an individual to vote." Or. Br. 27-28. Oregon's atextual understanding of the purpose of Title III (*see* Or. Br. 27 ("[T]he voter

- 17 -

roll . . . ha[s] no bearing on whether an individual was denied the right to vote due to a discriminatory registration practice.")) completely reads the word "relating" out of the statute. The pertinent question is whether the voter roll "relat[es]" to "any application, registration, payment of poll tax, or other act requisite to voting," 52 U.S.C. 20701, not whether it is a byproduct, Or. Br. 27. The SVRL showing whether a would-be voter was successful in registering to vote certainly relates to the voter's application and registration.

For their part, intervenors argue that the phrase "come into [his] possession" denotes records obtained from an outside source. Ints. Br. 45-46. They point to a modern dictionary that defines "receive" as "to come into possession of or get from some outside source." Ints. Br. 46 (quoting *Receive*, *Black's Law Dictionary* (12th ed. 2024)). But to the extent non-contemporaneous definitions of entirely different terms have any persuasive value, this definition supports the United States' reading—if "come into possession of" and "get from some outside source" were synonymous, they would not be joined by the disjunctive "or."

Despite intervenors' assertion that Oregon's SVRL is beyond the scope of the CRA because it is "created" and does not "come into [the]

possession" of Oregon election officials (Ints. Br. 45-46), the Supreme Court has previously held in Freedom of Information Act cases that, when the agency is in control of the materials at the time the request is made, the materials have "come into the agency's possession" in the course of official duties. *United States Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144-145 (1989). Thus, the Supreme Court has made clear that an agency record can be both created by the agency *and* have come into the agency's possession—coming into possession of material refers to *when*, not *how*, the possession began. *See id.* at 146. Here, because Secretary Read was in control of Oregon voter information at the time the request was made for the SVRL, the individual records were within his possession in the form of the SVRL. *See id.* at 144-145. To suggest that the State itself *generated* the voting information of millions of Oregonians rather than *stored*, in one central digital file, what came into its possession as many individual registration records is puzzling at the very least. Voter information, at one point or another, came into the possession of defendants.

Intervenors cite several cases in support of their preferred interpretation. *See* Ints. Br. 46 (citing *Honeycutt v. United States*, 581

- 19 -

U.S. 443, 449 (2017); *Huddleston v. United States*, 415 U.S. 814, 820 (1974); *United States v. Prasad*, 18 F.4th 313, 319 (9th Cir. 2021); *United States v. Mohrbacher*, 182 F.3d 1041, 1048 & n.5 (9th Cir. 1999)). But none of these citations points to definitions of "come into possession." *See ibid.* For example, *Honeycutt* dealt with the meaning of the term "obtained," not "come into possession." 581 U.S. at 449-450. Regardless, *Honeycutt* noted that one definition of "obtain" is "[t]o come into the possession or enjoyment of (something) by one's own effort, or by request; to procure or gain, as the result of purpose and effort." *Id.* at 449 (alteration in original) (quoting 7 *Oxford English Dictionary* 37 (1933)). Even under this definition, an officer of election who uses his own efforts to compile voter data "comes into possession" of the SVRL.[6]

---

[6] Intervenors appear to misunderstand the DOJ's interpretation of "comes into possession." They argue that "[u]nder [the DOJ's] theory, when an election official first creates a new record, it would not be subject to the CRA until it was transmitted to or came under the purview of a *different* election official—until that point, the created record had not yet 'come into' anyone's 'possession.'" Ints. Br. 55. This is not the DOJ's interpretation, but rather the logical consequence of *Intervenors'* own theory given the CRA's focus on individual "officer[s] of election," 52 U.S.C. 20701.

Further, the United States' temporal interpretation gives full effect to every word in Section 301. U.S. Br. 32. Intervenors argue that the phrase "come into possession" is surplusage if used to denote only a temporal requirement. Ints. Br. 55. It is not. Absent that phrase, every officer of election, whether or not in current possession of relevant records, would have a duty to preserve those records, potentially making each officer vicariously liable for the unknown missteps of others. In an example of careful drafting, Congress explicitly foreclosed this result, rather than relying on judicial construction. *See Rotkiske v. Klemm*, 589 U.S. 8, 13-14 (2019).

Instead, it is intervenors who would read out part of the statute— namely, the phrase "relating to." Intervenors point to the list in 52 U.S.C. 20701—"relating to any application, registration, payment of poll tax, or other act requisite to voting"—as "indicat[ing] the sorts of records covered by the statute: namely, records that election officials *receive*, rather than *create*." Ints. Br. 49-50 (quoting *Benson*, 2026 WL 362789, at *9). But like Oregon, intervenors overlook the word "relating," which broadens the scope of "records and papers" to cover self-created records, rather than just voter applications and registrations generated by third parties.

- 21 -

Accordingly, this court should reject intervenors' interpretation of "comes into possession." Ints. Br. 45-50, 54-56.

### 2. The SVRL must be retained and preserved under Title III.

Title III imposes on officers of election a duty to "retain and preserve" registration-related records, 52 U.S.C. 20701, and then, upon the Attorney General's written demand, to produce these records, 52 U.S.C. 20703. Defendants incorrectly argue that because HAVA requires voter-list maintenance Oregon cannot retain and preserve the SVRL but must constantly update it, and thus the SVRL cannot be a registration-related record within Title III. Or. Br. 29-30; Ints. Br. 51-53.

Oregon contends that "[t]he plain meaning of 'retain' is 'to hold secure or intact'" and that "[t]he plain meaning of 'preserve' is 'to keep safe from injury, harm, or destruction; protect.'" Or. Br. 29 (quoting *Retain*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/retain, and *Preserve*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/preserve). Even under Oregon's own definitions, state election officers "retain and preserve" a record when they keep it secure and protect it—these definitions do not forbid updates or alterations.

A separate provision of Title III punishes any person who "willfully steals, destroys, conceals, mutilates, or alters" any of the election-related records preserved under Section 20701. 52 U.S.C. 20702. Intervenors contend that because Oregon election officials are required to update the SVRL under the HAVA, they are altering the SVRL and, under the DOJ's interpretation, would violate Section 20702 by complying with Section 20701's retention-of-records requirement. Ints. Br. 51-52.

But penalizing an election official for keeping a voter registration record would be absurd and turn the CRA on its head. It would also contravene Section 11 of the NVRA, which provides that "[t]he rights and remedies established by this section are *in addition* to all other rights and remedies provided by law." 52 U.S.C. 20510(d)(1) (emphasis added). Obviously, updating the list is supplementing it, not "willfully" altering it in a punishable sense.

Intervenors also argue that the "DOJ's read of Title III would require Oregon's election officials to 'retain and preserve' *every* iteration of the State's voter list whenever it changes," which would be "unworkable." Ints. Br. 52 (quoting 52 U.S.C. 20701). But returning to the binder-file example, an election official would not have been expected

- 23 -

to retain a copy of the original file every time a new voter was added. A file is no less preserved—or protected, or held secure, or kept safe—upon properly adding a voter. *See* Or. Br. 29. Nothing in the broad records-retention-and-production provisions of the CRA conflicts with HAVA. The SVRL is a record within the meaning of Title III.

## II. Privacy laws do not foreclose the DOJ's demand for an electronic, unredacted copy of Oregon's SVRL.

In dismissing the DOJ's CRA claim, the district court did not reach defendants' federal privacy-related arguments but held that Title III does not preempt Oregon's privacy law. ER-5-28. Defendants argue that federal and state privacy laws prohibit the DOJ from collecting the sensitive information of Oregon voters. Or. Br. 30-40; Ints. Br. 42-44. They are wrong.

### A. The CRA preempts any contrary state privacy laws.

Title III of the CRA preempts any conflicting state privacy laws. And contrary to Oregon's argument (Or. Br. 30), the DOJ has not waived its argument as to preemption.

#### 1. The DOJ did not waive its preemption argument.

In response to a paragraph in Oregon's memorandum below—that did not mention preemption and discussed only the harmony between

Oregon law and the NVRA—the DOJ pointed out that "to the extent Oregon law purports to bar the United States from obtaining federal election data necessary to enforce the NVRA, that conflicting law is preempted." ER-83 n.6 (citing *Voter Reference Found., LLC v. Torrez*, No. 24-2133, 2025 WL 3280300, at *7-10 (10th Cir. Nov. 25, 2025)); *see* ER-127 (Oregon's argument). Of course, the CRA was one of the means the DOJ had invoked to enforce the NVRA. Because defendants did not argue in their motions to dismiss that Title III of the CRA did not preempt Oregon law, the DOJ was not required to raise the issue in defending against their motions. The district court erroneously analyzed preemption under the CRA and held that the DOJ had failed to show preemption. ER-27-28.

### 2. Title III preempts contrary Oregon privacy laws.

To the extent that Oregon privacy law forbids election officials from producing the unredacted SVRL to the DOJ, that law is preempted. *See* U.S. Br. 39-42. Intervenors argue that "nothing in the statute's text specifically extends to such [sensitive] information." Ints. Br. 43; *see* Or. Br. 31. And Oregon contends that "Title III is silent on the topic—

- 25 -

reflective of the fact that plaintiff invokes a law from decades before such electronic data files even existed." Or. Br. 31.

They are incorrect. Title III prohibits the Attorney General from publicly disclosing records obtained under that Title with limited exceptions—a prohibition that makes clear that Title III records may contain sensitive information. 52 U.S.C. 20704.[7] And even in the 1960s, voter registrations could include significant personal information, such as birthdate, literacy, address and length of residency, and information about one's "good moral character." *See United States v. Duke*, 332 F.2d 759, 761 (5th Cir. 1964) (literacy, good moral character); *Gray v. Main*, 309 F. Supp. 207, 219 (M.D. Ala. 1968) (birthdate); *United States v. Mississippi*, 229 F. Supp. 925, 995 & nn.92-93 (S.D. Miss. 1964) (Brown, J., dissenting) (birthdate, good moral character, address, length of

---

[7] Intervenors claim that *Lynd* "recognized the CRA was intended to reach only 'public records which ought ordinarily to be open to legitimate reasonable inspection,' *not* 'confidential, private papers and effects.'" Ints. Br. 43 (quoting 306 F.2d at 231). To the contrary, the court merely noted that the district court's "delay" in allowing "inspection and copying" was unwarranted given the nature of the records sought *in that case*, which were "public" and "ought ordinarily to be open to legitimate reasonable inspection." 306 F.2d at 230-231. Intervenors' more blanket interpretation would make little sense in light of 52 U.S.C. 20704's protections.

residency), *rev'd*, 380 U.S. 128 (1965). Nothing in Title III excludes such information; in fact, 52 U.S.C. 20704 contemplates such private information coming into the Attorney General's hands.

The existence of sensitive personal information predated the age of online record-keeping. *See* Or. Br. 31. It makes little difference, from an individual privacy perspective, whether the government demands a paper or electronic record, a complete voter list or certain applications. Congress was aware of the sensitivity of voter registrations and so struck a balance, providing the DOJ with a broad right of access but prohibiting public disclosure. Any conflicting Oregon law is preempted and cannot overcome this right of access.

## B. The Privacy Act does not warrant dismissal of the DOJ's CRA claim.

Section 3 of the Privacy Act provides, with certain exceptions, that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. 552a(b) (the non-disclosure provision). By its terms, Section 3 only applies to disclosures of personal information by federal agencies and does not

apply to state and local entities at all. 5 U.S.C. 552a(a)(1), 552(f)(1). Accordingly, as the DOJ argued in its Opening Brief (at 38-42), the non-disclosure provision does not prohibit the Attorney General's demand to Oregon that it turn over an electronic, unredacted copy of its SVRL, nor does it prohibit Oregon's compliance with that demand.

First, Oregon argues that the maintenance provisions prohibit the DOJ from "maintain[ing]" a voter registration list that "describe[s] how an[] individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. 552a(e)(7); *see* Or. Br. 30-32. Because the United States agrees that an individual's party affiliation and how that individual votes (including for which party) "describ[es] how any individual exercises [First Amendment] rights," *ibid.*, the United States will not object to a redaction of that information in the State's SVRL. With the observation that the Privacy Act prohibits maintenance of records "describing *how* any individual exercises [First Amendment] rights," *ibid.*, and not *whether* the individual does, the United States believes that any argument that additional information

- 28 -

cannot be provided due to the Privacy Act is an appropriate avenue for inquiry on remand.

Second, Oregon argues that the DOJ failed to comply with the maintenance provision's requirement that it publish a System of Records Notice (SORN) in the Federal Register before "establish[ing] or revis[ing]" a "system of records," 5 U.S.C. 552a(e)(4). Or. Br. 36-39. Contrary to Oregon's argument, an electronic, unredacted copy of Oregon's SVRL is covered by the existing SORN titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47,610, 47,611 (Aug. 11, 2003); 70 Fed. Reg. 43,904 (July 29, 2005); and 82 Fed. Reg. 24,147 (May 25, 2017).

Oregon responds that the unredacted SVRL does not fall under the SORN's coverage for "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division." 68 Fed. Reg. at 47,611; Or. Br. 37-38. But the SORN states that "[t]he records in the system of records are kept . . . in the ordinary course of fulfilling the responsibility assigned to [the Civil Rights Division] under the provisions of 28 CFR 0.50, 0.51." 68 Fed. Reg. at 47,611. And

the cited regulation, in turn makes clear that the Civil Rights Division is responsible for "[e]nforcement of all Federal statutes affecting civil rights, including those pertaining to elections and voting." 28 C.F.R. 0.50(a).[8] The SORN covers a variety of people, including "[s]ubjects of investigations, [and] victims." 68 Fed. Reg. at 47,611. Eligible voters' votes may be diluted by votes cast by non-eligible voters and are thus potential victims of NVRA and HAVA non-compliance. "Fraud can affect the outcome of a close election, and *fraudulent votes dilute the right of citizens to cast ballots that carry appropriate weight.* Fraud can also undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021) (emphasis added). And HAVA further criminalizes the knowing and willful giving of false information in registering to vote. 52 U.S.C. 21144(a).[9]

---

[8] The SORN further identifies the "Civil Rights Division Web page" as a source for "[t]he delegated legal duties and responsibilities of each section" of the Division. 68 Fed. Reg. at 47,611. And the Voting Section's webpage identifies all three statutes prominently and by name. U.S. Dep't of Just., Civil Rights Division, Voting Section, https://www.justice.gov/crt/voting-section (last visited Apr. 23, 2026).

[9] The Democratic National Committee as *amicus curiae* mischaracterizes an out-of-context statement in related litigation

- 30 -

Oregon contends that "none of those published SORNs address collecting and maintaining voter lists complete with [sensitive information]." Or. Br. 37. But this contention incorrectly faults the DOJ for not meeting a heightened level of notice not required by the Privacy Act. *See* 5 U.S.C. 552a(e)(4) (listing what each "notice shall include").

### C. The E-Government Act does not prevent the DOJ from obtaining an electronic, unredacted copy of Oregon's SVRL.

Defendants argue that the DOJ's demand violated the E-Government Act because the DOJ failed to conduct a privacy impact assessment (PIA) before initiating the collection of personal voter information. Or. Br. 38-40; *see* E-Government Act of 2002, Pub. L. No. 107-347, § 208, 116 Stat. 2921-2922 (44 U.S.C. 3501 note) (hereinafter

---

in which a DOJ attorney explained to the district court how the DOJ would use the SAVE system—run by the Department of Homeland Security—to verify citizenship. *Amicus* incorrectly characterizes this process as an offer "to provide complete, unredacted voter files . . . to DHS." DNC Br. 22. The Civil Rights Division will be accessing the SAVE system in the same manner and form that states and localities have in this administration, *see U.S. Citizenship & Immigr. Servs.*, SAVE Agency Search Tool, https://tinyurl.com/n7fpu4zz (collecting states and localities) (last visited Apr. 24, 2026), pursuant to a user agreement under which the Civil Rights Division maintains control over the files it uploads into the system.

cited without reference to the Statutes at Large or the U.S. Code note).
This argument should be rejected.

Pursuant to the E-Government Act, agencies must perform a PIA before "initiating a new collection of information" in particular circumstances. E-Government Act of 2002 § 208(b)(1)(A)(ii), (B)(i). A "collection of information" is the act of "obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for," as relevant here, "answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons," where a "person" can include a "State." 44 U.S.C. 3502(3)(A) and (10); *see* E-Government Act § 201 (incorporating definitions from 44 U.S.C. 3502). When an agency "initiat[es] a new collection of information" that "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, [and] identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons," the agency must perform a PIA. E-Government Act § 208(b)(1)(A)(ii)(II), (B)(i).

The DOJ's demand for Oregon's SVRL was not a "collection of information" and so did not trigger any need for a PIA. The Attorney General demanded that Secretary Read provide the State's SVRL, which the State was required to "define[], maintain[], and administer[] at the State level." 52 U.S.C. 21083(a)(1)(A). Under HAVA, an SVRL must "contain[] the name and registration information of every legally registered voter in the State and assign[] a unique identifier to each legally registered voter in the State." *Ibid.*; *see generally* 52 U.S.C. 21083(a). Therefore, it is HAVA, and not the DOJ, that has imposed the relevant "reporting or recordkeeping requirement[]," *i.e.*, "collection of information," on the State. 44 U.S.C. 3502(3)(A) (defining "collection of information").

Even if the DOJ's demand constituted a "collection of information," it did not "initiat[e] a new collection of information." E-Government Act § 208(b)(1)(A)(ii). "The term 'initiating'" in the E-Government Act "has no statutory . . . definition," *Electronic Privacy Info. Ctr. v. United States Dep't of Com.*, 356 F. Supp. 3d 85, 87 (D.D.C.) (*EPIC*), *vacated and remanded on other grounds*, 928 F.3d 95 (D.C. Cir. 2019), nor does the term "new." *See* 44 U.S.C. 3502. "Contemporary

dictionaries define 'initiate' as '[t]o begin, commence, enter upon; to introduce, set going, give rise to, originate, "start" (a course of action, practice, etc.).'" *EPIC*, 356 F. Supp. 3d at 89 (citation modified) (collecting definitions). The relevant definition of "new" is "[h]aving been made or come into being only a short time ago; recent" or "[n]ever used . . . before now." *The American Heritage College Dictionary* 936 (4th ed. 2002); *see Merriam-Webster's Collegiate Dictionary* 780 (10th ed. 2002) (defining "new" as "having existed or having been made but a short time" or "different from one of the same category that has existed previously"). Seeking information already maintained by the State due to *pre-existing* "reporting or recordkeeping requirements," 44 U.S.C. 3502(3)(A), is not the "*initiat*[*ion* of] a *new* collection of information," E-Government Act § 208(b)(1)(A)(ii)(emphasis added).

## CONCLUSION

For the reasons stated in this brief and the United States' Opening Brief, this Court should reverse the district court's order dismissing the DOJ's Title III claim and remand with instructions to order Secretary Read to immediately produce the requested unredacted SVRL (except as noted at pages 28-29).

Respectfully submitted,

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant
  Attorney General

s/ Andrew G. Braniff
ANDREW G. BRANIFF
DAVID N. GOLDMAN
MEREDITH L. BAKER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 532-3803

Date: April 24, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-1231

I am the attorney or self-represented party.

**This brief contains** 6,957 **words, including** 0 words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated _____.

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Andrew G. Braniff **Date** 04/24/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at *forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*