

**U.S. Department of Justice**

Civil Rights Division

---

*Appellate Section*
*Ben Franklin Station*
*P.O. Box 14403*
*Washington D.C. 20044-4403*

May 12, 2026

**<u>VIA CM/ECF</u>**

Molly C. Dwyer, Clerk of the Court
Office of the Clerk
James R. Browning Courthouse
United States Court of Appeals
 for the Ninth Circuit
95 Seventh Street
San Francisco, CA 94103

> Re: *United States v. Oregon*, No. 26-1231 (9th Cir.) (oral argument scheduled for May 19, 2026)—Appellant United States' Rule 28(j) Letter

Dear Ms. Dwyer,

Pursuant to Rule 28(j), Appellant the United States advises the Court of an opinion from the Department of Justice Office of Legal Counsel (OLC) published on May 12, 2026 (attached). https://www.justice.gov/olc/media/1440346/dl.

OLC concludes that the Civil Rights Act (CRA) authorizes the Attorney General to compel States to produce unredacted statewide voter registration lists (SVRLs) and that, once they are produced, the Department may share that data with components within the Department of Homeland Security (DHS). *See* Op. 6, 11, 34; *see also* U.S. Br. 31. The CRA covers SVRLs because such lists relate to

- 1 -

voter registration and come into the possession of state election officers. Op. 7-11; *see* U.S. Br. 33-38. And because "the term 'relating to,'" is "broad," Op. 7 (citation omitted), "[a] State's [SVRL] is perhaps the archetypical example of a 'record' that 'relat[es]' to voter 'registration,'" *ibid.* (quoting 52 U.S.C. 20701); *see* U.S. Reply Br. 17-18, 21.

Additionally, OLC concludes that NVRA and HAVA enforcement is a proper purpose for a CRA request, both because the CRA's text does not limit requests to particular purposes and because the NVRA and HAVA are voting-rights legislation. Op. 15-21; U.S. Br. 26-30. Any later-arising secondary purpose does not alter this conclusion. Op. 20-21. The statement-of-basis requirement is also "fairly minimal." Op. 21; *see* U.S. Br. 20-24; U.S. Reply Br. 15-16. As a whole, the purpose-and-basis requirement is satisfied when the Attorney General "tell[s] a state what he is looking for and a high-level explanation as to why." Op. 23.

The OLC opinion also thoroughly explains the requirements of the Privacy and E-Government Acts and why they are satisfied here based on the Civil Rights Division's current rules and procedures. Op. 24-33. Each requirement contains an applicable exception, is already being complied with, or does not apply at all. *Ibid.*; *see* U.S. Reply Br. 27-34. And because the Privacy Act contains exceptions for law enforcement and routine use, the Attorney General may share the SVRL with

- 3 -

appropriate components within DHS and remain in full compliance with that Act and other statutes related to data security and maintenance. Op. 34, 36-41.

Sincerely,

s/ Andrew Braniff
Andrew Braniff
Attorney
Appellate Section
Civil Rights Division
Andrew.Braniff@usdoj.gov
(202) 532-3803

Attachment

cc: Counsel of Record (via CM/ECF)

- 3 -

## CERTIFICATE OF COMPLIANCE

I hereby certify that this letter complies with the word limit of Federal Rule of Appellate Procedure 28(j) and Circuit Rule 28-6.

s/ Andrew Braniff
Andrew Braniff
Attorney

Date: May 12, 2026

# ATTACHMENT

(Slip Opinion)

# Authority to Obtain and Share Statewide Voter Roll Data

The Department of Justice's Civil Rights Division has authority to seek statewide voter lists and share them with the Department of Homeland Security as part of its effort to identify individuals who are ineligible to vote, which other provisions of law do not limit.

May 12, 2026

MEMORANDUM OPINION FOR THE
ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION

As part of his efforts to preserve and protect the integrity of the American electoral process, President Trump has directed the Attorney General to "prioritize enforcement of 18 U.S.C. [§§] 611 and 1015(f) and similar laws that restrict non-citizens from registering to vote or voting, including through use of . . . databases or information maintained by the Department of Homeland Security" ("DHS") and "similar records relating to citizenship." Exec. Order No. 14248 § 2(e) (2025). He has further directed the Attorney General to "take appropriate action with respect to States that fail to comply with the list maintenance requirements of the National Voter Registration Act and the Help America Vote Act contained in 52 U.S.C. [§] 20507 and 52 U.S.C. [§] 21083." *Id.* § 3(c).

In response to the President's order to identify those who may be voting illegally (whether by reason of alienage or otherwise), the Civil Rights Division ("Division" or "CRT") proposed to seek statewide voter lists, and then to share the lists with Homeland Security Investigations ("HSI") or another unit within DHS. In connection with that proposal, you asked us whether (1) the Civil Rights Act of 1960 authorizes the Division to seek these records from states, (2) the Division may compel states to produce their voter registration lists notwithstanding other federal laws or principles of estoppel, and (3) the Division may share such lists with DHS for the purpose of identifying illegal aliens who are ineligible to vote. In early September 2025, we informally answered each question in the affirmative. At your subsequent request, we now memorialize and expand upon the basis of our advice.

1

50 Op. O.L.C. __ (May 12, 2026)

## I.

"Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam); *see also, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) (opinion of Stevens, J.). "Common sense, as well as constitutional law, compels the conclusion that" such confidence requires "substantial regulation" if "some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). It also requires "the prevention of fraud." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2340 (2021); *see also, e.g.*, *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). "Fraud can affect the outcome of a close election . . . ." *Brnovich*, 141 S. Ct. at 2340; *cf. Bush v. Gore*, 531 U.S. 98, 100–03 (2000) (per curiam) (discussing the outcome of an election decided by a few hundred votes). Indeed, voter fraud "dilute[s] the right of citizens to cast ballots that carry appropriate weight," *Brnovich*, 141 S. Ct. at 2340, and even the *perception* of "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government," *Purcell*, 549 U.S. at 4. Congress has passed numerous statutes to prevent just such an outcome, and your question arises out of efforts to enforce those statutes.

### A.

### 1.

Although regulating elections is primarily the purview of states, Congress has exercised its enumerated powers to enact several statutes intended to ensure that only those who are entitled to vote in federal elections do so. U.S. Const. art. I, § 4, cl. 1; *id.* amend. XIV, § 5; *accord id.* amends. I, XV, XIX, XXVI. As relevant here, the National Voter Registration Act of 1993, Pub. L. No. 103-31, 107 Stat. 77 ("NVRA"), "has two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018). "To achieve the latter goal, the NVRA requires States to 'conduct a general program that makes a reasonable effort to remove the names' of voters who are ineligible

2

*Authority to Obtain and Share Statewide Voter Roll Data*

'by reason of' death or change in residence." *Id.* (quoting 52 U.S.C. § 20507(a)(4)); *see also Crawford*, 553 U.S. at 192. And it permits the Attorney General to "bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary" to ensure that the NVRA's voter-list maintenance is "carr[ied] out." 52 U.S.C. § 20510(a).

The Help America Vote Act of 2002, Pub. L. No. 107-252, 116 Stat. 1666 ("HAVA"), reinforces this obligation by "requir[ing] every State to create and maintain a computerized statewide list of all registered voters," *Crawford*, 553 U.S. at 192 (citing 42 U.S.C. § 15483(a) (Supp. V 2000), currently codified at 52 U.S.C. § 21083(a)), which must meet certain specified requirements, 52 U.S.C. § 21083(a)(1), (4). It also requires state and local election officials to "perform list maintenance with respect to the computerized list on a regular basis," *id.* § 21083(a)(2)(A), and that states "make[] a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters," *id.* § 21083(a)(4)(A).[1] Again, "[t]he Attorney General may bring a civil action against any State or jurisdiction . . . as may be necessary to carry out" HAVA's election "administration requirements." *Id.* § 21111.

To assist in enforcing these and other election laws, Congress has long granted the Attorney General broad investigative authority. In particular, section 301 of Civil Rights Act of 1960 provides, in relevant part, that "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of" any federal election "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." Pub. L. No. 86-449, § 301, 74 Stat. 86, 88 (codified at 52 U.S.C. § 20701) ("CRA" or "Civil Rights Act"). Section 303, in turn, requires that "[a]ny record or paper required by [section 301] to be retained and preserved shall, upon demand in writing" by a representative of the Attorney General "be made available for inspection, reproduction, and copying." 52 U.S.C. § 20703.[2] Section 303 further provides that "[t]his

---

[1] Although not immediately relevant to your question, we note that states must also design their election systems to contain "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." 52 U.S.C. § 21083(a)(4)(B).

[2] To be sure, 52 U.S.C. § 20703 does require the materials to be made available "at the principal office of their custodian." As you did not indicate that the location of any review

3

50 Op. O.L.C. __ (May 12, 2026)

demand shall contain a statement of the basis and the purpose therefor." *Id.* Should an election officer refuse to comply with a demand for production under section 303, the Attorney General may sue in district court "to compel the production of such record or paper." *Id.* § 20705.

**2.**

The Attorney General may wish to investigate whether illegal aliens are being removed from voter-registration lists as part of those lists' ordinary maintenance.[3] Federal law protects the priceless value of citizenship by prohibiting illegal aliens from registering to vote or voting. Thus, for example, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") makes it a crime punishable by up to a year in prison for an alien to vote in federal elections, subject to certain exemptions not relevant here. Pub. L. No. 104-208, div. C, § 216(a)–(b), 110 Stat. 3009-546, 3009-572–73 (codified at 18 U.S.C. § 611(a)–(b)). It further provides, again with certain exceptions not relevant here, that

> [w]hoever knowingly makes any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election (including an initiative, recall, or referendum) . . . [s]hall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1015(f).

Although their exact scope differs, the NVRA and Voting Rights Act of 1965 also criminalize the submission of certain materially false statements when establishing one's eligibility to vote or when casting one's ballot.

---

would be an issue, we have not examined what the provision requires during an era where many voting records are maintained electronically.

[3] Other issues include whether the individuals who appear in a state's list are felons; are mentally incompetent; are not of age to vote; have not provided the required registration information; do not reside in the relevant jurisdiction; or appear in the list multiple times. *See* 52 U.S.C. § 20507(a)(3)(B), (a)(4); *id.* § 21083(a)(2)(A)(ii), (a)(2)(B)(iii), (a)(5)(A), (b)(4)(A)(i)–(iii). Federal law may vary somewhat regarding how it applies to each of these grounds for exclusion from the list. Either way, in focusing much of our discussion on alienage, we do not mean to take a position (or depart from a prior position) on such issues on behalf of the Department of Justice. We merely describe the context in which your question was raised to us.

*Authority to Obtain and Share Statewide Voter Roll Data*

*See* 52 U.S.C. §§ 10307(c), 20511(2). Because illegal aliens are ineligible to vote, these generally applicable laws are also implicated by an illegal alien's presence on a state's voter rolls.

**B.**

To ensure (among other things) that states are complying with Congress's demand to remove those who are ineligible to vote from their rolls—whether due to illegal presence in this country or otherwise—the Division has sent states letters demanding that they produce copies of their statewide voter registration lists. Those letters reflect that the Division seeks these lists as part of what we understand to be a good-faith effort to determine whether it needs to institute enforcement actions against such states pursuant to 52 U.S.C. §§ 20510(a) and 21111. *See, e.g.*, Memorandum for Steve Hobbs, Secretary of State, State of Washington, from Harmeet K. Dhillon, Assistant Attorney General, Civil Rights Division, *Re: Request for Complete Washington's Voter Registration List with All Fields* at 1–2 (Sept. 8, 2025), https://perma.cc/6N9J-CQBB ("Dhillon Memorandum"). Specifically, the Division informed states that it demands the lists to assess each "[s]tate's compliance with the statewide voter registration list maintenance provisions of the" NVRA and HAVA, and it invoked the Attorney General's investigatory authority under the Civil Rights Act. *Id.* at 1 & n.1.

As part of that compliance-ensuring effort, the Division has proposed to share these lists with HSI or another unit within DHS, which would enable cross-referencing the lists against existing databases in order to identify illegal aliens who are ineligible to vote. Although this activity may have incidental immigration consequences by providing DHS updated information regarding the location of illegal aliens, *cf. Padilla v. Kentucky*, 559 U.S. 356, 369 (2010) (acknowledging that the collateral immigration consequences of a criminal plea or conviction can be "complex"), your staff has represented that the purpose of its activity is to facilitate ordinary list maintenance. If the search reveals that an alien unlawfully has registered to vote or voted in an election, the Division may seek to strike the alien's name from the voter registration list for future elections, refer the alien for prosecution, or both.[4] Senior leadership offices within

---

[4] CRT generally is authorized to enforce "all Federal statutes affecting civil rights, including those pertaining to elections and voting." 28 C.F.R. § 0.50(a). "Notwithstanding

5

50 Op. O.L.C. __ (May 12, 2026)

the Department of Justice ("DOJ") have further represented to us that, at the time the requests were made, DOJ did not intend to use these lists for immigration enforcement.[5]

Before seeking to enforce state compliance with your letters, you asked our Office whether the Civil Rights Act allows the Attorney General to compel states to turn over statewide voter lists, and whether federal law permits the Attorney General to share those records for the purpose of investigating voter fraud. In consultation with HSI, you further asked whether federal law authorizes DHS to *receive* that information. We provided informal advice in the affirmative as to each question, which you have subsequently asked us to memorialize. We now do so.[6]

## II.

To start, we conclude that federal law authorizes the Division to compel states to produce their statewide voter registration lists regardless of whether the Division intends to share them with HSI or another unit within DHS so that DHS may cross-check them against existing databases. Such lists fall within the scope of the data that Congress has permitted the Attorney General to demand: A state's voter registration list falls within CRA section 301's scope, and no state is entitled to withhold responsive materials based on privacy or confidentiality provisions found in state law. Section 303's requirement that the Division include in its demand for such a list "a statement of the basis and the purpose therefor,"

---

the provisions of the foregoing sentence, the responsibility for the enforcement of" 18 U.S.C. § 611 and 52 U.S.C. § 10307 "is assigned to the Assistant Attorney General, Criminal Division," 28 C.F.R. § 0.50(a) (listing section 1973i of title 42, which is now section 10307), although CRT may refer matters under these statutes to the Criminal Division for prosecution, *see id.* § 0.50(d)–(e); *see also id.* § 0.55(m)(1)–(2) (Criminal Division is responsible for these matters).

[5] To be clear, we have received no information as of the time of signature that this intent has changed. But consistent with the purpose of this memorandum to record past advice, it reflects facts as we understood them at the time of our advice.

[6] We are aware that CRT's efforts have come under significant scrutiny in litigation. Consistent with this Office's longstanding practice, this memorandum reflects the facts as we understood them when we provided our advice in mid-September 2025. We address additional counterarguments raised by litigation only to explain why they do not change our prior advice.

6

*Authority to Obtain and Share Statewide Voter Roll Data*

52 U.S.C. § 20703, meanwhile, imposes relatively minimal burdens that the Division has satisfied here.[7]

## A.

As noted above, the Civil Rights Act requires state election officers to retain for a period of twenty-two months after an election "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." CRA § 301, 74 Stat. at 88 (codified at 52 U.S.C. § 20701). Because statewide voter registration lists both "relat[e] to" voter "registration" and "come into [the] possession" of state election officers, 52 U.S.C. § 20701, they fall within section 301's scope. Moreover, nothing in section 303 allows a state to withhold or redact the voter registration list based on privacy protections in *state* law.

## 1.

A state's statewide voter registration list is perhaps the archetypical example of a "record" that "relat[es]" to voter "registration." *Id.* "When a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). And "[t]he ordinary meaning of" the term "relating to," the Supreme Court has explained, "is a broad one." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). This term means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Id.* (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)); *see also Milner v. Dep't of the Navy*, 562 U.S. 562, 566 n.1 (2011) (noting that the term "related" is "expansive"). Since a statewide voter registration list is the method by which a state records who has registered

---

[7] For the avoidance of doubt, we do not think that CRT's statement of purpose in this case is subject to judicial review. But we do not expound upon that issue here, which is subject to significant litigation and outside the scope of the question upon which we were asked to opine. *See, e.g.*, Maine's Opposition to the United States's Motion for Order to Show Cause at 11–13, *United States v. Bellows*, No. 1:25-CV-00468-LEW (D. Me. Dec. 12, 2025), Dkt. No. 55; Proposed Notice of Motion & Motion to Dismiss at 18 n.8, *United States v. Weber*, No. 2:25-CV-09149-DOC-ADS (C.D. Cal. Nov. 17, 2025), Dkt. No. 62-1.

50 Op. O.L.C. __ (May 12, 2026)

to vote, one cannot seriously dispute that such a list "has 'a connection with, or reference to,' the topics the statute enumerates," *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting *Morales*, 504 U.S. at 384)—namely, voter "registration," 52 U.S.C. § 20701.[8]

## 2.

Some might argue that, because state election officers create statewide voter registration lists,[9] those lists do not "come into [their] possession," *id.*, but this is not the best reading of the statute. Instead, the ordinary meaning of the term "possession" encompasses "enjoyment of a thing which a man holds or exercises by himself, or by another who keeps or exercises it in his name"—regardless of how such dominion is obtained. *Bouvier's Law Dictionary: Baldwin's Students Edition* 955 (1934); *see also Webster's Seventh New Collegiate Dictionary* 663 (1967 ed.) ("the act of having or taking into control"); *Webster's Third New International Dictionary* 1770 (1971 ed.) ("something owned, occupied, or controlled"). Moreover, one can "come into" possession of a thing that one created oneself; the phrase does not carry a requirement that the thing is received from a third party. 52 U.S.C. § 20701. Instead, it means simply "to acquire as a possession or achievement." *Merriam-Webster's Collegiate Dictionary* 228 (10th ed. 2002) ("*Merriam-Webster's Tenth*"); *The Random House Dictionary of the English Language* 294 (1979 ed.) ("*Random House*") ("to acquire; get"). And one may "acquire" something by creating it. *See Merriam-Webster's Tenth* at 10 (defining "acquire" as "to come into possession or control of often by unspecified means"); *Random House* at 13 ("to come into possession of; get as one's own" or "to gain for oneself through one's actions or efforts"). Case law[10]—not to mention

---

[8] For this reason, the statutory text belies any assertion that section 301 is limited to voter-created records or voter-taken action; it specifically enumerates an "application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701.

[9] *See, e.g.*, Intervenors John Schneck & Marpheen Chann's Motion to Dismiss & Memorandum in Support at 14–18, *Bellows*, No. 1:25-CV-00468-LEW (D. Me. Dec. 12, 2025), Dkt. No. 61.

[10] *See, e.g.*, *United States v. Malik*, 385 F.3d 758, 759 (7th Cir. 2004); *U.S. Coachways, Inc. v. Vaccarello*, No. 1:17-CV-05983-EK-SMG, 2018 WL 3716888, at *2

*Authority to Obtain and Share Statewide Voter Roll Data*

common sense[11]—amply demonstrates that it is not unusual to say that one comes into possession of a thing that one created oneself. This is particularly true when the entity that comes into possession of an item is a *state*: The item (in this case, a list) can be created by local employees, compiled by municipalities, and ultimately used by a statewide agency. The state comes into possession of the list created by local employees and compiled by municipalities.

If Congress had meant to limit section 303 to materials that a third party has provided state election officers, it had other, more specific words available. For example, ordinarily the term "receive" is used to mean "[t]o come into possession of, get, acquire, or the like, from any source outside of oneself." *Webster's New International Dictionary* 2076 (2d ed. 1958) ("*Webster's New International*"); *see also* 75 *Corpus Juris Secundum* 642–43 (Francis J. Ludes & Harold J. Gilbert eds., 1952) ("It indicates a transfer of possession from one person . . . to another . . . . [I]n order to receive there must be one person to offer and another to take."). Accordingly, Congress has made it a crime to "receive" or "possess" various items, including (depending on the circumstances) certain firearms, 26 U.S.C. § 5861; *see also* 18 U.S.C. § 926A; tobacco products, 26 U.S.C. § 5751; ransom money, 18 U.S.C. § 1202; and various weapons of mass destruction, *id.* § 2332h (radiological dispersal devices); *id.* § 175c (the variola virus). Listing both verbs would be redundant if one cannot be considered to "possess" an object merely because one has "receive[d]" it, or "g[ot it] from some outside source." *Black's Law Dictionary* 1523 (12th ed. 2024) ("*Black's Twelfth*") (defining "receive"). These definitions, read in their larger statutory context, confirm that the states "come into [the] possession" of their statewide voter registration

---

(E.D.N.Y. Aug. 3, 2018); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 8:10-ML-02151-JVS-E, 2010 WL 2901798, at *5 (C.D. Cal. July 20, 2010).

[11] For example, there can be little dispute that Aaron still possessed the golden calf when Moses retuned from Mount Sinai, *see Exodus* 32:1–6, 22–24; that a motor enthusiast continues to possess a kit car after it is constructed, Peter Jones, *Are Kit Cars Street Legal? Rules Explained (With Examples)*, Motor & Wheels (Oct. 23, 2023), https://perma.cc/7PAP-CXBN; or that homeowners expect to retain possession of the results of their do-it-yourself home improvements indefinitely, *e.g.*, *DIY Projects and Ideas*, Home Depot, https://perma.cc/YW59-ZW6L (last visited May 6, 2026).

50 Op. O.L.C. __ (May 12, 2026)

lists within section 301's meaning, 52 U.S.C. § 20701, even though they create such lists themselves.[12]

To be sure, at times, Congress has used the phrase "in the possession of," *e.g.*, 30 U.S.C. § 1732(b); 6 U.S.C. § 1502(a), to reflect items that a person currently possesses. But the "construction of statutory language often turns on context, which certainly may include the definitions of related words," *FCC v. AT&T Inc.*, 562 U.S. 397, 404 (2011) (citation omitted)—not to mention "common sense," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Absent contrary indication, ordinary English language reflects that cognates—such as "possess" and "possession"—"typically reflect the meaning of corresponding" words. *AT&T*, 562 U.S. at 402. We see no such contrary indication here.

Moreover, for those who find legislative history useful or persuasive, the Civil Rights Act's accompanying House Report, too, suggests that section 303's drafters understood it to encompass "all records and papers in the possession of election officers relating to . . . act[s] requisite to voting," not just materials received from others. H.R. Rep. No. 86-956, at 6 (1959).

Unsurprisingly, then, courts long have recognized that section 301 encompasses materials in a state election officer's possession regardless of whether he received them from another or created them himself. *See, e.g.*, *Kennedy v. Lynd* ("*Lynd II*"), 306 F.2d 222, 227 (5th Cir. 1962); *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 855 (M.D. Ala. 1960), *aff'd sub nom.*, *Dinkens v. Att'y Gen.*, 285 F.2d 430 (5th Cir. 1961). Indeed, courts specifically have recognized that section 301 encompasses "records of voting registration," *United States v. Mississippi*, 380 U.S. 128, 134, 136–38 (1965), including voter registration lists, *see, e.g.*, *United States v. Maine*, No. 1:06-CV-0086-JAW, 2007 WL 1059565, at *5 (D. Me. Apr. 4, 2007); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985).

---

[12] We are aware that, since the time we originally conveyed our advice, at least one court has held the opposite. *See United States v. Benson*, No. 1:25-CV-01148-HYJ-PJG, 2026 WL 362789, at *9–10 (W.D. Mich. Feb. 10, 2026). Because rulings in these cases postdate the informal advice we have since been asked to memorialize, we do not discuss them at length in this memorandum. Consistent with our ongoing obligation to provide our best view of the law to the Executive Branch, we have continued to monitor the evolving litigation landscape. As of the date of this memorandum's signing, none of these cases has provided reasoning that has led us to doubt or revise our advice from last fall.

*Authority to Obtain and Share Statewide Voter Roll Data*

In reaching this conclusion, courts have recognized that limiting section 301 to materials that a state election official has acquired from a third party would undermine the statute's purpose. That is, section 303 was "designed to secure a more effective protection of the right to vote" by enabling "preliminary investigations of registration practices . . . in order to determine whether or not such practices conform to constitutional principles." *Gallion*, 187 F. Supp. at 853.[13] Interpreting section 301 to exclude materials that state election officers have created themselves— including statewide voter registration lists—would subvert that purpose by frustrating the Division's ability to acquire evidence that could shed light on whether a violation of the law has occurred. And though purpose cannot overcome plain text, courts "have rejected rules that would 'thwart and defeat [an agency's] appropriate investigatory powers.'" *United States v. Clarke*, 573 U.S. 248, 254 (2014) (quoting *Donaldson v. United States*, 400 U.S. 517, 533 (1971)); *accord N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").

### 3.

Section 303 does not permit a state to redact or withhold any information from its statewide voter registration list based on privacy or confidentiality provisions of state law. Section 303's scope "is sweeping," *Lynd II*, 306 F.2d at 226, providing without qualification that "[a]*ny* record or paper required by [section 301] to be retained and preserved *shall*" be produced. 52 U.S.C. § 20703 (emphases added). Because that mandatory language preempts contrary state law, a state must produce information that lies within section 303's scope upon demand—period.

"Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*,

---

[13] *See also, e.g.*, *Lynd II*, 306 F.2d at 228 ("Its purpose is to enable the Attorney General to determine whether . . . actions should be instituted. And it is to enable him to obtain evidence for use in such cases if and when filed."); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962) ("The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred."), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

50 Op. O.L.C. __ (May 12, 2026)

520 U.S. 1, 5 (1997) (quoting *Webster's Third New International Dictionary* 97 (1976)). Although Congress *could* have included a saving provision for state privacy laws, *see, e.g.*, 18 U.S.C. § 1838; 42 U.S.C. § 300jj-19(c)(4), "Congress did not add any language limiting the breadth of that word," *Gonzales*, 520 U.S. at 5, in enacting section 303.

To the extent of an irreconcilable conflict between section 303 and state-law privacy or confidentiality protections, section 303 wins. The Constitution's Supremacy Clause provides that "the Laws of the United States which shall be made in Pursuance" of the Constitution "shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "This means that when federal and state law conflict, federal law prevails and state law is preempted." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018); *see also Preemptive Effect of Defense Production Act Order on State Law*, 50 Op. O.L.C. __, at *4, *7–9 (Mar. 3, 2026). State privacy laws that require election officials to withhold or redact information that Congress has mandated they produce are thus "preempted because [they] impose[] a duty that [i]s inconsistent . . . with federal law." *Murphy*, 584 U.S. at 478; *see also Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013) ("[S]tate law [is] impliedly pre-empted where it is 'impossible for a private party to comply with both state and federal requirements.'" (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990))).

A state seeking to withhold information it deems private or confidential from its response to a section 303 demand will not find support in the Elections Clause. To the contrary, that Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives[] shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of ch[oo]sing Senators." U.S. Const. art. I, § 4, cl. 1. As described to the people of New York before ratification, that provision "authorises the national Legislature to regulate in the last resort the election of its own members," and ensures that the Constitution "contain[s] in itself the means of its own preservation." *The Federalist* No. 59, at 397–98 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) (emphasis omitted). Far from creating a special rule of state power to override Congress, "the federalism concerns" surrounding preemption "are somewhat *weaker*"

12

*Authority to Obtain and Share Statewide Voter Roll Data*

under the Elections Clause precisely because "the [s]tates' role in regulat-ing congressional elections . . . has always existed subject to the express qualification that it 'terminates according to federal law.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14–15 (2013) (emphasis added) (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)). That is, the Elections Clause is a rare instance in which the Framers granted Congress "a revisionary power . . . to counter state legislatures." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2495 (2019).

To be sure, as with other aspects of "the regulation of elections for the Federal Government," the Framers granted authority "in the first instance to the local administrations; which in ordinary cases, and when no improper views prevail, may be both more convenient and more satisfactory." *The Federalist* No. 59, at 399. But "whenever extraordinary circumstances might render [an] interposition necessary to its safety," *id.*, a state's authority to protect the privacy or confidentiality of election-related personal information must yield to Congress's superior authority under the Clause, *see Ex parte Siebold*, 100 U.S. (10 Otto) 371, 384 (1880); *Inter Tribal Council*, 570 U.S. at 14—not to mention the Fourteenth and Fifteenth Amendments, *see City of Rome v. United States*, 446 U.S. 156, 179–80 (1980)—to require that states produce the materials unredacted.

One counterargument is that courts "sometimes" presume that federal law does not preempt state law "unless that was the clear and manifest purpose of Congress." *Inter Tribal Council*, 570 U.S. at 13 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). But for at least three reasons, such a presumption cannot justify withholding or redacting information sought under section 303.

*First*, the Elections Clause, *see* U.S. Const. art. I, § 4, cl. 1, authorizes Congress to enact regulations that displace state law. Such regulations include those "relating to 'registration,'" *Inter Tribal Council*, 570 U.S. at 8–9 (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)), such as sec-tion 303, *see Gallion*, 187 F. Supp. at 853 & n.6. On its face, the Elections Clause "empower[s] Congress to override state election rules." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 814–15 (2015). "Because the power the Elections Clause confers is none other than the power to pre-empt, the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive in-

tent," free from any presumption about preemption one way or another. *Inter Tribal Council*, 570 U.S. at 14.

*Second*, presuming Congress did not intend to preempt state privacy laws would be irreconcilable with the context of section 303. After all, Congress enacted section 303 for the "clear and manifest purpose," *Inter Tribal Council*, 570 U.S. at 13 (citation omitted), of overcoming the "refusal of some State and local authority to permit such inspection," H.R. Rep. No. 86-956, at 7; *see also, e.g.*, *Message to Congress*, Pub. Papers of Pres. Dwight D. Eisenhower at 166 (1959). And far from leaving the effectiveness of federal investigations to the vagaries of state privacy laws, Congress has in the Civil Rights Act, together with the Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 ("Privacy Act"), created "a comprehensive and detailed set of requirements for the management of confidential records held by Executive Branch agencies." *FAA v. Cooper*, 566 U.S. 284, 287 (2012). This scheme lays out in full what Congress itself has deemed to be adequate privacy and confidentiality protections for election-connected information. The states need not supplement them—and, in this case, cannot. *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001); *Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297, 301 (1943).

*Third*, even when one applies the presumption against preemption, that presumption only presumes that Congress did not intend to preempt "innocuous" rules, which burden federal law only in "incidental" ways. *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 325 (2016). The same presumption would not apply to "a state law that enters a fundamental area of [a federal] regulation" or that "counters the federal purpose." *Id.* at 325–26. In this instance, any applicable state-law privacy or confidentiality provision would enter "a fundamental area" of section 303, *id.*, because it would require a state to withhold the very material that section 303 requires a state to produce on demand, such that the presumption against preemption simply would be rebutted. *See id.* at 325; *see also Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 148–50 (2001). Thus, even if the presumption against preemption would otherwise apply (and it would not), it does not justify the redaction or withholding of information that Congress specifically required states to provide.

*Authority to Obtain and Share Statewide Voter Roll Data*

## B.

Based on the facts as they have been communicated to us, the Division can also satisfy section 303's requirement that a "demand shall contain a statement of . . . the purpose therefor." 52 U.S.C. § 20703. Because the Civil Rights Act does not limit the purposes for which the information may be sought (or on what basis), this requirement imposes a minimal burden. And an effort to ensure that states are complying with the NVRA's and HAVA's list-maintenance requirements is a proper "purpose" for demanding that the states produce those lists. *Id.*

### 1.

The Civil Rights Act imposes only one requirement when it comes to such a demand for information: that the Attorney General state his "purpose," *id.*—that is, his "object to be attained" or "end or aim to be kept in view," *Webster's New International* at 2018. Congress could have limited the purposes for which the Division may invoke section 303. "But that is not the text of the statute Congress enacted." *Pac. Operators Offshore, LLP v. Valladolid*, 565 U.S. 207, 215 (2012). And we generally "resist reading words or elements into a statute that do not appear on its face," *Duty to Report Suspected Child Abuse Under 42 U.S.C. § 13031*, 36 Op. O.L.C. 167, 181 (2012) ("*Duty to Report*") (quoting *Dean v. United States*, 556 U.S. 568, 572 (2009)), as doing so would violate the "fundamental principle of statutory interpretation that 'absent provisions cannot be supplied by'" an interpreter, *Rotkiske v. Klemm*, 140 S. Ct. 355, 360–61 (2019) (alteration accepted) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 94 (2012)).[14]

Nor can we infer that section 303 may be used only for the purpose of enforcing the Civil Rights Act itself. After all, much of that law is about issues besides voting, *see* CRA, tits. II, V, VII, 74 Stat. at 86–88, 89–90, 92, and title III (in which section 303 is located) imposed no new substantive requirements on states or localities with respect to voting, *see gener-*

---

[14] *See also, e.g.*, *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 701–02 (1995); *Howe v. Smith*, 452 U.S. 473, 480–82 (1981); *Detroit Tr. Co. v. The Thomas Barlum*, 293 U.S. 21, 37–38 (1934).

15

*ally id.*, tit. III, 74 Stat. at 88–89.[15] Since the availability of records under section 303 is tied to acts requisite to voting, limiting the set of permissible purposes for section 303 demands to those that enforce provisions that have nothing to do with voting would render the provision a nullity. "It is an 'elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.'" *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 510 n.22 (1986) (quoting *Colautti v. Franklin*, 439 U.S. 379, 392 (1979)); *see also, e.g.*, *United States v. Tohono O'odham Nation*, 563 U.S. 307, 315 (2011); *Dublino*, 413 U.S. at 419–20.

Limiting the statute's scope by atextual interpretive "supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision." *Rotkiske*, 140 S. Ct. at 361. Other statutes authorize agencies to obtain certain materials for only specified purposes.[16] "So if we needed any proof that Congress knew how to" limit the purposes for which an agency can obtain information "when it meant" to do so, "here we find it." *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 416 (2012); *see also United States v. Shabani*, 513 U.S. 10, 14 (1994) ("In light of this additional element in [one] statute, Congress' silence in [a different statute] speaks volumes."). Congress chose not to do so here.

**2.**

One counterargument rests on legislative history indicating that Congress enacted section 303 to provide DOJ with additional tools to enforce existing voting laws, including the voting provisions of the Civil Rights Act of 1957, Pub. L. No. 85-315, pt. IV, 71 Stat. 634, 637–38, which was

---

[15] Title VI of the Civil Rights Act admittedly expanded the *remedies* available when a court finds a deprivation of certain preexisting rights or privileges with respect to voting, but it does not create any such rights or privileges. *See* CRA, tit. VI, 74 Stat. at 90–92.

[16] *See, e.g.*, 8 U.S.C. § 1446(b) ("For [the] purposes" of "conduct[ing] examinations upon applications for naturalization," an agency "is authorized . . . to require by subp[o]ena the attendance and testimony of witnesses" and "production of relevant books, papers, and documents."); 12 U.S.C. § 1467a(g)(2) ("any investigation under this section"); 29 U.S.C. § 2616(d) ("any investigation provided for in this section"); 46 U.S.C. § 12140(b)(1) ("any investigation conducted under this section"); 50 U.S.C. § 4101(c)(1) ("any hearing, examination, or investigation under this subchapter").

the first "civil rights measure to pass the Congress in 85 years," *Statement by the President Upon Signing the Civil Rights Act of 1960*, Pub. Papers of Pres. Dwight D. Eisenhower 398, 398 (May 6, 1960) ("*Statement*"). For example, the House Report accompanying the CRA observed that "[e]xperience has shown the need for this legislation," because "lacking a suitable provision for access to voting records during the course of an investigation and prior to the institution of a suit" rendered "the authority of the Attorney General . . . relatively ineffective." H.R. Rep. No. 86-956, at 7. Others involved in the legislation echoed this sentiment.[17] We are unpersuaded.

For one, this would be a novel way to read a statutory provision. As even a court that has since disagreed with our advice has recognized, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes." *Benson*, 2026 WL 362789, at *8. To the contrary, "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Brown & Williamson Tobacco Corp*., 529 U.S. at 133. "Th[e] classic [interpretive] task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." *United States v. Fausto*, 484 U.S. 439, 453 (1988).

It would be particularly problematic to apply such a view to a procedural statute that, on its face, stretches across different substantive protections. Congress can and does adopt procedures to enforce substantive legal rules already on the books and then modifies or adds to those legal rules without changing the legal scheme. For example, Congress passed the Administrative Procedure Act ("APA") in 1946, Pub. L. No. 79-404, 60 Stat. 237, *amended by*, Pub. L. No. 89-554, 80 Stat. 378 (1966), to govern federal agency action as it enforced existing organic statutes, *see*

---

[17] *See Statement* at 398 ("One provision, which requires the retention of voting records, will be of invaluable aid in the successful enforcement of existing voting rights statutes."); *Special Message to the Congress on Civil Rights*, Pub. Papers of Dwight D. Eisenhower 164, 166 (Feb. 5, 1959) ("*Message to Congress*") (calling for "[s]upplemental legislation" to address "[a] serious obstacle" to the 1957 law); S. Rep. No. 86-1205, at 2 (1960) (noting that the 1957 law failed to "provide sufficient mechanisms and alternatives to overcome systematic disfranchisement").

50 Op. O.L.C. __ (May 12, 2026)

Admin. Conf. of the U.S., *Administrative Procedure Act*, https://perma.cc/ 8ALK-D9Q7 (last visited May 6, 2026) (providing a brief overview of the APA and its history). The APA has never been understood as applying only to the agencies that existed when Congress enacted it, and no court has suggested that subsequently created agencies need not heed its dictates. *Id.*; *see also* 5 U.S.C. § 551(1) (providing expressly which kinds of agencies are exempted from the APA's rules). Rather, agencies that Congress created quite recently still abide by that 80-year-old statute. *Compare, e.g.*, Homeland Security Act of 2002, Pub. L. No. 107-296, § 101, 116 Stat. 2135, 2142 ("Homeland Security Act" or "HSA") (establishing the Department of Homeland Security), *with, e.g.*, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (applying the APA to DHS actions).

For another, legislative history "can assist in" the interpretive process "to the extent [that it] demonstrate[s] the manner in which the public used or understood a particular word or phrase," *McDonald v. City of Chicago*, 561 U.S. 742, 828 (2010) (Thomas, J., concurring in part and concurring in judgment); *see also Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 50 (1911) (substantively similar), but "legislative history is not the law," *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018). Rather, when interpreting a statute, the "proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself. Where, as here, that examination yields a clear answer, [we] must stop." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) (citation omitted).[18]

But even taking this legislative history on its own terms, it shows at most that Congress intended section 303 to aid DOJ in enforcing existing voting laws—not that Congress meant section 303 to be unavailable for enforcing other laws within DOJ's jurisdiction, including voting laws that Congress would enact in the future such as the NVRA or HAVA.

---

[18] *See also, e.g.*, *Davis v. Mich. Dep't of the Treasury*, 489 U.S. 803, 809 (1989) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 618 (2013) (Scalia, J., concurring in part and dissenting in part) ("We do not inquire what the legislature meant; we ask only what the statute means." (quoting Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 419 (1899))).

"[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). Congress might have had in mind voting laws that were already on the books (and the 1957 law in particular) when it enacted section 303, but "Congress for cogent reasons chose to enact a more general statute, one which, although it had [existing voting rights laws] as its focus, was not limited in application" to those laws. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 248 (1989).

If anything, other aspects of section 303's legislative history demonstrate that it does *not* limit the purposes for which it can be used to enforce preexisting voting statutes. For example, an early version of what eventually would become section 303 would have authorized DOJ, when "conducting any investigation in carrying out the powers and authority conferred in [section 131(c) of the 1957 law] . . . , to require by subp[o]ena the production of such [materials] as may be relevant or material to such investigation." S. 499, 86th Cong. § 301 (1959). As enacted and signed into law, section 303 conspicuously omits that limitation. *See* CRA § 303, 74 Stat. at 88 (codified at 52 U.S.C. § 20703). "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–42 (1987) (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 392–93 (1980) (Stewart, J., dissenting)); *see also, e.g.*, *Russello*, 464 U.S. at 23–24; *Gen. Acct. Off. v. Gen. Acct. Off. Pers. Appeals Bd.*, 698 F.2d 516, 525 n.52 (D.C. Cir. 1983).[19]

---

[19] "[F]loor statements by individual legislators rank among the least illuminating forms of legislative history," *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017), even when made by sponsors of the bill, *see Brnovich*, 141 S. Ct. at 2350 (rejecting a "cat's paw" theory of legislative history as inconsistent with legislators' "duty to exercise their judgment and to represent their constituents"). But for those who find such materials helpful, *see, e.g.*, *Corley v. United States*, 556 U.S. 303, 317–20 (2009), "one of the principal spokesmen for the bill in the Senate," *Coleman*, 313 F.2d at 868, unequivocally stated that "[c]learly a sufficient statement would be the assertion that the demand was made for the purpose of investigating possible violations of a Federal statute," 106 Cong. Rec. 7767 (1960) (Sen. Kenneth Keating).

50 Op. O.L.C. __ (May 12, 2026)

**3.**

Even if section 303 *were* limited to enforcing voting-rights legislation, the Division's stated purpose here would satisfy this minimal burden. In each section 303 demand to the states, the Division stated that it requests the state's statewide voter registration list "to assess [the] state's compliance with the statewide [list-]maintenance provisions of the NVRA." *E.g.*, Dhillon Memorandum at 1. Although perhaps aimed at a larger group of states than has been done in the past, this request is entirely in line with the Division's historical practice of invoking section 303 to demand materials, including statewide voter registration lists, from the states when enforcing a variety of voting statutes. These statutes include both the NVRA and HAVA, as well as the Voting Rights Act of 1965 and the Uniformed and Overseas Citizens Absentee Voting Act, Pub. L. No. 99-410, 100 Stat. 924 (1986).[20] That level of application is to be expected: Even assuming that section 303 is limited to enforcement of voting statutes, bringing it to bear on the NVRA's and HAVA's list-maintenance provisions, which are designed to ensure that only those who are entitled to vote actually do so, is consistent with such a limitation.

We do not think that the Division's decision to use the statewide voter-registration lists to investigate voter fraud (whether by illegal aliens or otherwise) alters this analysis. By requiring that a demand specify "*the* purpose therefor," 52 U.S.C. § 20703 (emphasis added), section 303 "uses the definite article to reference the particular" purpose that the Division had for making it, *Slack Techs., LLC v. Pirani*, 143 S. Ct. 1433, 1440 (2023). The Division has represented to us that it decided to use the voter registration lists to investigate voter fraud, including by illegal aliens, only after issuing the section 303 demands in question. A secondary purpose such as this does not, in our view, constitute part of "*the* purpose" for these demands that section 303 requires the Division to state. 52 U.S.C. § 20703 (emphasis added); *cf. TIG Ins. Co. v. Republic of*

---

[20] *See, e.g.*, Letter for R. Tamar Hagler, Chief, Voting Section, Civil Rights Division, from Michael L. Jones Jr., General Counsel, Office of the Secretary of State of Alabama at 1 (Sept. 19, 2024); Order at 2, *United States v. Alabama*, No. 2:08-CV-00920-WKW-CSC (M.D. Ala. Mar. 27, 2009), Dkt. No. 24; Memorandum of Understanding Between the Department of Justice and the Office of the Texas Secretary of State (May 13, 2008), https://perma.cc/GEL3-2287; Consent Judgment & Decree, *United States v. Georgia*, No. 1:06-CV-02442-CC (N.D. Ga. Oct. 27, 2006), Dkt. No. 4.

*Argentina*, 967 F.3d 778, 783 (D.C. Cir. 2020) (noting that, under "the usual rules governing civil litigation, . . . district courts generally assess facts at the time of filing"). Regardless, such a purpose is permissible under section 303 given that, as explained, section 303 does not limit the purposes for which the Division may invoke it. And, beyond this fact, even were section 303 limited to the enforcement of voting statutes, statutes that criminalize voter fraud would satisfy any such condition.

## C.

The Division also has articulated a valid "basis" for its demands that States produce their statewide voter registration lists. 52 U.S.C. § 20703. Again, this is a fairly minimal requirement, which the Division satisfied in saying that it requests the state's statewide voter-registration list "to assess [the] state's compliance with the statewide [list-]maintenance provisions of the NVRA." *E.g.*, Dhillon Memorandum at 1.

The general rule is that an administrative subpoena's validity does not turn on "the strength of the underlying complaint." *McLane Co. v. EEOC*, 581 U.S. 72, 76 (2017); *see also EEOC v. Shell Oil Co.*, 466 U.S. 54, 72 n.26 (1984) (noting that an administrative subpoena's validity does not depend on the underlying charge being "'well founded' or 'verifiable'" (citation omitted)). Congress often empowers a federal agency to "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950). That general rule applies here because section 303 demands are in the nature of "subpoenas." Aram A. Gavoor & Steven A. Platt, *Administrative Investigations*, 97 Ind. L.J. 421, 434 & n.94 (2022); *see also Black's Twelfth* at 1732 (noting that an "administrative subpoena" is "issued by an administrative agency to compel an individual to provide information to the agency").

Congress knows how to depart from that general rule: It can condition an agency's authority to compel the production of materials on the agency's demonstration of adequate grounds to believe that a legal violation has occurred. The Stored Communications Act, Pub. L. No. 99-508, tit. II, 100 Stat. 1860 (1986), *amended by* Pub. L. No. 103-414, § 207(a)(2), 108 Stat. 4279, 4292 (1994), for example, authorizes the government to obtain certain communications or records thereof only if it "offers specific and articulable facts showing that there are reasonable grounds to believe" the

materials sought "are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Another provision of that statute requires a warrant. *See id.* § 2703(a). When sought from a federal district court, that warrant must be issued pursuant to the Federal Rules of Criminal Procedure, *see id.*, which require a showing of "probable cause," Fed. R. Crim. P. 41(d)(1). And another statute allows the Federal Bureau of Investigation to obtain a court order for acquiring certain records only if it "specif[ies] that . . . there are specific and articulable facts giving reason to believe that the person to whom the records pertain is a foreign power or an agent of a foreign power." 50 U.S.C. § 1862(b)(2). Section 303's absence of any similar requirement is revealing. *See Duty to Report*, 36 Op. O.L.C. at 181; *Rotkiske*, 140 S. Ct. at 360–61.

Here, Congress instead requires only that the Attorney General (or his designee) offer a "basis"—that is, "foundation" or "support"—for a section 303 demand. *Oxford Dictionary of English Etymology* 77 (1966). A section 303 demand does not require "detailed information" or "specific details of voter discrimination," *United States v. Lynd* ("*Lynd I*"), 301 F.2d 818, 822 (5th Cir. 1962),[21] and cannot be defeated for purportedly lacking a "proper basis" merely by virtue of election officials denying that a violation has occurred, *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962). Further, reading such a requirement into section 303 would frustrate the statute's "very purpose," which "is to discover and procure evidence, not to prove a pending charge or complaint, but upon which to make one if . . . the facts thus discovered should justify doing so." *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 201 (1946); *see also Lynd II*, 306 F.2d at 225, 228; *Coleman*, 208 F. Supp. at 200–01; *Gallion*, 187 F. Supp. at 853.

Nor does Congress require a demand's "basis" to be distinct from its "purpose." Section 303's use of the terms "basis" and "purpose" reflects "a lawyerly penchant for doublets (aid and abet, cease and desist, null and void)." *King v. Burwell*, 576 U.S. 473, 502 (2015) (Scalia, J., dissenting);

---

[21] True, in *Lynd I*, the Fifth Circuit stated that a "simple assertion . . . that there are reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights in a given county" was a sufficient condition that justifies the request. 301 F.2d at 822. But *Lynd I* did not hold that "a sufficient condition" to justify a section 303 demand was also "a necessary one" to justify any request. *Clark v. Arizona*, 548 U.S. 735, 753 (2006).

22

*accord Temporary Presidential Designation of Acting Board Members of the Inter-American Foundation and the United States African Development Foundation*, 49 Op. O.L.C. __, at *8 n.3 (Mar. 14, 2025) (same). That is, section 303's use of the phrase "the basis and the purpose therefor" is best understood to require the Attorney General or his designee to tell a state what he is looking for and a high-level explanation as to why. *See* 52 U.S.C. § 20703. As a result, as in other legal contexts, the same explanation can furnish both an action's "conceptual basis and purpose[]." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 533–34 (1984); *see also, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 841 (1985) (Marshall, J., concurring in judgment).

Contrary to one counterargument we have seen,[22] such an interpretation does not improperly render the term "basis" superfluous. "Doublets in our language of the law often are not redundancies but rather the result of the merger of the Anglo-Saxon and Norman French strands of modern day legal English," Paul Brickner, *How Judges Think*, 59 Case W. Rsrv. L. Rev. 793, 800 (2009) (book review),[23] and thus often function "as a single unit of analysis to convey only a single meaning," Ethan J. Leib & James J. Brudney, *The Belt-and-Suspenders Canon*, 105 Iowa L. Rev. 735, 741 (2020). This grammatical usage, unsurprisingly, tracks investigative reality: Although the "basis" of an investigation can be distinct from its "purpose" if someone approaches investigators with a specific factual reason to think records will reveal wrongdoing, it is common in the early days of an investigation for the "basis" of the inquiry to overlap with its "purpose," especially when an agency undertakes the investigation simply to ensure that the law is being followed. In this instance, the purpose for asking for the lists is to investigate states' NVRA and HAVA compliance, and the basis for asking for the lists is that they contain critical evidence in assessing NVRA and HAVA compliance, which Congress has tasked

---

[22] *See, e.g.*, Maine's Motion to Dismiss at 14–16, *Bellows*, No. 1:25-CV-00468-LEW (D. Me. Dec. 12, 2025), Dkt. No. 54.

[23] In the Norman Conquest's wake, "official proceedings were conducted in Norman French, while the parties themselves almost invariably spoke Old English, a Germanic tongue. This led to the practice of including both the French and Old English words in every critical phrase in a document." Drury Stevenson, *Forensic Linguistics: An Introduction to Language in the Justice System*, 77 U. Colo. L. Rev. 257, 261 (2006) (book review).

50 Op. O.L.C. __ (May 12, 2026)

the Division with investigating. And, as already noted, section 303 does not require the Division to have some pre-existing level of suspicion to justify an investigation. *McLane Co.*, 581 U.S. at 76; *EEOC*, 466 U.S. at 72 n.26.

Even if a section 303 demand's "purpose" is legally distinct from its "basis," and "the same [information] may prove two separate elements, this does not mean that the two elements collapse into one." *Boyle v. United States*, 556 U.S. 938, 950 n.5 (2009).[24] For example, the Division's purpose may be to investigate whether a state is failing to adequately maintain its voter rolls, or improperly imposing a poll tax, but the investigation's starting point may be "reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights in a given county" within that state. *Lynd I*, 301 F.2d at 822. As a practical matter, such circumstances may be rare, but "[l]anguage in a statute is not rendered superfluous merely because in some contexts that language may not be pertinent." *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981); *see, e.g.*, *Kawashima v. Holder*, 565 U.S. 478, 488 (2012); *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 545–46 (1994).[25]

### III.

Having concluded that section 303 allows the Division to seek statewide voter registration lists, you also asked us whether the Privacy Act, Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, tit. XXX, 108 Stat. 2099 ("Driver's Privacy Protection Act"), or E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899

---

[24] *See also, e.g.*, *Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776, 781 (6th Cir. 2000) ("[T]he plaintiff may allege the separate elements . . . through the same facts . . . ."); *Vitaline Corp. v. Gen. Mills, Inc.*, 891 F.2d 273, 275 (Fed. Cir. 1989) ("Although abandonment requires both non-use and intent not to resume use of the mark, the element of intent can be established inferentially by the same facts that establish non-use."); *United States v. Qaoud*, 777 F.2d 1105, 1115 (6th Cir. 1985) ("[S]eparate elements . . . may be proved by the same evidence.").

[25] Even if this were not the case, the canon against surplusage does not compel such a construction, as it "is not an absolute rule" and "certainly does not require us to favor an unusual meaning that will avoid surplusage over a more natural one." *Stanley v. City of Sanford*, 145 S. Ct. 2058, 2066 (2025) (cleaned up); *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) ("The canon against surplusage is not an absolute rule" and "has considerably less force in" some contexts than in others.).

("E-Government Act"), prevent the Division from obtaining these lists (in whole or in part). We advised that they do not.

## A.

The Privacy Act's limitation on an agency's ability to maintain records that "describ[e]" the exercise of First Amendment rights, 5 U.S.C. § 552a(e)(7), does not prevent the Division from retaining statewide voter registration lists under section 303. Even if we assume the Privacy Act is implicated by these lists, the Division's demands fall within the scope of an authorized law enforcement activity. These lists also fall within the scope of a published Privacy Act System of Records Notice ("SORN"). And finally, the Privacy Act's restrictions on disclosure for use in a computer-matching program do not apply here.

## 1.

For agencies that maintain records systems, the Privacy Act provides that federal agencies can "maintain no record describing how any individual exercises rights guaranteed by the First Amendment" unless the record falls within a specified exception. *Id.* § 552a(e)(7). It is clear that the First Amendment protects the "rights of voters." *Burdick*, 504 U.S. at 434; *see also generally* Armand Derfner & J. Gerald Hebert, *Voting Is Speech*, 34 Yale L. & Pol'y Rev. 471 (2016). It is far *less* clear that statewide lists of who is registered to vote "describ[e] how any individual exercises" that right. 5 U.S.C. § 552a(e)(7). Assuming they do, however, the Division may retain them in this instance, as the Division's actions are "within the scope of an authorized law enforcement activity" for two independent reasons—necessarily implying that they can *obtain* the materials consistent with the Privacy Act. *Id.*

*First*, enforcing the NVRA's and HAVA's list-maintenance requirements satisfies the Privacy Act law enforcement exception regardless of whether either statute carries criminal penalties. The NVRA and HAVA are laws that the DOJ may enforce through "declaratory or injunctive relief." 52 U.S.C. § 20510(a) (NVRA); *id.* § 21111 (HAVA). Both Congress and the courts have recognized that "law enforcement" extends beyond "investigation of . . . criminal activity." *Jabara v. Webster*, 691 F.2d 272, 280 (6th Cir. 1982) (finding that 5 U.S.C. § 552a(e)(7)'s excep-

25

tion for authorized law-enforcement activities is not limited "to investigation of . . . criminal activity").

*Second*, even if the potential for criminal penalties were necessary (and they are not here), we understand that the Division further intends to use the voter-registration lists to identify those (including illegal aliens) who are ineligible to vote. "Congress has vested in the Attorney General the power to conduct the criminal litigation of the United States Government," *United States v. Nixon*, 418 U.S. 683, 694 (1974); *see also* 28 U.S.C. §§ 516, 533(1), 547(1), including the enforcement of federal statutes that ban voter fraud, *see* 18 U.S.C. § 1015(f); 52 U.S.C. § 20511(2). And by regulation, the Division has been delegated powers to assist in that effort. *See* 28 C.F.R. § 0.50(a).[26] Because the Division's proposed uses of the lists are "pertinent to and within the scope of an authorized law enforcement activity," 5 U.S.C. § 552a(e)(7), the Privacy Act permits the Division to retain them.

### 2.

At the time of the Division's demands, its collection of statewide voter registration lists also satisfied the Privacy Act's requirement that each agency maintaining a system of records shall "publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records"—that is, a SORN. *Id.* § 552a(e)(4). That "notice shall include," as relevant here, both "the categories of individuals on whom records are maintained in the system" and "the categories of records maintained in the system." *Id.* We understand, based on our conversations with CRT, that the Division intends to retain the lists sought in a system of records known as the "Central Civil Rights Division Index File and Associated Records" ("Central Index File"). *See* Privacy Act of 1974; Systems of Records, 68 Fed. Reg. 47,610, 47,611 (Aug. 11, 2003). Because a published SORN has covered both the categories of individuals who appear in the lists and the lists themselves, the Division's collection of the lists satisfies the Privacy Act's SORN requirements.

---

[26] By regulation, the Criminal Division enforces 18 U.S.C. § 611 and 52 U.S.C. § 10307. *See* 28 C.F.R. §§ 0.50(a)(1)–(2), 0.55(m)(1)–(2). Thus, we do not consider these statutes in our analysis of 5 U.S.C. § 552a(e)(7) as they apply to matters CRT enforces.

*Authority to Obtain and Share Statewide Voter Roll Data*

*First*, the SORN that announced the Central Index File's establishment states that "categories of individuals covered by the system . . . may include: [s]ubjects of investigations" and "victims." 68 Fed. Reg. at 47,611 (capitalization omitted). Both of these categories cover persons who appear in the lists.

The term "subject" is a "term[] of art in the context of DOJ investigations," *Am. Oversight v. DOJ*, 45 F.4th 579, 582 n.2 (2d Cir. 2022), which, for as long as the relevant SORN has existed, has included anyone whose "conduct is within the scope of the . . . investigation," Justice Manual § 9-11.151 (Jan. 2020), https://perma.cc/9HVT-HLZC.[27] Standing in contrast to a "target"—who is considered "a putative defendant" because of "substantial evidence" linking that individual to a crime, *id.*— a "subject's" conduct may be entirely "innocent." *Am. Oversight*, 45 F.4th at 594 n.19. "Here, the context of these words—the water in which they swim—indicates that [the SORN] used them as terms of art." *United States v. Hansen*, 143 S. Ct. 1932, 1943 (2023). The Justice Manual "sets forth internal [DOJ] policies and procedures" for all Department components, Justice Manual § 1-1.100 (Mar. 2024), https://perma.cc/9JXJ-2X9U—including the Division, the author of the SORN, *cf. id.* § 8-1.010. Context thus suggests that the SORN uses the term "subject" to mean a person whose conduct is within an investigation's scope.[28]

Persons who appear in a statewide voter registration list are "[s]ubjects of investigations," 68 Fed. Reg. at 47,611, as their voter registrations are within the scope of the Division's investigation into voter fraud. The Division has represented to us that it must examine every individual entry in a statewide voter registration list to determine whether the list satisfies

---

[27] *See* United States Attorneys' Manual § 9-11.150 (Oct. 1, 1990); United States Attorneys' Manual § 9-11.260 (Apr. 4, 1985). Because DOJ renamed *United States Attorneys' Manual* to *Justice Manual* in 2018, *see Justice Manual*, Dep't of Just., https://perma.cc/387L-XCEY, we refer to it herein as "the Manual."

[28] Even if "[s]ubjects of investigations" were *not* a term of art, 68 Fed. Reg. at 47,611, we would still look to the Manual. It "was compiled by experts in the field of federal prosecution for the guidance of professionals in that field," *In re North*, 11 F.3d 1075, 1077 (D.C. Cir. 1993), making its longstanding provisions represent "a body of experience and informed judgment to which [interpreters] may properly resort for guidance." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

50 Op. O.L.C. __ (May 12, 2026)

the NRVA's and HAVA's list-maintenance requirements. *Accord* 52 U.S.C. § 20507(a)(3)(B), (a)(4); *id.* § 21083(a)(2)(A)(ii), (a)(2)(B)(iii), (a)(5)(A), (b)(4)(A)(i)–(iii). These persons' registrations thus are "within the scope of the [Division's] investigation" of a state's compliance with the NVRA's and HAVA's list-maintenance requirements. Justice Manual § 9-11.151.

Moreover, legitimate voters who appear on these lists are the potential "victims" of voter fraud, 68 Fed. Reg. at 47,611, which "deprives, defrauds, or attempts to deprive or defraud the residents of a State of a fair and impartially conducted election process," 52 U.S.C. § 20511(a)(2). Their role in the electoral process suffers "unlawful 'dilution,'" *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 304–05 (1978) (opinion of Powell, J.) (citing *United Jewish Orgs. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144 (1977)), which can be severe enough to "affect the outcome of a close election," *Brnovich*, 141 S. Ct. at 2340. Although often downplayed in public discourse, courts have repeatedly recognized that "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell*, 549 U.S. at 4 (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).[29] As such, persons who appear legitimately in the voter-registration lists are potential victims within the SORN's meaning.

*Second*, the same SORN also covers the statewide voter registration lists themselves, which include "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the . . . Division." 68 Fed. Reg. at 47,611. For the reasons already discussed, these lists "relat[e]" to efforts by the Division to "enforce[] . . . civil rights laws." *Id.*; *see supra* Part II.A.1. The lists thus fall within the SORN's scope, satisfying this aspect of the Privacy Act.

A counterargument could be that the Division's proposed *collection* of the voter rolls does not satisfy the SORN requirement unless HSI's SORN

---

[29] *See also, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion); *Anderson v. United States*, 417 U.S. 211, 226–27 (1974); *Gray v. Sanders*, 372 U.S. 368, 379–81 (1963); *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 952 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008).

*Authority to Obtain and Share Statewide Voter Roll Data*

(or that of another component within DHS for that matter) similarly encompasses the lists' data. Not so. An agency must publish a new SORN whenever it "establish[es] or revis[es]" a "system of records," 5 U.S.C. § 552a(e)(4), a term defined in relevant part as "a group of any records under the control of any agency," *id.* § 552a(a)(5). The Division has represented to us that DOJ will access an account on DHS's Systematic Alien Verification for Entitlements system that DOJ controls and that belongs to DOJ for oversight and audit functions. DOJ will upload the files for a DHS employee to access individual records; no one at DHS will download the lists to a server or place them in a directory that it controls. If events occur as thus described, review of names from the lists would not appear to entail placing the lists in a DHS "system of records"—that is, a group of records under DHS's "control." *Id.* Because such read-only access neither "establish[es]" nor "revis[es]" a DHS "system of records," the lists need not fall within the scope of any DHS SORN at all. *Id.* § 552a(e)(4). The Division has thus complied with the only SORN requirement to which the demand is subject.

### 3.

The Division's efforts similarly do not run afoul of the Privacy Act's bar against the provision of information "for use in a computer matching program," *id.* § 552a(o)(1), as one commentator has suggested.[30] At a high level, a "matching program" involves "any computerized comparison" between either (i) federal and non-federal records to make certain eligibility or recoupment decisions "with respect to[] cash or in-kind assistance or payments under Federal benefit programs," or (ii) "two or more automated Federal personnel or payroll systems of records or a system of Federal personnel or payroll records with non-Federal records." *Id.* § 552a(a)(8)(A). The Privacy Act further defines the phrase "Federal benefit program" as encompassing "any program administered or funded by the Federal Government, or by any agent or State on behalf of the Federal Government, providing cash or in-kind assistance in the form of payments, grants, loans, or loan guarantees to individuals." *Id.* § 552a(a)(12).

---

[30] *See* Justin Levitt, *The Recent Rash of DOJ Voter File "Requests,"* Election L. Blog (July 18, 2025), https://perma.cc/9AHQ-GURL.

50 Op. O.L.C. __ (May 12, 2026)

As we understand the facts, the Division's efforts to obtain information from the states do not run afoul of this prohibition because the Division would not use such lists for any prohibited purpose. As the lists are not personnel or payroll records, they fall entirely outside section 552a(a)(8)(A)(ii). And, even if done electronically, collection and review of statewide voter registration lists to enforce the NVRA and HAVA have no conceivable connection to "cash or in-kind assistance or payments under Federal benefit programs," let alone to the recoupment of payments or debts thereunder. *Id.* § 552a(a)(8)(A)(i).

This conclusion is fully consistent with the Privacy Act's contemplation of matching programs that involve states, local governments, and agencies thereof. *See id.* § 552a(a)(11), (o)(1). Although a record in the possession of a state, local government, or agency thereof can be part of a matching program, the Privacy Act's limits on disclosure for use in a matching program apply only to records in the federal government's possession. This fact accords with the Privacy Act's goal of "protect[ing] the privacy of individuals identified in information systems maintained *by Federal agencies*." Privacy Act § 2(a)(5), 88 Stat. at 1896 (emphasis added). Thus, the Privacy Act does not preclude the Division from obtaining information from states under the present scenario.

**B.**

For similar reasons, the Driver's Privacy Protection Act does not prevent the Division from obtaining the statewide voter registration lists either. That statute provides that a state department of motor vehicles (or an affiliated person) "shall not knowingly disclose or otherwise make available . . . personal information . . . about any individual obtained by the department in connection with a motor vehicle record." 18 U.S.C. § 2721(a). Like the Privacy Act, however, it excepts disclosure "[f]or use by any government agency, including any . . . law enforcement agency, in carrying out its functions." *Id.* § 2721(b)(1). And, as just discussed, the Division intends to use the lists "in carrying out its functions," *id.*, of enforcing the NVRA's and HAVA's list-maintenance requirements.

**C.**

The E-Government Act similarly does not apply to the Division's efforts to obtain statewide voter registration lists. Section 208 of that

30

statute requires an agency to conduct, review, and, if practicable, publish a privacy-impact assessment before "initiating a new collection of information that . . . includes any information in an identifiable form permitting the physical or online contacting of [10 or more] specific" persons or entities.[31] E-Government Act § 208(b)(1)(A)(ii), 116 Stat. 2899, 2921–22 (codified at 44 U.S.C. § 3501 note). But the section 303 demands at issue here neither pose "questions" to nor impose "reporting requirements" on states. *See id.* Neither aspect of the E-Government Act applies here.[32]

*First*, the Division's section 303 demands do not pose "questions" to the states. *See id.* § 208(b)(1)(A)(ii)(II), 116 Stat. at 2921–22. Paradigmatic "questions" subject to section 208's requirements are those found on the decennial-census questionnaire. *See Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 99 (D.C. Cir. 2019). The section 303 demands do not ask, "What is all the information in your statewide voter registration list?" Rather, as noted above, they take the form of administrative subpoenas. *See supra* Part II.C. The distinction between subpoenas and interrogatories or deposition by written question is well known in the law. *See, e.g.*, *United States v. Clinesmith*, No. 2:23-CV-20063-DDC-1, 2025 WL 974262, at *5 & n.1 (D. Kan. Apr. 1, 2025); *Sekerke v. Arkwright*, No. 3:20-CV-01045-JO-AHG, 2023 WL 1453147, at *5 (S.D. Cal. Feb. 1, 2023). Congress is presumed to have acted deliberately and in full knowledge of that distinction when it declined to impose section 208 requirements on administrative subpoenas (and other devices of such a nature, whether or not formally styled as "subpoenas"). *See Gallardo ex rel. Vassallo v. Marstiller*, 142 S. Ct. 1751, 1761 (2022) ("We must also read [a statute's] text in light of background legal principles . . . .").

*Second*, the Division's section 303 demands do not impose "reporting requirements" on states. E-Government Act § 208(b)(1)(A)(ii)(II), 116 Stat. at 2921–22. Like the word "subject," *see supra* Part III.A.2, the phrase "reporting requirement" is a term of art that is well understood to

---

[31] Section 201 defines the term "persons" in section 208 to cover states. *See* E-Government Act §§ 201, 208(b)(1)(A)(ii)(II), 116 Stat. at 2910, 2921–22; 44 U.S.C. § 3502(10).

[32] For the avoidance of doubt, we do not suggest that, apart from these reasons, the E-Government Act may bar CRT's demands for information. We simply do not reach the questions, as they are unnecessary to our inquiry herein.

be conceptually distinct from a subpoena by courts;[33] by Congress, *see, e.g.*, 49 U.S.C. § 20107(a)(1); and by commentators, *see, e.g.*, Robert A. Mikos, *Can the States Keep Secrets from the Federal Government?*, 161 U. Pa. L. Rev. 103, 115 (2012). Although both can result in the provision of similar information, reporting requirements generally are fixed by law in advance to require certain people or entities to provide certain information under certain circumstances. *See, e.g.*, *District of Columbia v. Carter*, 409 U.S. 418, 429–30 n.25 (1973); *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 26–30 (1974); 31 U.S.C. § 5314; Homebuyers Privacy Protection Act, Pub. L. No. 119-36, § 4(b), 139 Stat. 493, 494 (2025). By contrast, although subpoenas can require ongoing production, they generally issue on an ad hoc basis as part of (or as prelude to) an enforcement action or other litigation, typically about something that happened in the past. *See* Fed. R. Civ. P. 45; Fed. R. Crim. P. 17. Because a section 303 demand is in essence a backward-looking subpoena, *see supra* Part II.C, it does not impose a forward-looking reporting requirement on a state.

Even if section 303 demands were deemed to pose "questions" to or impose "reporting requirements" on states, the E-Government Act still would not apply because the demands do not "initiat[e] a new collection of information" within section 208's meaning. E-Government Act § 208(b)(1)(A)(ii), 116 Stat. at 2921–22; *see also id.* § 201, 116 Stat. at 2910; 44 U.S.C. §§ 3502(3), 3518(c). Neither "initiating" nor "new" has a statutory definition provided by this statute. *See* 44 U.S.C. 3502. "Contemporary dictionaries define 'initiate' as '[t]o begin, commence, enter upon; to introduce, set going, give rise to, originate, "start" (a course of action, practice, etc.'" *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 356 F. Supp. 3d 85, 89 (D.D.C. 2019) (alteration in original) (citations omitted), *vacated and remanded on other grounds*, 928 F.3d 95 (D.C. Cir. 2019). The relevant definition of "new" is "[h]aving been made or come into being only a short time ago; recent" or "[n]ever used . . . before now." *The American Heritage College Dictionary* 936 (4th ed. 2002); *see also Merriam-Webster's Tenth* at 780 ("having existed or having been

---

[33] *See, e.g.*, *McLaughlin v. Kings Island, Div. of Taft Broad. Co.*, 849 F.2d 990, 995 (6th Cir. 1988); *United States v. D.F.*, 63 F.3d 671, 684 n.20 (7th Cir. 1995), *judgment vacated on other grounds*, 517 U.S. 1231 (1996); *Canal Refin. Co. v. Corrallo*, 616 F. Supp. 1035, 1037–38 (D.D.C. 1985).

*Authority to Obtain and Share Statewide Voter Roll Data*

made but a short time" or "different from one of the same category that has existed previously"). Here, the Division seeks information that states are already required to collect and maintain. *See* 52 U.S.C. § 21083(a)(1)(A); 44 U.S.C. § 3502(3)(A). As a result, the Division's demands for election-related information do not require states to introduce any recordkeeping or collection requirements that did not previously exist.

One could argue that the collection is new to the federal government even if states had already collected the information from their local governments. It is far from apparent to us that the transfer of data that has already been collected implicates the type of privacy interests that Congress had in mind. But even if it did, through a series of statutory cross-references, Congress has excluded most (if not all) federal enforcement proceedings. Specifically, section 208 takes its definition of "collection of information" from 44 U.S.C. § 3502(3), *see* E-Government Act § 201, 116 Stat. at 2910, which excludes any "collection of information described under section 3518(c)(1)," 44 U.S.C. § 3502(3)(B). Section 3518(c)(1) generally exempts from section 208 the collection of information in federal criminal investigations, *see id.* § 3518(c)(1)(A); civil actions to which the federal government or an agency is party, *see id.* § 3518(c)(1)(B)(i); and most "administrative action[s] or investigation[s]," *id.* § 3518(c)(1)(B)(ii). With that said, section 208 does apply "to the collection of information during the conduct of general investigations" outside of the antitrust context "undertaken with reference to a category of individuals or entities such as a class of licensees or an entire industry." *Id.* § 3518(c)(2). Apart from that proviso for general investigations, your inquiry would fall squarely into one of the three excluded categories. We do not think the general-investigations proviso, however, applies. Your inquiry is certainly widespread, but the phrasing of that proviso—and particularly the exclusion of antitrust actions—indicates that a "general investigation" of a class or industry refers to an investigation *of the group as a group* rather than widespread investigation of such a group or industry's members, such as your investigation in to HAVA and NVRA compliance by various states.[34]

---

[34] *See, e.g.*, 30 U.S.C. § 3 (empowering the Bureau of Mines to investigate the "mining, quarrying, metallurgical, and other mineral industries"); 43 U.S.C. § 316n (authoriz-

50 Op. O.L.C. __ (May 12, 2026)

## IV.

Finally, we have identified no impediment to the Division sharing with HSI or another unit within DHS—or DHS receiving—the statewide voter registration lists for the purpose of identifying individuals (including illegal aliens) who are ineligible to vote. Neither the Civil Rights Act itself nor the doctrine of equitable estoppel restricts the Division from sharing the lists.[35] The Privacy Act imposes certain restrictions, but the Division's proposed sharing can be done in a way that satisfies at least two of the statute's exceptions.

### A.

The Civil Rights Act imposes no limits on the Division's ability to share the statewide voter registration lists acquired pursuant to section 303 under circumstances presented here. Congress knows how to "establish[] an absolute prohibition on disclosure of information." *Telematch, Inc. v. U.S. Dep't of Agric.*, 45 F.4th 343, 352 (D.C. Cir. 2022). Congress also knows how to pass a statute under which "[d]isclosure . . . is prohibited unless for a purpose permitted by an exception." *Maracich v. Spears*, 570 U.S. 48, 52 (2013); *see also, e.g.*, *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 498–99 (1994); *United States v. Woodward*, 256 U.S. 632, 634 (1921). The CRA falls in the latter category: Although it generally prohibits disclosure of materials obtained pursuant to section 303, one of the exceptions available under the Privacy Act is disclosure "to . . . governmental agencies." 52 U.S.C. § 20704.

### B.

This analysis is not changed by the Division having represented to certain states that it would use their voter registration lists solely for list-

---

ing the Secretary of Agriculture to investigate the reindeer industry in Alaska); *cf.* 19 U.S.C. § 1862(b)(1)(A) (empowering the Secretary of Commerce to investigate the import of "articles" on national security).

[35] HAVA requires a state motor-vehicle authority to enter into an agreement with the Commissioner of Social Security for the purposes of verifying that applicable information is accurate, *see* 52 U.S.C. § 21083(a)(5)(B)(ii), and this agreement shall "include . . . safeguards to assure the maintenance of [such information's] confidentiality," 42 U.S.C. § 405(r)(9)(A)(ii). But nothing in either the Civil Rights Act or HAVA restricts CRT's ability to share voter registration lists obtained under section 303.

maintenance purposes. Any argument to the contrary would sound in equitable estoppel, which does not preclude the Division from using lists acquired in such a manner for other purposes.

"From [its] earliest cases," the Supreme Court has "recognized that equitable estoppel will not lie against the Government as it lies against private litigants." *OPM v. Richmond*, 496 U.S. 414, 419 (1990). The Court has acknowledged that arguments for "a flat rule that estoppel may not in any circumstances run against the Government" are "substantial." *Id.* at 423 (quoting *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984)). And although the Court has yet to adopt such a categorical rule in most contexts,[36] it has (1) declined to hold that even "some type of 'affirmative misconduct' might give rise to estoppel against the Government," *id.* at 421; (2) suggested that, at a minimum, "extreme circumstances" would be necessary in order to equitably estop the United States, *id.* at 434; and (3) "reversed every finding of estoppel" against the United States that it has reviewed, *id.* at 422.

Even if equitable estoppel could run against the government, a party cannot successfully invoke it against the United States "without at least demonstrating that the traditional elements of an estoppel are present." *Heckler*, 467 U.S. at 61. These include (among other things) that (1) the United States made "a definite misrepresentation of fact" upon which (2) the party seeking estoppel acted "in reasonable reliance," resulting in a "detrimental change in position." *Id.* at 59, 61. A state could not establish either in this circumstance.

*First*, based on the facts as we understand them, the states cannot show that the Division has made "a definite misrepresentation of fact," *id.* at 59, because there are no facts supporting any "allegation that [a federal] official knowingly misled" any state. *Statute of Limitations and Settlement of Equal Credit Opportunity Act Discrimination Claims Against the*

---

[36] The Supreme Court has suggested that estoppel will not lie against the United States "in matters of national and international concern." *Sanitary Dist. of Chi. v. United States*, 266 U.S. 405, 427 (1925); *see also United States v. California*, 332 U.S. 19, 39–40 (1947). Because a state cannot satisfy even the traditional elements of equitable estoppel here, as explained further in this Part, we do not consider whether a state's estoppel claim also would fail on the ground that it implicates matters of national concern. *See Rann v. Chao*, 346 F.3d 192, 197 (D.C. Cir. 2003); *United States v. Harvey*, 661 F.2d 767, 775 (9th Cir. 1981).

50 Op. O.L.C. __ (May 12, 2026)

*Department of Agriculture*, 22 Op. O.L.C. 11, 28 (1998) ("*Equal Credit*"); *see also, e.g.*, *Henshaw v. Bissell*, 85 U.S. (18 Wall.) 255, 271 (1874) (requiring "some degree of turpitude in his conduct which has misled others to their injury"). The Division has represented to us that it had no intention of using the statewide voter registration lists to identify illegal aliens for immigration enforcement at the time that it demanded these lists from states, and we are aware of no such intention today. There cannot be "estoppel by silence concerning facts of which defendants may have had no actual knowledge," *Wiser v. Lawler*, 189 U.S. 260, 270 (1903), because no one "knowingly misled" states regarding the purpose for seeking the lists, *see Equal Credit*, 22 Op. O.L.C. at 28.

*Second*, we do not think that the states can demonstrate a "detrimental change in position," *Heckler*, 467 U.S. at 59, resulting from any claimed misrepresentation by the Division. A party "cannot raise an estoppel without proving that it will be significantly worse off than if" the party it seeks to estop "had never" made the alleged misrepresentation in the first place. *Id.* at 63. Had the Division informed the states ahead of time that it would use their statewide voter registration lists to identify illegal aliens as well as others who are ineligible to vote, the states still would have needed to produce their lists to the Division upon its demand, for all the reasons that we have already explained above. *See supra* Parts II–IV.A. A party cannot, for example, estop the United States from recovering funds "to which [the party] was not entitled . . . in the first place," for the simple reason that the party is not made "significantly worse off than if it had never obtained the . . . funds in question." *Heckler*, 467 U.S. at 53, 61, 63. And of course, a state that refused to comply with the Division's section 303 demand plainly cannot show detrimental reliance.

## C.

By contrast, the Privacy Act *does* restrict the Division from "disclos[ing] any record" that falls within the Division's ambit "except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," unless an enumerated exception to the general prohibition on disclosure applies. 5 U.S.C. § 552a(b). But at least two such exceptions apply in this circumstance: the law-enforcement exception and the routine-use exception.

*Authority to Obtain and Share Statewide Voter Roll Data*

**1.**

Most directly on point, the Privacy Act authorizes disclosure for law-enforcement purposes. Specifically, it allows disclosure to a broad range of "agenc[ies]" or "instrumentalit[ies]" (1) "for a civil or criminal law enforcement activity" that (2) "is authorized by law," if (3) "the head of the agency or instrumentality has made a written request" that meets certain requirements. *Id.* § 552a(b)(7). Although we have not been provided a copy of any relevant request from HSI (or any other DHS unit), we see no reason why the Division sharing the voter registration lists could not be done in a way that satisfies each of these elements.

*First*, for many of the reasons already discussed, because HSI would use the voter registration lists to investigate voter fraud by (among others) illegal aliens, disclosure would be for a law-enforcement activity. *See supra* Part III.A.1; *see also, e.g.*, *United States v. Collins*, 596 F.2d 166, 169 (6th Cir. 1979); *Manivannan v. U.S. Dep't of Energy*, No. 2:18-CV-00297-MPK, 2024 WL 3046476, at *14 (W.D. Pa. June 18, 2024), *aff'd*, No. 24-2337, 2025 WL 1742785 (3d Cir. June 24, 2025); *Gonzalez v. United States*, No. 8:07-CR-00202-DOC-6, 2021 WL 9747618, at *4 (C.D. Cal. June 11, 2021); *SEC v. Dimensional Ent. Corp.*, 518 F. Supp. 773, 777 (S.D.N.Y. 1981).

*Second*, although an admittedly closer question, our view is that HSI is authorized by law to investigate such voter fraud. As already noted, the Attorney General is authorized to "conduct the criminal litigation of the United States Government." *Nixon*, 418 U.S. at 694. Prior to Congress's enactment of the Homeland Security Act, the Attorney General also had full authority, which he had delegated to the Immigration and Naturalization Service ("INS"), to "administer and enforce the Immigration and Nationality Act and all other laws relating to immigration (including but not limited to admission, exclusion, and deportation)," subject to certain limited exceptions not relevant here. 28 C.F.R. § 0.105(a) (2002); *see also* 8 C.F.R. § 100.2(a) (2002). Sections 611(a) and 1015(f) of title 18 to the U.S. Code, which criminalize voter fraud by illegal aliens and were enacted as part of IIRIRA, are in any reasonable sense "laws relating to immigration." 8 C.F.R. § 100.2(a) (2002); 28 C.F.R. § 0.105(a) (2002); *see also Coventry Health*, 581 U.S. at 96; *Milner*, 562 U.S. at 566 n.1; *Morales*, 504 U.S. at 383.

50 Op. O.L.C. __ (May 12, 2026)

The Homeland Security Act transferred from INS to the newly established DHS, as relevant here, the law-enforcement "functions performed under . . . [t]he investigations program." HSA § 441, 116 Stat. at 2192 (codified at 6 U.S.C. § 251); *see also* 6 U.S.C. § 542(a) (directing the President to transmit to certain congressional committees the corresponding reorganization plan for DHS). The Secretary of Homeland Security, in turn, delegated to Immigration and Customs Enforcement ("ICE") what had been "[INS's] interior enforcement functions, including. . . the investigations program." H.R. Doc. No. 108-32, at 3 (2003). As with many issues relating to the organization of DHS, the exact mechanisms are a bit messy.[37] But the upshot is that since 2003, *see Flores v. Bondi*, No. 2:85-CV-04544-DMG-AGR, 2025 WL 2995478, at *1 (C.D. Cal. Aug. 15, 2025) (recognizing that the 2003 reorganization plan remains in force), ICE has had the authority to investigate violations of 18 U.S.C. §§ 611(a) and 1015(f). Our understanding based on our conversations with the Division is that ICE has delegated such authority to HSI. For these reasons, HSI's investigation of voter fraud by illegal aliens "is authorized by law." 5 U.S.C. § 552a(b)(7).[38]

*Third*, the Division should have little difficulty satisfying the law-enforcement exception's procedural requirements. The exception authorizes disclosure of information to an agency "if the head of the agency" seeking the record "has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought." *Id.*

This requirement "assur[es] some high level evaluation of the need for the information," but is not particularly onerous. *Doe v. DiGenova*, 779 F.2d 74, 84 (D.C. Cir. 1985). The request must be in writing. *See United States Secret Service Use of the National Crime Information Center*, 6 Op. O.L.C. 313, 323 n.22 (1982); *Covert v. Harrington*, 876 F.2d 751,

---

[37] *See* Dep't of Homeland Sec., Delegation No. 7030.2, *Delegation of Authority to the Assistant Secretary for U.S. Immigration and Customs Enforcement* § 2(C) (Mar. 1, 2003), https://perma.cc/8X3S-J87F; *see also Umanzor-Chavez v. Noem*, No. 8:25-CV-01634-SAG, 2025 WL 2467640, at *5 (D. Md. Aug. 27, 2025); *Margallo-Gans v. USCIS*, No. 1:21-CV-02898-APM, 2024 WL 1212778, at *4 (D.D.C. Mar. 20, 2024).

[38] Because 6 U.S.C. § 251(4) authorizes DHS to investigate violations of 18 U.S.C. §§ 611(a) and 1015(f), we do not address here whether 8 U.S.C. § 1103(a)(1) and 19 U.S.C. § 1589a(3) do as well.

*Authority to Obtain and Share Statewide Voter Roll Data*

754 n.2 (9th Cir. 1989). And it should specify that DHS seeks the statewide voter registration lists for the purpose of investigating violations of 18 U.S.C. §§ 611(a) and 1015(f), and specifically to identify illegal aliens who have registered to vote or have voted. There are, however, several officials within DHS who can likely provide the request that the information be shared, as the Privacy Act's definition of "agency" includes both cabinet departments and their various components. *See Loc. 2855, Am. Fed'n of Gov't Emps. v. United States*, 602 F.2d 574, 578 n.5 (3d Cir. 1979); *Ramer v. Saxbe*, 522 F.2d 695, 697 (D.C. Cir. 1975); *cf. Tran v. Dep't of Treasury*, 351 F. Supp. 3d 130, 136–37 (D.D.C. 2019), *aff'd*, 798 F. App'x 649 (D.C. Cir. 2020).

In this instance, the Secretary of Homeland Security, the Senior Official Performing the Duties of the Director of ICE, and the Acting Executive Associate Director for HSI, or their designees, among others, may request the statewide voter registration lists from the Division under the law-enforcement exception. 5 U.S.C. § 552a(b)(7); 6 C.F.R. § 5.20(b)(1), (c). So long as any of these officials make the request, we believe that the request would satisfy the law-enforcement exception's requirements.

### 2.

Even apart from the law-enforcement exception, the Privacy Act authorizes disclosure of covered information "for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section." 5 U.S.C. § 552a(b)(3). As explained above, whenever an agency establishes or revises a system of records, it must publish a new SORN. *See supra* Part III.A.2. The SORN must include "each routine use of the records contained in the system, including the categories of users and the purpose of such use." 5 U.S.C. § 552a(e)(4)(D).

Because the Division's sharing of the voter rolls would comply with its longstanding SORN, it also complies with the routine-use exception to the Privacy Act. Specifically, the SORN for the Central Index File provides, in relevant part:

> A record maintained in this system of records may be disseminated as a routine use of such records as follows: . . . In the course of . . . the investigation or litigation of a case or matter, a record may be disseminated to a Federal . . . agency . . . if there is reason to believe

> that such agency . . . possesses information or has the expertise in an official or technical capacity . . . to analyze information relating to the investigation . . . and the dissemination is reasonably necessary to elicit such . . . information or expert analysis . . . .

68 Fed. Reg. at 47,611. Here, the Division is investigating, among other things, voter fraud, including by illegal aliens. *E.g.*, Dhillon Memorandum at 1 (citing 52 U.S.C. § 21083(a)(5)(A)(i)). As it is the entity charged with maintaining databases relating to illegal immigration, we see little doubt that DHS "possesses information or has the expertise in an official or technical capacity . . . to analyze information relating to the investigation." 68 Fed. Reg. at 47,611. And the Division does not have the capacity internally to identify illegal immigrants who are on states' voter rolls, so its sharing these lists with DHS also "is reasonably necessary to elicit such assistance, information or expert analysis." *Id.*

One counterargument is that this understanding of what use qualifies as routine runs against the principle recognized by the D.C. Circuit that an agency "may not utilize the 'routine use' exception to circumvent the mandates of the Privacy Act." *Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988). Although we have characterized that ruling as "reasonable" and "likely" to be "followed in future decisions," Memorandum for Donald L. Ivers, Acting General Counsel, Department of Veterans Affairs, from William P. Barr, Assistant Attorney General, Office of Legal Counsel, *Re: Interpretation of Subsections 552a(b)(3) and (b)(7) of the Privacy Act (5 U.S.C. § 552a) in Light of* Doe v. DiGenova*, 779 F.2d 74 (D.C. Cir. 1985) and* Doe v. Stephens*, 851 F.2d 1457 (D.C. Cir. 1988)* at 11 (Aug. 28, 1989), it must be read in conjunction with the principle that the very purpose of the routine-use exception is to enable disclosures "which would otherwise violate the [Privacy] Act," *Swenson v. U.S. Postal Serv.*, 890 F.2d 1075, 1078 (9th Cir. 1989).

Neither we nor the courts have elucidated a clear standard for when a routine use crosses the line to circumventing more specific provisions in the Privacy Act, but we do not understand CRT to be attempting to circumvent the law enforcement exception for at least three different reasons. *First*, we have already concluded that the more specific provision—the law-enforcement exception—is satisfied. *See supra* Part IV.C.1. *Second*, the normal concerns that inhere in circumvention are not present here because no one appears to be attempting to use the routine-use

exception to evade the limitations on the law-enforcement exception.[39] Instead, whereas the law-enforcement exception's purpose is to facilitate the receiving entity's own law-enforcement activity, *see* 5 U.S.C. § 552a(b)(7), the routine-use exception's purpose is to enable a receiving entity to assist the sharing agency's investigation, *see* 68 Fed. Reg. at 47,611. Because these provisions serve different purposes, relying on the routine-use exception would not circumvent the limits on the law-enforcement exception. *Third*, precisely because the routine-use exception only applies to facilitate the Division's *own* investigation, it is actually the *more* restrictive exception, as the law-enforcement exception allows the receiving agency to use the record for *any* authorized law-enforcement activity. *Compare* 68 Fed. Reg. at 47,611, *with* 5 U.S.C. § 552a(b)(7). Under such circumstances, circumvention is not a concern, and either exception will allow the Division to share the records with DHS.

## V.

In sum, we conclude that section 303 of the Civil Rights Act authorizes the Division to seek statewide voter registration lists from states. Moreover, the Privacy Act, Driver's Privacy Protection Act, and E-Government Act do not limit that authority. Finally, no other legal restriction impedes the Division from sharing the lists with DHS as part of its effort to identify individuals who are ineligible to vote, including—in DHS's specific jurisdiction—illegal aliens.

LANORA C. PETTIT
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[39] *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 131 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010); *G. & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 40 (1st Cir. 1980); *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 990 (D.C. Cir. 1973); *United States v. Amalgamated Sugar Co.*, 48 F.2d 156, 158 (10th Cir. 1931); *Barnsdall v. Owen*, 200 F. 519, 522 (8th Cir. 1912).